DEAN S. KRISTY (CSB NO. 157646)
dkristy@fenwick.com
JENNIFER C. BRETAN (CSB NO. 233475)
jbretan@fenwick.com
FENWICK & WEST LLP
555 California Street, 12th Floor
San Francisco, CA 94104
Telephone: (415) 875-2300
Facsimile: (415) 281-1350

Attorneys for Defendants Tesla, Inc.,
Elon R. Musk, and Deepak Ahuja

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| GREGORY WOCHOS, Individually and on Behalf of All Others Similarly Situated, | Case No.: 3:17-cv-05828-CRB |
| Plaintiff, | **NOTICE OF MOTION AND MOTION TO DISMISS AMENDED COMPLAINT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF** |
| v. | |
| TESLA, INC., ELON R. MUSK, DEEPAK AHUJA, and JASON WHEELER, | Date: August 31, 2018<br>Time: 10:00 a.m.<br>Dept.: Courtroom 6, 17th Floor<br>Judge: Hon. Charles R. Breyer |
| Defendants. | Date Action Filed: October 10, 2017 |

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

# TABLE OF CONTENTS

**Page**

NOTICE OF MOTION AND MOTION TO DISMISS ....................................................... vi

ISSUES TO BE DECIDED ............................................................................................ vi

SUMMARY OF ARGUMENT ....................................................................................... vi

I.    INTRODUCTION ............................................................................................... 1

II.   STATEMENT OF FACTS .................................................................................. 6

      A.    Tesla, Its Mission, And Model 3 ............................................................ 6

      B.    Tesla's Extensive Disclosures Regarding Model 3 Production Challenges .......... 8

      C.    As Early-Stage Production Begins To Ramp, Tesla Encounters Unexpected
            Bottlenecks In The Module Line and Promptly Discloses The Problem............. 10

      D.    This Suit ............................................................................................. 12

III.  PLAINTIFFS' CLAIM IS SUBJECT TO STRICT PLEADING REQUIREMENTS..... 12

IV.   PLAINTIFFS FAIL TO PLEAD ANY FALSE OR MISLEADING STATEMENT ...... 13

      A.    There Was No Misstatement or Omission on May 3, 2017................................. 13

      B.    There Was Also No Misstatement or Omission on August 2, 2017. ................... 17

V.    PLAINTIFFS HAVE NOT AND CANNOT PLEAD FACTS GIVING RISE TO A
      STRONG, COGENT, AND COMPELLING INFERENCE OF SCIENTER................. 19

      A.    Plaintiffs' Theory Of Fraud Makes No Sense And Is Overwhelmed By Facts
            Establishing Tesla's Genuine Belief In Its Model 3 Plans................................... 20

      B.    The Former Employee Allegations Offer Nothing To Establish Scienter ........... 22

VI.   PLAINTIFFS HAVE NOT ADEQUATELY PLEADED LOSS CAUSATION ............. 24

VII.  CONCLUSION .................................................................................................. 25

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

NOTICE OF MOT. AND MOT. TO DISMISS
AMENDED COMPLAINT AND MPA IN SUPPORT

i

CASE NO.: 3:17-cv-05828-CRB

**CASES**

*3226701 Canada, Inc. v. Qualcomm, Inc.*,
  2017 WL 4759021 (S.D. Cal. Oct. 20, 2017) ...................................................16

*Allison v. Brooktree Corp.*,
  999 F. Supp. 1342 (S.D. Cal. 1998) ......................................................... viii, 18

*Brodsky v. Yahoo! Inc.*,
  592 F. Supp. 2d 1192 (N.D. Cal. 2008) .......................................................22

*Brody v. Transitional Hosp. Corp.*,
  280 F.3d 997 (9th Cir. 2002)...............................................................13, 18

*Callan v. Motricity*,
  2013 WL 5492957 (W.D. Wash. Oct. 1, 2013), *aff'd*, 649 F. App'x 526 (9th Cir. 2016) .......16

*City of Royal Oak Ret. Sys. v. Juniper Networks, Inc.*,
  880 F. Supp. 2d 1045 (N.D. Cal. 2012) .......................................................25

*Coyler v. Acelrx Pharms., Inc.*,
  2015 WL 7566809 (N.D. Cal. Nov. 25, 2015)..............................................13, 19

*Dura Pharms., Inc. v. Broudo*,
  544 U.S. 336 (2005)............................................................................24

*Haque v. Tesla Motors, Inc.*,
  2017 WL 448594 (Del. Ch. Feb. 2, 2017) ................................................17, 21

*Hong v. Extreme Networks, Inc.*,
  2017 WL 1508991 (N.D. Cal Apr. 27, 2017) ............................................16, 17

*In re Accuray, Inc. Sec. Litig.*,
  757 F. Supp. 2d 936 (N.D. Cal. 2010) ........................................................24

*In re Allied Nevada Gold Corp. Sec. Litig.*,
  2016 WL 4191017 (D. Nev. Aug. 8, 2016) ...................................................16

*In re Am. Apparel, Inc. S'holder Litig.*,
  855 F. Supp. 2d 1043 (C.D. Cal. 2012)...................................................14, 16

*In re Cutera Sec. Litig.*,
  610 F.3d 1103 (9th Cir. 2010).............................................................13, 17

*In re Dot Hill Sys. Corp. Sec. Litig.*,
  594 F. Supp. 2d 1150 (S.D. Cal. 2008) .......................................................20

*In re Downey Sec. Litig.*,
  2009 WL 2767670 (C.D. Cal. Aug. 21, 2009) ................................................24

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

Page(s)

*In re Foundry Networks, Inc. Sec. Litig.*,
   2003 WL 22077729 (N.D. Cal. Aug. 29, 2003)....................................................16

*In re Fusion-io, Inc. Sec. Litig.*,
   2015 WL 661869 (N.D. Cal. Feb. 12, 2015)......................................................15

*In re Nimble Storage, Inc. Sec. Litig.*,
   252 F. Supp. 3d 848 (N.D. Cal. 2017) ...........................................................16

*In re Omnicom Grp. Inc. Sec. Litig.*,
   597 F.3d 501 (2d Cir. 2010)........................................................................25

*In re Quality Sys., Inc. Sec. Litig.*,
   865 F.3d 1130 (9th Cir. 2017)......................................................................16

*In re Rigel Pharm., Inc. Sec. Litig.*,
   697 F.3d 869 (9th Cir. 2012) ................................................................ viii, 20

*In re Sierra Wireless, Inc. Sec. Litig.*,
   482 F. Supp. 2d 365 (S.D.N.Y. 2007)............................................................16

*In re Silicon Graphics, Inc. Sec. Litig.*,
   183 F.3d 970 (9th Cir. 1999).......................................................................19

*In re Silicon Image, Inc. Sec. Litig.*,
   2007 WL 2778414 (N.D. Cal. Sept. 21, 2007), *aff'd*, 325 F. App'x 560 (9th Cir. 2009)........22

*In re Tesla Motors, Inc. Sec. Litig.*,
   75 F. Supp. 3d 1034 (N.D. Cal. 2014), *aff'd*, 671 F. App'x 670 (9th Cir. 2016) ...................13

*In re Vantive Corp. Sec. Litig.*,
   110 F. Supp. 2d 1209 (N.D. Cal. 2000), *aff'd*, 283 F.3d 1079 (9th Cir. 2002).......................12

*In re Wet Seal, Inc. Sec. Litig.*,
   518 F. Supp. 2d 1148 (C.D. Cal. 2007)..........................................................20

*In re Worlds of Wonder Sec. Litig.*,
   35 F.3d 1407 (9th Cir. 1994)................................................................. viii, 20

*In re Yahoo!, Inc. Sec. Litig.*,
   2012 WL 3282819 (N.D. Cal. Aug. 10, 2012), *aff'd*, 611 F. App'x 387
   (9th Cir. 2015) ...............................................................................18, 19

*Loos v. Immersion Corp.*,
   762 F.3d 880 (9th Cir. 2014)................................................... ix, 7, 13, 24

*M&M Hart Living Trust v. Global Eagle Entm't, Inc.*,
   2017 WL 5635425 (C.D. Cal. Oct. 30, 2017) .....................................................16

*Matrixx Initiatives, Inc. v. Siracusano*,
   131 S. Ct. 1309 (2011) ............................................................................13

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

Page(s)

*Metzler Inv. GmbH v. Corinthian Colls., Inc.*,
   540 F.3d 1049 (9th Cir. 2008).................................................................. viii, 12, 20, 24

*Meyer v. Greene*,
   710 F.3d 1189 (11th Cir. 2013)........................................................................................25

*Mineworkers' Pension Scheme v. First Solar, Inc.*,
   881 F.3d 750 (9th Cir. 2018)............................................................................................24

*Omnicare v. Laborers Dist. Council Constr. Indus. Pension Fund*,
   135 S. Ct. 1318 (2015) ....................................................................................................15

*Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*,
   2012 WL 1868874 (N.D. Cal. May 22, 2012), *aff'd*, 759 F.3d 1051 (9th Cir. 2010).........15, 24

*Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*,
   759 F.3d 1051 (9th Cir. 2010) ............................................................... viii, 13, 15

*Pompano Beach Police & Firefighters Ret. Sys. v. Las Vegas Sands Corp.*,
   2018 WL 2015510 (9th Cir. May 1, 2018) ........................................... viii, 14, 15

*Rok v. Identiv, Inc.*,
   2018 WL 807147 (N.D. Cal. Feb. 9, 2018), *aff'd*, 716 F. App'x 663 (9th Cir. 2018)..............24

*Ronconi v. Larkin*,
   253 F.3d 423 (9th Cir. 2001)................................................................. viii, 16, 21

*Schuster v. Symmetricom, Inc.*,
   2000 WL 33115909 (N.D. Cal. Aug. 1, 2000)..................................................................21

*Shurkin v. Golden State Vintners Inc.*,
   471 F. Supp. 2d 998 (N.D. Cal. 2006), *aff'd*, 303 F. App'x 431 (9th Cir. 2008) ...................22

*Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*,
   552 U.S. 148 (2008) ........................................................................................................12

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
   551 U.S. 308 (2008) ............................................................................. viii, 13, 19, 20

*Webb v. SolarCity Corp.*,
   884 F.3d 844 (9th Cir. 2018)............................................................................... *passim*

*Xu v. ChinaCache Int'l Holdings, Ltd.*,
   2017 WL 114401 (C.D. Cal. Jan. 9, 2017) ........................................... viii, 14, 16

*Zack v. Allied Waste Indus., Inc.*,
   2005 WL 3501414 (D. Ariz. Dec. 15, 2005), *aff'd*, 275 F. App'x 722 (9th Cir. 2008)............21

*Zucco Partners, LLC v. Digimarc Corp.*,
   552 F.3d 981 (9th Cir. 2009)................................................................................13, 22

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

NOTICE OF MOT. AND MOT. TO DISMISS
AMENDED COMPLAINT AND MPA IN SUPPORT
    iv
    CASE NO.: 3:17-cv-05828-CRB

**STATUTES**

15 U.S.C. § 78u-4(a)(3)(B)(v) ...................................................................................12

15 U.S.C. § 78u-4(b)(1) ...........................................................................................12

15 U.S.C. § 78u-5(c)(1)(A)(i) ..................................................................................13

Private Securities Litigation Reform Act of 1995 ("PSLRA")........................... vi, 12, 13

Federal Rules of Civil Procedure
  Rule 9(b) ........................................................................................... vi, 12
  Rule 12(b)(6) ............................................................................................ vi

Securities Exchange Act of 1934
  Section 10(b) ................................................................................ vi, 12, 25
  Section 20(a) ................................................................................ vi, 12, 25

**OTHER AUTHORITIES**

A. Cole, *Woes Mounting for Recalled 2017 Chrysler Pacifica Hybrid Minivan,*
  Wash. Post., June 28, 2017 ......................................................................7

C. Rogers, *Glitches Delayed Sale of New Ford F-150 Pickup Trucks,*
  Wall. St. J., Dec. 6, 2016.........................................................................7

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

## NOTICE OF MOTION AND MOTION TO DISMISS

PLEASE TAKE NOTICE that on August 31, 2018, at 10:00 a.m., in the courtroom of the Honorable Charles R. Breyer of the United States District Court for the Northern District of California, defendants Tesla, Inc. ("Tesla" or the "Company"), Elon R. Musk, and Deepak Ahuja will, and hereby do, move to dismiss the Amended Class Action Complaint for Violation of the Federal Securities Laws (the "Amended Complaint" or "AC").  Defendants move pursuant to Rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure and the Private Securities Litigation Reform Act of 1995 ("PSLRA") on the grounds that plaintiffs fail to state a claim for violation of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934.  This motion is based on the Memorandum of Points and Authorities below, defendants' Request for Judicial Notice, the Declaration of Jennifer C. Bretan ("Bretan Declaration") and attached exhibits[1], the [Proposed] Order, the arguments of counsel, and any other matters properly before the Court.

## ISSUES TO BE DECIDED

1.      Should the Section 10(b) claim be dismissed because plaintiffs have (i) failed to allege specific facts showing that any defendant made a false or misleading statement, (ii) failed to plead particularized facts giving rise to the strong, cogent and compelling inference of scienter the law demands, and (iii) failed to plead loss causation by linking any decline in Tesla's stock price to a disclosure "correcting" any supposed misstatement?

2.      Should the Section 20(a) control person claim be dismissed because plaintiffs have failed to plead a primary violation of Section 10(b)?

## SUMMARY OF ARGUMENT

This lawsuit relates to Tesla's efforts to introduce and ramp production of Model 3, its first mass market all-electric vehicle, in Q3 2017.  Tesla's disclosures about the challenges it would face in bringing its factories, suppliers and first-of-their-kind production processes up to speed to produce Model 3 were frank and in plain language.  It told the world it was entering "production hell" and faced "an incredibly difficult production ramp."  Tesla's production guidance for that initial quarter was modest.  Although it spent billions of dollars to procure

---

[1] Unless otherwise noted, references to Exhibits ("Ex.") are to the Bretan Declaration.

equipment that was designed to build 5,000 vehicles per week, it projected making 1,500 Model 3s that initial quarter, and only later expected to ramp to a run-rate of 5,000 vehicles per week by the end of 2017.

Despite Tesla's belief in its goals and best efforts to achieve them, it ran into unexpected production bottlenecks as Q3 progressed and fell short of its 1,500 guidance (producing just 260 cars) – developments it promptly disclosed on October 2, 2017.  As detailed further in Tesla's report of Q3 results on November 1, 2017, the primary constraint was Tesla's highly automated battery module line, certain zones of which did not perform as expected once they came online in Q3.  Because Tesla had to rewrite the software for the line, which had been built by a leading outside robotics supplier, and this would take time, it deferred its goal of reaching 5,000 vehicles per week to 2018.  Plaintiffs do not claim that Tesla's guidance was false or misleading, recognizing that it is protected by the PSLRA's safe harbor.  Instead, plaintiffs take issue with Tesla's statements in May and August that "production preparations" were "on track" to achieve its forecasted goals, which they say misstated the "then-current state of affairs."  However, both statements were made well before problems with the module line surfaced – which plaintiffs' FEs concede was not until September 2017.  Specifically, the May 3, 2017 statement was two months before production even began and four months before the problems emerged.  The August 2, 2017 statement was just days after production started and at least a month before problems emerged.  The Amended Complaint is classic fraud by hindsight and fails for at least three basic reasons.

*First,* plaintiffs have no facts showing that Tesla's statements were false or misleading.  Instead, plaintiffs rely on a false narrative, alleging that aspects of Tesla's highly automated production process had not been installed by May 3 or August 2, 2017, and that this must mean that Tesla was not "on track."  But Tesla never said its preparations were "done" on either date.  In fact, it said the opposite: that it had "started" the installation of manufacturing equipment, the process was "continuing," that it would "increase automation and production capacity as the year progressed," and that it needed to "complete implementation" to reach its targeted volume.  *See Pompano Beach Police & Firefighters Ret. Sys. v. Las Vegas Sands Corp.*, 2018 WL 2015510, at

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1  *2 (9th Cir. May 1, 2018) (no misstatement where progress was accurately described).  That

2  alone is dispositive.  Moreover, the claim also fails because plaintiffs have not alleged facts

3  detailing the production plan, including when various automated processes were scheduled to be

4  fully implemented, and when and how production was expected to ramp to hit Tesla's goals

5  compared to Tesla's actual progress.  Indeed, plaintiffs cannot possibly show that Tesla was "off

6  track" without alleging such facts.  *See Xu v. ChinaCache Int'l Holdings, Ltd.*, 2017 WL 114401,

7  at *6 (C.D. Cal. Jan. 9, 2017) (claim fails because plaintiff does not allege a timeline against

8  which the "on track" claim might be verified).  In any event, the assailed statements are forward-

9  looking – they concern preparations "to support the ramp to 5,000 by year end" – and as such are

10  protected by the safe harbor.  *See Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d

11  1051, 1059 (9th Cir. 2010).

12  *Second,* plaintiffs fail to plead specific facts giving rise to a strong, cogent and compelling

13  inference of scienter.  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2008);

14  *Webb v. SolarCity Corp.*, 884 F.3d 844, 850 (9th Cir. 2018).  Far from downplaying risks, Tesla

15  bluntly warned of the many challenges of Model 3 production in stark terms, which is

16  irreconcilable with scienter.  *See In re Worlds of Wonder Sec. Litig.*, 35 F.3d 1407, 1425 (9th Cir.

17  1994).  Plaintiffs also do not allege what any defendant supposedly gained by virtue of this

18  supposed short-term "fraud."  No defendant sold Tesla stock or is alleged to have received any

19  benefit at all, which also weighs heavily against scienter.  *See In re Rigel Pharm., Inc. Sec. Litig.*,

20  697 F.3d 869, 884-85 (9th Cir. 2012); *Metzler Inv. GmbH v. Corinthian Colls., Inc.*, 540 F.3d

21  1049, 1067 (9th Cir. 2008).  In fact, Mr. Musk's compensation plan, which was negotiated during

22  the class period, is tied to long-term goals, not near-term production rates.  Viewed holistically, as

23  the law requires, challenges like the ones Tesla encountered at the beginning of production are

24  hardly rare in complex manufacturing and Tesla was up front and explicit in disclosing the

25  challenges it faced.  That is transparency, not fraud.  *See Ronconi v. Larkin*, 253 F.3d 423, 434

26  (9th Cir. 2001) ("problems and difficulties are the daily work of business people.  That they exist

27  does not make a lie out of any of the alleged false statements"); *Allison v. Brooktree Corp.*, 999 F.

28  Supp. 1342, 1348 (S.D. Cal. 1998) ("[i]n bringing any high-tech product to market, problems

1    encountered . . . are the norm, not the exception" and do not support a securities fraud claim).

2           *Third,* plaintiffs have not pleaded loss causation.  The alleged "corrective" disclosures

3    either resulted in an increase in Tesla's stock price or were not corrective at all.  *See Loos v.*

4    *Immersion Corp.*, 762 F.3d 880, 887 (9th Cir. 2014).

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

## I.    INTRODUCTION

When Tesla began production of the all-new Model 3 in late July 2017, it was venturing into unchartered territory.  No other automobile company had ever before attempted to introduce a mass market all-electric vehicle.  Yet, despite being only the third vehicle model Tesla ever produced in any meaningful volume, that is what the Company set out to do.  And it was doing so using a never-before-tried manufacturing system consisting of an extraordinary amount of automation spanning across two factories, including the brand-new Gigafactory it had just built in Sparks, Nevada.  If the ten-year Model 3 program were a 100-yard football field, the beginning phase of the production ramp was the first yard.  Recognizing this, Tesla's production guidance for that initial quarter (Q3 2017) was modest:  it projected making a total of 1,500 Model 3 cars in that three month period, as early production efforts were just getting underway, and indicated that it expected to ramp to a run-rate of 5,000 vehicles a week by the end of 2017, as Tesla continued to install and bring new volume manufacturing systems online.

Tesla had a plan to meet those targets and believed it would do so.  Indeed, it spent billions of dollars buying manufacturing equipment that was specifically designed to achieve its targeted production rate.  But given the enormity of the Model 3 undertaking and the lack of certainty around precisely how long it would take to ramp up, it provided a host of blunt, plain-English warnings about the likely challenges.  At the Model 3 live broadcast launch event on July 28, 2017, when it delivered the very first production vehicles before online viewers worldwide, Tesla's CEO, Elon Musk, pointedly warned that Tesla was entering "***production hell,***" and that substantial production challenges almost certainly lay ahead "***over the next six to nine months***."  He cautioned that, with "ten thousand unique items" in Model 3, "the production rate will move as fast as the slowest and least luck[y] component in the whole mix," and "[t]hen on top of that, we have the Gigafactory" and associated challenges ramping production at that new facility.  Mr. Musk reiterated the sentiment just a few days later, on Tesla's August 2, 2017 earnings call, stating that "***[w]hat we have ahead of us, of course, is an incredibly difficult production ramp.***"

These sobering words are the opposite of what one would say if trying to provide an overly rosy view of the future, as plaintiffs claim.  They also did not exist in isolation.  Rather,

they echoed statements Tesla had been making for more than a year: that the outset of Model 3 production starting in Q3 2017 would be "*complicated and bumpy and dealing with a lot of unexpected issues*" and thus "*very uncertain*." As Mr. Musk repeatedly stated, it is "*just fundamentally impossible to predict* [the production ramp]. *It's crazy hard.*" This was particularly true, he explained, given the high level of automation Tesla required to reach its Model 3 goals: "*[P]roduction is a hard thing . . . Particularly when it's new technology . . . It's cutting edge technology, it's really hard to scale up production, because you've got to design the machine that makes the machine, not just the machine itself.*" Thus, Tesla's statements were not a promise that production would proceed flawlessly, that the new highly automated systems would operate as expected, or that it would execute as planned. There simply were no guarantees when commencing production of a brand new car utilizing new high-tech manufacturing processes that no one had ever tried before.

Despite best efforts, Tesla was not immune to the production challenges it had repeatedly disclosed. On October 2, 2017, it announced that it had encountered unexpected bottlenecks as it attempted to ramp early-stage production and was only able to produce 260 cars in Q3. As detailed in Tesla's report of Q3 results on November 1, 2017, the primary constraints were two of four zones in its automated battery module line at the Gigafactory that did not perform as expected once they came online in Q3. Although designed and built by a well-respected robotics supplier, Tesla ultimately determined that it would need to rewrite the software for the line, causing it to defer its goal of reaching a run-rate of 5,000 vehicles per week to 2018. In other words, Tesla revised its guidance because of the type of challenge about which it had warned.

This securities fraud lawsuit was filed one week after the October 2 announcement. It assails statements Tesla made on two dates, both statements occurring *well before* problems with the module line surfaced in Q3: May 3, 2017 (months before Model 3 production even began) and August 2, 2017 (mere days after it started). Ignoring all surrounding context, plaintiffs focus on Tesla's statements on those days that "production preparations" were "on track" to achieve its forecasted goals. Notably, plaintiffs do not claim that Tesla's guidance itself was false or misleading (nor could they, as the guidance is plainly protected by the safe harbor for forward-

Fenwick & West LLP
Attorneys at Law
San Francisco

Notice of Mot. and Mot. To Dismiss
Amended Complaint and MPA In support
2
Case No.: 3:17-cv-05828-CRB

looking statements). Instead, they strain to plead around the safe harbor by portraying their claim about "on track" statements as concerning "the then-current state of affairs" rather than guidance. Regardless of how it is characterized, however, the claim is fatally flawed because it lacks any factual basis and ignores virtually everything Tesla actually disclosed about producing Model 3.

**No Falsity.** When Tesla's actual statements are evaluated, it becomes readily apparent that plaintiffs have no case. Rather than address those statements, the Amended Complaint offers a false narrative, variously alleging that aspects of Tesla's highly automated production processes were not fully installed or operational as of May 3 and August 2, 2017, and that this must mean that "production preparations were not on track." This is pure fiction. Tesla's disclosures explicitly noted that *installation was continuing* as of both dates, *not complete.* In fact, in May, Tesla said it had only "*started* the installation of Model 3 manufacturing equipment," was "on-track for start of . . . production in July 2017" (a target Tesla hit), and would "increase automation and add production capacity" as the year progressed. In August, just after production began, Tesla said it was "*continuing preparations* at our production facilities," that for the ramp to be successful "we will need to *complete the implementation* and ramp of efficient, automated . . . manufacturing capabilities, processes and supply chains necessary to support [high] volumes," that "[o]ur ability to achieve these plans will depend . . . [on] our ability to *add* production lines and capacity as planned," and that Tesla was still procuring equipment for Model 3 production. In other words, Tesla made clear that it was not yet done, and that it would need to implement and complete more work to reach its targeted volume in Q3 and by year end. That alone defeats plaintiffs' claim.

Even if Tesla had not made those express disclosures, the claim would fail. For production to be "off track," plaintiffs had to plead specific facts regarding the details of the *production plan as it stood on May 3 and August 2, 2017* – including the timelines when various machines and processes were supposed to be installed, activated and operational *compared to* when they actually were installed, activated and operational. Plaintiffs make no effort to provide *any* of those facts, and thus offer *no basis* for asserting that Tesla's statements conflict in any way with its actual progress.

Fenwick & West LLP
Attorneys at Law
San Francisco

1  **No Scienter.**  Also fatal is the absence of well-pleaded facts that even remotely give rise

2  to the strong, cogent and compelling inference of scienter the law demands.  There is no blueprint

3  for what Tesla was undertaking with the Model 3 ramp.  It was the first of its kind and difficulties

4  were likely to occur once the Model 3 production ramp got underway, especially given the high

5  level of automation envisioned, the newness of the Gigafactory, the need to coordinate and work

6  in cadence with a vast supply chain to build an all-new electric car, and the disclosed fact that

7  Tesla had no experience with high-volume manufacturing.  Far from downplaying those risks,

8  Tesla specifically warned of them in the most direct terms.  Tesla's contemporaneous disclosures

9  that it was entering "production hell" and faced "an incredibly difficult production ramp," and its

10  other consistent warnings about "inevitable" and "unavoidable" problems, are anything but the

11  types of statements one would make if trying to mislead investors or instill false confidence about

12  early Model 3 production.[2]

13  Ignoring these disclosures, which themselves defeat scienter, plaintiffs rely on an

14  incoherent theory of fraud in which they posit that Model 3 was of such "existential importance"

15  to Tesla that it could not afford a production glitch.  However, if Tesla could not afford a

16  production glitch, the last thing it would do is temporarily lie about being "on track," knowing

17  that the lie would be revealed almost immediately – in the very first quarter of production.  That

18  theory makes no sense. And rather than seizing the opportunity to take "advantage" of this

19  supposed short-term "fraud" under plaintiffs' theory, no defendant is alleged to have sold stock or

20  otherwise received any benefit.  None.  Rather, during the class period, Mr. Musk negotiated a

21  compensation plan tied to meeting the long-term goals he set for Model 3 and Tesla, not short

22  term stock performance or production rates.  This too weighs heavily against scienter.

23  Production challenges are exceedingly common in automobile manufacturing, even for

24  long-established companies utilizing far less innovative processes.  Encountering a problem does

25  not make a lie out of an earlier statement.  And Tesla's good faith belief in the Model 3 program

---

26  [2] Plaintiffs originally claimed a supposed "fraud" reaching back to May 4, 2016, more than a year
before Tesla even started production.  Recognizing how frivolous that assertion was, they jettison

27  those claims (now asserting a class period starting May 3, 2017) but still purport to plead facts
relating to each of Tesla's quarterly conference calls, shareholder letters and SEC filings dating

28  back to May 4, 2016 (and in certain instances even earlier) as background.  Because they are
referenced in the AC, and are also subject to judicial notice, the Court may consider them here.

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1  is reflected in everything it has done: the $4 billion it invested in the program, the buildout of the

2  Gigafactory (already one of the world's largest buildings), and the equipment and processes it

3  commissioned to support high volume production.  The only rational, reasonable inference to

4  draw from these actions is that Tesla believed in earnest that it could reach its Model 3 goals, had

5  a plan in place to ramp production to do so, disclosed in advance that there were serious risks it

6  would face along the way, and then experienced the very sorts of difficulties it had warned about

7  as production progressed during the quarter.  Viewed holistically, there is no cogent or

8  compelling inference of scienter on these facts.

9           Nor do any of the eleven anonymous former employees, temporary or contract workers

10  ("FEs") on whom plaintiffs rely come close to establishing scienter. Several left in 2016 or early

11  2017, many months and in some cases more than a year before Model 3 production even began.

12  Furthermore, not one FE could know anything about whether Tesla was "off track": none claims

13  to have been involved in production planning, purports to know what the production plan was or

14  how or when Model 3 production was supposed to ramp, explains how Tesla allegedly was

15  falling short of its plans, or offers anything else to suggest that Tesla's statements on May 3 or

16  August 2, 2017 were false or misleading.  If anything, the FE allegations backfire.  The only two

17  who claim to have any pertinent information (FE8 and FE9) actually corroborate Tesla's

18  explanation of what happened: issues with the Gigafactory's battery module line ***manifested in***

19  ***September 2017*** and it suffered from "automation-related malfunctions" and troubles with robotic

20  programming.  Other FEs, viewed most charitably, describe problems within their narrow

21  windows of responsibility, but tellingly ***do not*** assert that those areas were the actual constraints

22  that caused the Q3 miss.  Recognizing this, plaintiffs feature their star witness, FE1, a former

23  manufacturing employee, right up front.  FE1 claims to have told Mr. Musk "directly" that Tesla

24  could not produce 5,000 Model 3s per week by the end of 2017.  The Amended Complaint

25  admits, however, that FE1 was fired in June 2016 – ***more than a year before*** Model 3 production

26  began – and so could not possibly know about Tesla's manufacturing capabilities or plan a year

27  later.  Moreover, the basis for FE1's speculation that Tesla could not achieve 5,000 cars per week

28  within a year-and-a-half was predicated on a demonstrably false premise: that Tesla would not

even "*start*" manufacturing until at least six months after July 2017. But FE1 is flatly wrong. *Tesla did* start Model 3 production in July 2017.

**No Loss Causation.** Finally, plaintiffs have not adequately pleaded loss causation. They reference three "corrective" disclosures, but none supports a claim. The first was Tesla's October 2, 2017 disclosure of Model 3 bottlenecks and the production shortfall. This news hardly "shocked" the market given Tesla's extensive warnings about production challenges. Instead, Tesla's stock price *increased* after the disclosure. Loss causation requires a decline, not a price increase. The second alleged "corrective" disclosure was not by Tesla at all. It was an October 6 report by the *Wall Street Journal* ("*WSJ*"), which negatively (and inaccurately) depicted the reasons for the Model 3 production miss. Such third-party hearsay is not a corrective disclosure under the case law, but, regardless, this article led to a one-day decline from which Tesla's stock price immediately rebounded, soon trading at even *higher* prices. As for the third disclosure, on November 1, 2017, the "news" that day was that Tesla had revised its forward-looking goal of producing 5,000 Model 3 vehicles per week to 2018. But plaintiffs have disavowed any claim assailing Tesla's guidance, so by necessity the *change* to that guidance could not cause any loss.

There is no case here. The defects cannot be cured. This lawsuit should be dismissed.

## II. STATEMENT OF FACTS

### A. Tesla, Its Mission, And Model 3

Tesla's mission is to accelerate the world's transition to sustainable energy. In a short period, it has gone from a Silicon Valley start-up to a thriving company with annual revenues of almost $12 billion and 37,000 employees.[3] Best known for its cars, Tesla designs, manufactures and delivers innovative all-electric vehicles that are widely recognized as among the most technologically advanced ever built. *See* Exs. 12 at 1-2; 10 at 1.

In 2008, Tesla produced its first all-electric car, the Roadster, which captured the imagination of the automotive market. Next was Model S, which began shipping in mid-2012 and has been updated over time with new features, such as high-performance, all-wheel drive, dual motor and other options. Tesla introduced Model X, its SUV, in late 2015. It featured

[3] The AC purports to summarize Tesla's history dating back to 2003. *See* AC ¶¶ 40-70.

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

innovative falcon-wing doors and other unique design elements. *See* Ex. 12 at 1-2. Both Model S and Model X have complex designs and can be customized by selecting among hundreds of options and features (*i.e.*, millions of possible permutations). As such, they presented significant manufacturing and supply chain challenges. *See* AC ¶¶ 65-70. And while plaintiffs gratuitously cast aspersions on Tesla for missing its Model S or Model X production guidance on occasion (*see id*. ¶¶ 60-70), those experiences only underscore the many challenges Tesla faces when introducing newly-designed cars, utilizing new manufacturing processes and supply chains.[4] In any event, Tesla ultimately met those challenges, and both Model S and Model X have been a tremendous success. For several years running, Models S has captured the #1 market share in the U.S. luxury vehicle segment (outselling cars by Mercedes, BMW, Lexus, Porsche and Audi). *See* Exs. 1 at 1; 7 at 2; 21 at 2. Tesla's achievements are also widely credited as the major impetus behind traditional automotive's increased commitment to electric vehicles even though, as articles cited in the Amended Complaint recognize, they remain years behind Tesla.[5]

The success of Model S and Model X paved the way for Model 3. Tesla's first mass market, moderately priced sedan, Model 3 was developed with Tesla's prior experience in mind. Its vehicle design was far simpler than Model S or Model X, and the menu of available options was drastically reduced. Having streamlined the car's design, Tesla anticipated that it would be able to reach far greater production volumes than it had ever before attempted or achieved. *See* Ex. 11 at 4-5. Tesla also invested heavily to ensure that Model 3 – a ten-year program – would be a long-term success. To date, Tesla has spent about $4 billion on the Model 3 program (AC ¶ 10)

---

[4] As anyone who has picked up a newspaper knows, production difficulties are not unique to Tesla. Traditional car companies experience production challenges too, even when building legacy vehicles that are short on innovation and use existing processes. *See, e.g.,* C. Rogers, *Glitches Delayed Sale of New Ford F-150 Pickup Trucks*, Wall. St. J., Dec. 6, 2016 (quoting Ford as saying "[l]aunches are complex, and every one of them presents different challenges and opportunities"); A. Cole, *Woes Mounting for Recalled 2017 Chrysler Pacifica Hybrid Minivan*, Wash. Post., June 28, 2017 (Fiat Chrysler halted production to resolve problems).

[5] *See* AC ¶ 104 n.35 (discussing Volvo's electric vehicle initiative, noting the "prestige" factor of owning a Tesla, and emphasizing that traditional car companies "operate on long timelines. It takes five to seven years to develop a new car"); *id.* n.30 (Mercedes' "real target is certainly the intensifying rivalry with Tesla," whose "Model S sedan outsold the Mercedes S-class and BMW 7-series last year in the U.S., putting pressure on the brands to defend their image as automotive innovators," and hence Mercedes will invest $4.8 billion by 2025); *id.* n.31 (Porsche will invest $7.4 billion through 2022 in an effort to "build a true Tesla Model S rival"); *id.* n.36 (Toyota hopes to launch new electric vehicles by "the early 2020s"). Exs. 26-29.

– a compelling indicator of Tesla's commitment and belief in Model 3's potential. Investments include the continuing buildout of the massive Gigafactory, which is the "biggest building, by footprint, on the planet." AC ¶ 91. Once complete, it will produce more lithium-ion batteries than the rest of the world's manufacturers combined.[6] Ex. 16 at 3.

The investments did not stop there. From the outset, Tesla indicated that it would be using an extremely high degree of automation as part of its plan to rethink manufacturing as the "machine that makes the machine," in which just as much focus and attention is placed on ***the process*** of making the product as the design of the product itself. *E.g.*, Exs. 4 at 2; 5 at 11; 8 at 13. To that end, it commissioned an extensive supply chain, including robotics hardware and software, designed to allow Tesla to scale Model 3 to a run-rate of 5,000 cars per week. As plaintiffs concede, consumer demand for Model 3 has been overwhelming, with about half a million paid customer reservations. *See* AC ¶ 3; *see also id.* ¶ 252 (citing article stating "Tesla has accomplished something no other automaker can claim: It's made a relatively affordable electric car, the Model 3, that hundreds of thousands of people are lining up to buy. The only problem is that [Tesla] can't produce enough of them").

**B.    Tesla's Extensive Disclosures Regarding Model 3 Production Challenges**

Tesla could not have been clearer about the production challenges Model 3 posed. The manufacturing processes needed to achieve its goals had no precedent, given the high level of automation required, the ongoing efforts to bring the Gigafactory online, and the thousands of parts that would have to be designed, produced and delivered in high volumes and at high quality from a vast supply chain. Tesla expressly warned of these issues from the time it unveiled the initial prototype of Model 3 in Q1 2016 to the present, and they have been discussed in detail in virtually every earnings call since May 2016. For example, in periods referenced by the Amended Complaint, the following disclosures were made:

- <u>May 4, 2016 earnings call</u>. "In order to achieve volume production of . . . a new car with several thousand unique items, you actually have to set a target internally and with suppliers that is quite aggressive . . . Now, will we actually be able to achieve

---

[6] The Gigafactory is where Tesla integrates production of battery material, cells, modules, packs and drive units. Fremont is where stamping, machining, casting, body assembly, paint operations, final vehicle assembly and end-of-line testing occur for Model 3. Exs. 19 at 31; 25 at 8-9.

volume production on July 1 next year? **Of course not . . . The reality is that volume production will then be some number of months later, as we resolve supply chain and internal production issues . . . [I]nevitably** there will be some small number of items that cause slippage . . . **This is simply the nature of things. It's unavoidable a**nd if you told me what those parts would be, we would be able to take action now. It's easier [to see] what these things are in **hindsight, not in advance, and sometimes there are things that you don't expect to be a problem.**" Ex. 2 at 4, 8.

- August 3, 2016 earnings call. "I don't expect us to be at full production on July 1. But I have to drive all suppliers and internal efforts to that date, knowing that some will fall short…But if several thousand parts are not driven to a particular date, there is no chance of making any point even past that date . . . **[W]e've just got to scale up production. Production is a hard thing. It's real hard. Particularly when it's new technology . . . [I]t's cutting edge technology, it's really hard to scale up production, because you've got to design the machine that makes the machine. Not just the machine itself.**" Ex. 5 at 8, 11.

- October 26, 2016 earnings call. "[A] car consists of several thousand unique items. **We can only go as fast as the slowest item** . . . Ultimately it is an S-curve . . . A shift of even a few weeks one way or the other can have quite a dramatic effect on what it looks like in that quarter, but that's not indicative of the future . . . **but it will be complicated and bumpy and dealing with a lot of unexpected issues at first – at the beginning of Model 3 production in Q3, Q4 [2017]. Q3 particularly is very uncertain** because it is the beginning of a [production ramp]." Ex. 8 at 16.

- February 22, 2017 earnings call. "The rate of production is as fast as the slowest component in the vehicle. **And when you have several thousand unique items, it can move as fast as the least lucky and worst executing part of Tesla or our suppliers** . . . So you go through a series of constraints. You try to anticipate as many as possible. There are new issues that pop up every week . . . **It's schedule whack-a-mole, and if we knew what would be late now, we would have attacked it, but some things only come to light late in the game.**" Ex. 11 at 6.

These warnings were also an integral part of the disclosures that plaintiffs assail on May 3 and August 2, 2017, and discussed at the July 28, 2017 launch event:

- May 3, 2017 earnings call. "**When you've got a whole new product and a whole new factory** [] I don't predict exactly what the . . . initial push in the S-curve looks like, **it's extremely difficult. In every way, the production starts off slowly and then you gradually eliminate constraints** and eventually it takes off exponentially. But because of that sort of slow initial ramp . . . it can have quite a big impact on total volume…Tesla [must get] incredibly good at the machine that builds the machine – which involves, by the way, a tremendous amount of software . . . it's the programming of the robots and how they interact . . . **There's plenty of things with uncertainty,** but I don't know anything that would prevent us from starting firstly in July, and exceeding 5,000 units per week by the end of the year. There may be some . . . [but] I just don't know what that is today." Ex. 14 at 7, 10-11.

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

- July 28, 2017 launch event. "[I]n terms of production, the thing that is going to be a **major challenge for us over the next six to nine months is how do we build a huge number of cars and frankly, we're going to be in production hell**…The point is to give you a sense of how manufacturing actually works. There are 10,000 unique parts to a Model 3. And these are coming from all over the world . . . any one of them can slow down the production process. So the **production rate will move as fast as the slowest and least luck[y] component in the whole mix. Then on top of that we have the Gigafactory** . . . the largest battery factory in the world, and when it's done, will produce more lithium ion batteries than the rest of the global production combined . . . so we've got a giant factory making battery packs and powertrains, giant factory making cars, and giant supply chain **and so all of those have to work together, in cadence, in order to get to our initial target of 5,000 cars a week.**[7] Ex. 16 at 2-3.

- August 2, 2017 earnings call. "**What we have ahead of us, of course, is an incredibly difficult production ramp** . . . So I would certainly urge people not to get too caught up in what exactly falls with thein the exact calendar boundaries of a quarter . . . **It's just fundamentally impossible to predict the exponential part of the manufacturing S-curve. It's crazy hard** . . . **it's really running through a series of constraints** . . . [a]nd then sometimes it'll go backwards because something broke. **When I said manufacturing hell [] – and supply chain hell on Friday** [at the July 28 handover event]. **I meant it.**" Ex. 18 at 3, 5.

Mr. Musk's comments were reinforced by a host of additional Tesla public disclosures, including those in its SEC filings and quarterly shareholder letters. Tesla disclosed that (i) it had experienced significant delays ramping production of Model S and Model X and may experience similar delays attempting to ramp production of Model 3, (ii) it had no experience manufacturing vehicles at the high volumes it anticipated for Model 3 and that, to be successful, it would need to "complete the implementation and ramp of efficient, automated and low-cost manufacturing capabilities, processes and supply chains", (iii) the new Gigafactory would need to be able to ramp and produce in a timely manner high-volumes of battery-related equipment (cells, modules and packs) needed for Model 3, and (iv) the impact of any delays or other constraints with respect to the Model 3 supply chain could be "substantially greater than any such issues experienced with respect to our products to date." *See, e.g.*, Exs. 3; 6; 9; 12; 15; 19; 23.

C. **As Early-Stage Production Begins To Ramp, Tesla Encounters Unexpected Bottlenecks In The Module Line and Promptly Discloses The Problem**

Tesla delivered the first thirty Model 3s at the July 28, 2017 launch event. As Q3

---

[7] Tesla projected a graphic illustrating the manufacturing S-curve at the launch event. *See* Ex. 16.

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

progressed, however, Tesla encountered unexpected production difficulties, chiefly with the Gigafactory's automated battery module line. On October 2, 2017, in its regularly announced vehicle deliveries and production release, Tesla stated that only 260 Model 3 vehicles had been built in Q3. It explained that Model 3 production had been limited by certain bottlenecks. Ex. 20.

Tesla reported full Q3 2017 results on November 1. Ex. 21. It explained that "[t]he initial phase of manufacturing any new vehicle is always challenging, and the Model 3 production ramp is no exception – particularly given our focus on highly automated manufacturing processes." It also provided specific details on the problem:

> "our primary production constraint has been in the battery module assembly line at [the] Gigafactory [], where cells are packaged into modules. Four modules are packaged into an aluminum case to form a Model 3 battery pack. The combined complexity of module design and its automated manufacturing process has taken this line longer to ramp than expected. The biggest challenge is that the first two zones of a four zone process, key elements of which were done" by an outside supplier, "had to be taken over and significantly redesigned by Tesla."

*Id.* at 1. Because "the nature of manufacturing challenges during a ramp such as this makes it difficult to predict exactly how long it will take for all bottlenecks to be cleared or when new ones will appear," Tesla deferred its goal of producing 5,000 Model 3s per week in 2017 to Q1 2018.

Mr. Musk provided an even deeper dive on the module line bottleneck in the earnings call: "The primary production constraints really by far is in the battery module assembly … There are 4 zones to module manufacturing . . . The zones 3 and 4 are in good shape; zones 1 and 2 are not . . . [W]e had a subcontractor . . . that unfortunately really dropped the ball, and *we did not realize the degree to which the ball was dropped until quite recently and . . . this is a very complex manufacturing area.* We had to rewrite all the software from scratch and redo many of the mechanical and electrical elements of zone 2 of the module production." Ex. 22 at 3. Mr. Musk also explained that bringing the vast level of automation online proved more difficult than anticipated, which at least one analyst on the call expressly acknowledged was "understandable, given the complexity." *Id.* at 7. And while deferring its targeted rate of 5,000 vehicles per week to early 2018 was disappointing, Mr. Musk noted that, "in the vast scheme of things, this is a relatively small shift, [as] the Model 3 is a 10-year program, and so we're talking about a few months out of a 10-year program." *Id.* at 3. Plaintiffs end the alleged class period on this date.

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

### D.     This Suit

This action was filed on October 10, 2017 by Gregory Wochos.  Only one purported Tesla shareholder, Kurt Friedman, sought appointment as lead plaintiff.  His motion was unopposed and was granted on February 2, 2018.  The Court also approved the Rosen Law Firm as sole counsel for lead plaintiff.  The Amended Complaint was filed on March 23, 2018 and reflects a number of changes.  It abandons claims relating to the first year of the original class period (which reached back to May 4, 2016), and so by necessity drops Jason Wheeler, Tesla's former Chief Financial Officer, as a defendant since he left Tesla before the new class period begins on May 3, 2017.  The Amended Complaint also now extends the class period to end on November 1, 2017, despite uniformly claiming in all prior pleadings that the "truth" was revealed by October 6.[8]  The suit now hinges entirely on alleged misstatements made on two days: May 3, 2017, in Tesla's Q1 2017 shareholder letter and earnings call (and related Form 10-Q filed a few days later), and August 2, 2017, in its Q2 2017 shareholder letter and earnings call (and related Form 10-Q filed thereafter).  In addition to Tesla, the suit names as defendants Mr. Musk and Deepak Ahuja, the Company's current CFO, and alleges claims under Sections 10(b) and 20(a) of the 1934 Act.

### III.     PLAINTIFFS' CLAIM IS SUBJECT TO STRICT PLEADING REQUIREMENTS

Section 10(b) requires: (1) a material misstatement or omission; (2) scienter; (3) purchase or sale of security; (4) reliance; (5) economic loss; and (6) loss causation.  *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*, 552 U.S. 148, 157 (2008).  Each element must be supported by particularized facts that satisfy Rule 9(b) and the "formidable" pleading standards of the PSLRA.  *Metzler*, 540 F.3d at 1055.

Several provisions of the PSLRA are implicated here.  *First,* plaintiffs must identify "each statement alleged to have been misleading" and "the reason or reasons why [it was] misleading."  15 U.S.C. § 78u-4(b)(1).  This requires specific contemporaneous facts, and bars pleading "fraud by hindsight."  *In re Vantive Corp. Sec. Litig.*, 110 F. Supp. 2d 1209, 1215-16

---

[8] Without explanation, the AC also adds an additional law firm to represent the class despite the Court's prior appointment of counsel at the lead plaintiff's request.  This undermines the PSLRA and the Court's February 12, 2018 Order.  The PSLRA expressly requires that lead plaintiff's choice of any counsel (in whatever role) is "subject to the approval of the court."  15 U.S.C. § 78u-4(a)(3)(B)(v).  By adding new counsel without approval, plaintiffs disregard this provision.

(N.D. Cal. 2000), *aff'd*, 283 F.3d 1079 (9th Cir. 2002). An omitted fact is material only if "a reasonable investor" would have viewed it "as having significantly altered the 'total mix' of information made available." *Matrixx Initiatives, Inc. v. Siracusano*, 131 S. Ct. 1309, 1321-22 (2011); *In re Tesla Motors, Inc. Sec. Litig.*, 75 F. Supp. 3d 1034, 1041 (N.D. Cal. 2014), *aff'd*, 671 F. App'x 670 (9th Cir. 2016). It must "affirmatively create an impression of a state of affairs that differs in a material way from the one that actually exists." *Coyler v. Acelrx Pharms., Inc.*, 2015 WL 7566809, at *6 (N.D. Cal. Nov. 25, 2015). A statement that is merely incomplete is not actionable. *Brody v. Transitional Hosp. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002).

*Second,* the PSLRA creates a "safe harbor" that precludes liability for forward-looking statements accompanied by meaningful cautionary factors that could cause actual results to differ materially from what is expected. 15 U.S.C. § 78u-5(c)(1)(A)(i); *Intuitive Surgical*, 759 F.3d at 1058; *In re Cutera Sec. Litig.*, 610 F.3d 1103, 1112-13 (9th Cir. 2010). The safe harbor extends to "any statement regarding (1) financial projections, (2) plans and objectives of management for future operations, (3) future economic performance, or (4) the assumptions underlying or related to any of these issues." *Intuitive Surgical*, 759 F.3d at 1058.

*Third,* plaintiffs must plead particularized facts raising a strong inference of scienter – an intent to defraud or deliberate recklessness tantamount to actual intent. *Webb*, 884 F.3d at 850-51; *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 991-92 (9th Cir. 2009). The inference "must be more than merely plausible or reasonable – it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs*, 551 U.S. at 314.

*Fourth,* plaintiffs needed to "plausibly allege" loss causation. *Loos*, 762 F.3d at 887.

## IV. PLAINTIFFS FAIL TO PLEAD ANY FALSE OR MISLEADING STATEMENT

### A. There Was No Misstatement or Omission on May 3, 2017.

Plaintiffs start the alleged class period on May 3, 2017, several months before Tesla even began producing the first Model 3. Plaintiffs' core allegation is that Tesla's May 3 shareholder letter made the following false and misleading statement: "preparations at our production facilities are on track to support the ramp of Model 3 production to 5,000 vehicles per week at some point in 2017, and to 10,000 vehicles per week at some point in 2018." AC ¶ 209; *see id.* ¶¶

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

216, 220; *see also* Exs. 13-15.  Plaintiffs ignore a virtually identical statement made in the same shareholder letter – that Tesla was "on track for initial production in July" – because Tesla hit that target.  Ex. 13 at 1.  Plaintiffs simply work backwards: the statement that Tesla was on track to hit a future target is not false when Tesla hits the target but is false when Tesla misses the target.  Such fraud by hindsight is barred for a variety of independent reasons.

*First and foremost,* plaintiffs have absolutely no facts whatsoever showing that Tesla's May 3 statement was false or misleading (much less believed to be false).  Instead, plaintiffs rely on their false narrative, alleging that because aspects of Tesla's highly automated production processes had not been installed by May 3, 2017, this must mean that "production preparations were not on track."  But Tesla never said it was ***"done"*** in May.  If fact, it said the opposite – that it had only ***"started"*** the installation of certain equipment, that preparations were "continuing," that as the year progressed it would "increase automation and add production capacity," and that it "will need to complete implementation" to hit its goals. Exs. 15 at 30, 40-41; 13 at 1.  That is what Tesla ***actually said*** and it completely eviscerates plaintiffs' claim.  *See Pompano Beach*, 2018 WL 2015510, at *2 (no misstatement where described project progress was true).

Even putting aside the dispositive fact that Tesla's actual statements disprove plaintiffs' narrative, to show production was "off track" plaintiffs would at a minimum need to allege specific facts detailing the ***production plan as it stood on May 3*** – including the timelines when various automated processes were scheduled to be fully implemented, or when and how production was expected to ramp, and how its actual progress was supposedly so short of that plan that any issues could not be addressed in time.  Plaintiffs make no effort to do so and their FEs do not even profess to have such knowledge.[9]  This too is fatal to any claim.  *See Xu*, 2017 WL 114401, at *6 ("Plaintiff does not allege a timeline against which the 'on track' claim might be verified.  Accordingly, plaintiff does not allege that the migration…was off-track"); *In re Am. Apparel, Inc. S'holder Litig.*, 855 F. Supp. 2d 1043, 1072-73 (C.D. Cal. 2012) (the "allegedly false statements are couched in aspirational terms" and "it is difficult to find deception in

---

[9] To put this in perspective, the May statements are more than ***two months*** before production even starts.  It is hard to imagine what the FEs could possibly say about how Tesla was "off track" or failing to meet production targets before production has even begun.  Not surprisingly, they do not even attempt to do so.

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1  statements that the company was 'on track' to 'making significant progress…by year-end' since

2  the comment can hardly be construed as a guarantee").

3      Plaintiffs' remaining allegations fare no better.  Mr. Musk's May 3 statement that he did

4  not know of anything that would prevent Tesla from beginning production in July (a target Tesla

5  hit) or achieving the 5,000 per week year-end goal – while flagging that "[t]here's plenty of

6  things with uncertainty" – is the same as plaintiffs' deficient "on track" allegations.  AC ¶ 211.

7  Nor are facts pleaded showing Mr. Musk's statement that Tesla "had a much better supply chain

8  in place" or "as far as we know, there are no issues," was false when made.  AC ¶ 214.  To the

9  contrary, the constraint in the automated module line that limited production and caused the

10  guidance miss occurred long after the May statement – not until September 2017, according to FE

11  9, after Tesla sought to ramp production in Q3 2017.  And Mr. Musk's view about the quality of

12  Tesla's suppliers is both an inactionable "soft" statement and an opinion plaintiffs cannot assail

13  under *Omnicare v. Laborers Dist. Council Constr. Indus. Pension Fund*, 135 S. Ct. 1318, 1327

14  (2015) ("opinion is a belief, a view, or a sentiment which the mind forms of persons or things").

15      *Second*, in addition to failing to plead falsity, plaintiffs' "on track" claim fails for an

16  independent reason:  the assailed statement is forward-looking – it concerns preparations "to

17  support the ramp to 5,000" by year end.  In *Intuitive Surgical,* the Ninth Circuit held that the safe

18  harbor applies when "examined as a whole, the challenged statements related to future

19  expectations and performance."  759 F.3d at 1059.  The Court affirmed the decision of Judge Koh

20  that a statement that defendant was "on track to grow 55% this year" was forward-looking, rather

21  than a statement of then-existing conditions.  *Police Ret. Sys. of St. Louis v. Intuitive Surgical,*

22  *Inc.,* 2012 WL 1868874, at *10 (N.D. Cal. May 22, 2012).  The Ninth Circuit made a similar

23  ruling just a few weeks ago.  *See Pompano Beach*, 2018 WL 2015510, at *2 ("on track"

24  statements were forward looking and within safe harbor).[10]

25  ─────────────────────
[10] Because Congress provided in the PLSRA that plans and objectives of management, and

26  assumptions related to them, are covered by the safe harbor, statements that may sound in the
present tense can be forward-looking.  *See Intuitive Surgical*, 759 F.3d at 1059 ("[a]t the present

27  time, we don't have any indicators that tell us that [customers will spend less]" protected by safe
harbor); *see In re Fusion-io, Inc. Sec. Litig.*, 2015 WL 661869, at *12 (N.D. Cal. Feb. 12, 2015)

28  (statements about demand protected where made "in the context of Fusion-io's guidance for its
third-quarter revenues").  Otherwise, the Congressional mandate would be meaningless.  In
contrast, where a statement has distinct forward-looking and historical/present parts, courts can

In fact, there is no shortage of cases holding that "on track" statements, which are inextricably intertwined with guidance, are protected by the safe harbor. *See, e.g., 3226701 Canada, Inc. v. Qualcomm, Inc.*, 2017 WL 4759021, at *15-17 (S.D. Cal. Oct. 20, 2017) ("everything [with product] remains on track and we expect commercial devices to be available in 1H 2015" forward- looking); *M&M Hart Living Trust v. Global Eagle Entm't, Inc.*, 2017 WL 5635425, at *6 (C.D. Cal. Oct. 30, 2017) ("on track" to meet financial goals forward-looking); *Xu*, 2017 WL 114401, at *2, 6 ("we are on track in completing the migration in the first quarter of 2015" forward-looking); *In re Allied Nevada Gold Corp. Sec. Litig.*, 2016 WL 4191017, at *7-10 (D. Nev. Aug. 8, 2016) ("on track to meet commissioning deadlines" and "on track to meet … production guidance" forward-looking); *Am. Apparel*, 855 F. Supp. 2d at 1072-73 ("we continue to be on track and continue to expect to demonstrate significant progress" were forward-looking).

*Third,* the claim also fails because management is entitled to be optimistic about its business, even in the face of challenges. *See In re Sierra Wireless, Inc. Sec. Litig.*, 482 F. Supp. 2d 365, 367 (S.D.N.Y. 2007) ("The securities laws neither require corporate officers to adopt a crabbed, defeatist view of the company's business prospects nor permit dissatisfied shareholders to assert serious allegations of fraud based on the perfect hindsight afforded by the passage of time"); *see also Ronconi*, 253 F.3d at 434 (optimistic statement not actionable simply because there were difficult problems – "[a] company could experience 'serious operational problems' [and] 'substantial difficulties' . . . and still have increasing revenues"). Thus, "on track" statements are often treated as expressions of corporate optimism that are not actionable. *See In re Nimble Storage, Inc. Sec. Litig.*, 252 F. Supp. 3d 848, 854 n.8 (N.D. Cal. 2017) ("on track" inactionable optimism); *In re Foundry Networks, Inc. Sec. Litig.*, 2003 WL 22077729, at *14-15 (N.D. Cal. Aug. 29, 2003) (product "on track" is inactionable optimism); *Qualcomm,* 2017 WL 4759021, at *17 ("on track" inactionable); *Callan v. Motricity*, 2013 WL 5492957, at *6-7 (W.D. Wash. Oct. 1, 2013) (contracts "on schedule" and "on track" not actionable), *aff'd*, 649 F. App'x 526 (9th Cir. 2016); *Allied*, 2016 WL 4191017, at *8 ("on track" statements "are the sort of

---

and do properly evaluate the non-forward-looking portion as it does any other statement. *See In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130 (9th Cir. 2017); *Hong v. Extreme Networks, Inc.*, 2017 WL 1508991, at *12 n.3 (N.D. Cal Apr. 27, 2017) (noting split of authority as to whether "on track" statements were forward-looking). As noted, plaintiffs' claim fails either way.

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1 optimistic, subjective assessments that do not amount to a securities violation"); *cf. Hong*, 2017

2 WL 1508991, at *12.[11]

3     **B.**     **There Was Also No Misstatement or Omission on August 2, 2017.**

4     Plaintiffs repeat the same refrain with respect to statements Tesla made on August 2, just

5 weeks after production began. Exs. 17-19. They assail Tesla's statements that "[b]ased on our

6 preparedness at this time, we are confident we can produce just over 1,500 vehicles in Q3, and

7 achieve a run rate of 5,000 vehicles per week by the end of 2017" and that Tesla "believe[d it

8 was] on track" to do so. AC ¶¶ 225, 227. Besides failing for all the same reasons (lack of falsity,

9 the safe harbor, and inactionable optimism), plaintiffs blatantly distort what Tesla actually said.

10     They ignore that ***in the very same August 2 call*** Mr. Musk stated: "what we have ahead of

11 us, of course, is an incredibly difficult production ramp"; Tesla was headed into "manufacturing

12 … and supply chain hell"; it is "fundamentally impossible" and "crazy hard" to predict the

13 production ramp; and Tesla will undoubtedly face "a series of constraints" and sometimes

14 production will go "backwards" due to equipment failures or other problems. Ex. 18 at 3, 5.

15 These statements echoed those made just days earlier at the Model 3 launch event on July 28,

16 where Mr. Musk emphasized that Tesla was entering "production hell" for at least the next "six to

17 nine months," that the Gigafactory and the extensive Model 3 supply chain would be challenging

18 to get ramped up, and that production moves only as fast as "the slowest and least luck[y]

19 component" in the manufacturing process. Ex. 16. Such transparency is the opposite of fraud.[12]

20 ─────────────────────────

21 [11] The only two analyst reports referenced in the AC after the May 3 disclosure put Tesla's optimism in context. *Cutera*, 610 F.3d at 1111 ("[I]nvestors . . . know how to devalue the

22 optimism of corporate executives"). On May 4, 2017, Oppenheimer (AC ¶ 113) recognized that Tesla "has an exceptionally large volume of work to do in upcoming months to reach its target of

23 5k vehicles/week by the end of 2017." Only in the "upside" scenario did it have Model 3 "ramp[ing] on schedule." Ex. 30. Deutsche Bank (AC ¶ 114) observed that the "key

24 upside/downside risk center around the timing and speed of ramp of the Model 3." Ex. 31.

[12] In fact, another court flatly rejected a similar shareholder claim regarding Tesla's efforts to

25 ramp Model S production. *Haque v. Tesla Motors, Inc.*, 2017 WL 448594 (Del. Ch. Feb. 2, 2017). The Court held that the claim "reflects a basic misunderstanding of Tesla's complex

26 manufacturing process," which is subject to an extensive array of disclosures, warnings and risk factors. *Id.* at *10. "If a problem surfaces with even one of the component parts, then short-term

27 production of completed vehicles will be adversely impacted." *Id.* at *2. "Simply because Tesla did not foresee production challenges it might face later in the quarter does not support an

28 inference that its statement halfway through the quarter that it expected to produce 20,000 vehicles…was false when made. *Id.* at *11. That analysis applies equally here.

In context, Tesla's statements cannot possibly be understood as an assurance that Tesla would achieve its goals as it attempted to ramp an all-new and innovative production system for the very first time. Indeed, courts recognize just the opposite; that investors understand that "[i]n ***bringing any high-tech product to market, problems encountered . . . are the norm, not the exception,***" and do not support a securities fraud claim. *See Allison*, 999 F. Supp. at 1348 (emphasis added).

As with the May 3 statements, plaintiffs attempt to show the August 2 statements were false by reiterating their mantra that aspects of Tesla's highly automated production process were not yet installed or operational. This is still a strawman: ***Tesla never said that as of August 2 all of its processes were complete***. In fact, it said the ***opposite*** in its August Form 10-Q: that it was "continuing preparations at our production facilities," it "will need to complete the implementation and ramp of efficient, automated . . . manufacturing capabilities, processes and supply chains necessary to support" volume production "on our projected timeline," and that, to achieve its plans, it will need "to add production lines and capacity as planned." Ex. 19 at 30, 41-42. Tesla also disclosed on the August 2 earnings call that it was still procuring equipment for Model 3 production. Ex. 18 at 14-15.[13] It is impossible to read those disclosures as suggesting that Tesla's manufacturing lines were already complete and fully capable of volume production.

Furthermore, even if these disclosures had not been made, plaintiffs have no claim. As discussed above, to show that Tesla was "off track" on August 2, plaintiffs were required to plead facts showing what the production plan was at that time, when automated lines were to be fully implemented, and when and how production was scheduled to ramp in order to achieve the 5,000 cars per week goal by year end. They would then need to compare those plans to what Tesla was actually achieving to show that any issues could not be resolved and that the targets would thus not be met by year end. Put simply, plaintiffs need to plead the implementation schedule under the plan compared to Tesla's actual progress to assess whether Tesla was "on" or "off" track as of August 2. Plaintiffs allege ***none*** of this necessary information. That is no accident: the S-curve

---

[13] Given such disclosures, and Tesla's admission that it was entering production hell, Tesla was not required to provide further details regarding every challenge or item left to be implemented. *See Brody*, 280 F.3d at 1007 (no obligation to provide details consistent with company statement); *In re Yahoo!, Inc. Sec. Litig.*, 2012 WL 3282819, at *12 (N.D. Cal. Aug. 10, 2012) (same), *aff'd*, 611 F. App'x 387 (9th Cir. 2015).

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

Fenwick & West LLP
Attorneys at Law
San Francisco

Mr. Musk displayed at the July 28 event shows very limited production in August, with growth anticipated to accelerate only later into Q4 2017. Ex. 16 at 2.

Instead of facts, plaintiffs offer more fraud by hindsight: they claim that on February 7, 2018, three months *after* the alleged class period and ***seven months*** after the August statement, Tesla "admitted" it knew all along that the automated module line could not reach a production level of 5,000 cars per week. AC ¶ 207. As in *Yahoo!*, "[t]he actual text of the statement does not include an 'admission.'" 2012 WL 3282819, at *13. What Tesla actually said was that, as it continued to remediate the problem during Q4 2017 and Q1 2018, its German subsidiary was redesigning certain aspects of the module line, and once the redesigned equipment arrived from Germany, it would be able to support the 5,000 per week target. Ex. 24. Far from a concession that Tesla knew back in August that the module line was incapable of meeting the 5,000 vehicle target, this is precisely the type of action one expects management to take to address a problem. "Simply disclosing something at some point does not 'admit' that it should have been disclosed earlier." *Yahoo!*, 2012 WL 3282819, at *13. *See also Coyler*, 2015 WL 7566809, at *12 (modifying design is not an admission that statements about safety of prior design were false).[14]

## V. PLAINTIFFS HAVE NOT AND CANNOT PLEAD FACTS GIVING RISE TO A STRONG, COGENT, AND COMPELLING INFERENCE OF SCIENTER

Plaintiffs need to plead specific facts establishing a strong inference of scienter. *See Tellabs*, 551 U.S. at 323. This is no minor hurdle; the facts must be "compelling," "persuasive," "effective," and "powerful." *Id.* They must reflect an intent to defraud or deliberate recklessness so egregious as to be tantamount to actual intent. *In re Silicon Graphics, Inc. Sec. Litig.*, 183 F.3d 970, 976-77 (9th Cir. 1999). A "strong inference cannot be identified in a vacuum, as the inquiry is inherently comparative." *Webb*, 884 F.3d at 850, quoting *Tellabs*, 551 U.S. at 323. It requires

---

[14] Plaintiffs' remaining allegations fall flat. No facts establish that Tesla knew there would be delays such that its "risk factors" in the Form 10-Q were deficient. *See* AC ¶¶ 234-38. That Tesla believed it was "making great progress on the battery front" is inactionable optimism (*see* AC ¶ 229). Mr. Musk's statement that "you've got a gigantic machine producing – that's meant for 5,000 vehicles per week and it's producing a few hundred vehicles a week" was merely illustrating the point that Model 3 gross margins will be negative until production ramps, as the very next sentence indicates ("This is true for anything. If . . . you had . . . a soap factory, let me tell you, your first bar of soap would be like millions of dollars. But then you get into volume production and then it's like $2. So true for any manufacturing situation"). Ex. 18 at 14.

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

careful examination of all relevant facts to see if, viewed holistically, the inference is at least as strong, cogent and compelling as any opposing inference. *Tellabs*, 551 U.S. at 314; 326; *Webb*, 884 F.3d at 850. Plaintiffs have utterly failed to discharge this pleading burden.

A. **Plaintiffs' Theory Of Fraud Makes No Sense And Is Overwhelmed By Facts Establishing Tesla's Genuine Belief In Its Model 3 Plans**

Rather than downplay the risks involved in ramping Model 3 production, Tesla warned the market of the many challenges in stark terms for a long time. *See* Sec. II.B, *supra* (discussing Tesla's entry into Model 3 "production hell," the myriad issues that might arise, and the inherent difficulty of identifying issues that might disrupt production ahead of the ramp). Such blunt, plain-language disclosures are the antithesis of an effort to hide the truth and are irreconcilable with scienter. *See Worlds of Wonder*, 35 F.3d at 1425 ("detailed risk disclosure . . . negates an inference of scienter"); *In re Wet Seal, Inc. Sec. Litig.*, 518 F. Supp. 2d 1148 (C.D. Cal. 2007) (explanation of negative information negates an inference of scienter); *In re Dot Hill Sys. Corp. Sec. Litig.*, 594 F. Supp. 2d 1150, 1160 (S.D. Cal. 2008) ("Disclosing the precise risks at issue 'negate[s] an inference of scienter'").

Moreover, unlike the normal securities fraud case, plaintiffs do not even try to allege what any defendant supposedly gained by virtue of this supposed short-term "fraud." No defendant traded Tesla stock or allegedly received any benefit at all; indeed, Mr. Musk, who is the target of most of plaintiffs' allegations, owns the largest percentage of Tesla stock and sold no shares. This also strongly weighs against scienter. *See Rigel*, 697 F.3d at 884-85 (absence of stock sales "does not support an inference of scienter" and in fact "supports the opposite inference")*; Metzler*, 540 F.3d at 1067 (lack of stock sales militates against strong inference of scienter).[15]

More devastating still, Mr. Musk's 2018 CEO Performance Award, which was being negotiated and finalized during the class period, ties his compensation over the next ten years directly to Tesla meeting its ***long-term*** goals, not near-term production rates or stock performance. *See* Ex. 32 at 31. Moreover, the award is priced at $350.02 per share and vests

---

[15] Mr. Ahuja also sold no shares and, other than by title, is barely mentioned in the AC. When plaintiffs do try, they make a glaring error. They allege that, in mid-2016, Mr. Musk and the "other Defendants" were told that Tesla "could never mass produce the Model 3 by the end of 2017." AC ¶ 15. Mr. Ahuja, however, was ***not*** even at Tesla in "mid-2016."

only if Tesla's revenues and earnings increase substantially.[16] Mr. Musk is required to hold any shares acquired *for at least five years* post exercise. *Id.* If anything, this shows that Mr. Musk's interests were fully aligned with the long-term success of Model 3 and Tesla, eviscerates claims that Mr. Musk had any incentive to inflate Tesla's stock for some short-term benefit, and "instead gives rise to an inference of good faith." *Zack v. Allied Waste Indus., Inc.*, 2005 WL 3501414, at *14 (D. Ariz. Dec. 15, 2005), *aff'd*, 275 F. App'x 722 (9th Cir. 2008); *Schuster v. Symmetricom, Inc.*, 2000 WL 33115909, at *8 (N.D. Cal. Aug. 1, 2000) (options keyed to allegedly inflated rate "negates any reasonable inference of scienter").

Unable to address any of Tesla's extensive warnings and the absence of any conceivable benefit for engaging in intentional wrongdoing, plaintiffs rest on a theory of fraud that makes no sense. They claim that Model 3 was of such "existential importance," and that time was so much "of the essence," that Tesla could not afford a production glitch. Hence, Tesla said it was "on track" to meet its goals in May and August 2017 knowing it was not true. AC ¶¶ 7, 13. But that theory is implausible on its face. If Tesla could not afford a production glitch, the last thing it would do is lie, knowing that the lie would be revealed with much fanfare almost immediately in the very first quarter of production. *See Haque*, 2017 WL 448594, at *7 ("If concealing low demand is so important to Tesla that it is willing deliberately to mislead its stockholders, then why risk exposing the lie? The answer, in my mind, is simple; there is no lie to conceal"). Tesla stood to gain nothing by disappointing its customers and investors in this way.

That analysis ends the inquiry. Tesla was at the very beginning of producing an all-new, innovative car utilizing all-new manufacturing processes. Challenges like the ones Tesla faced are not uncommon in complex automobile manufacturing, even for traditional car companies with decades of experience, and Tesla was candid in disclosing the many challenges it faced. "Problems and difficulties are the daily work of business people. That they exist does not make a lie out of any of the alleged false statements." *Ronconi*, 253 F.3d at 434 (rejecting scienter). The only rational, reasonable inference is that Tesla believed in earnest that it could reach its goals, repeatedly disclosed that there would likely be challenges early on, and then experienced the

_____

[16] By comparison, Tesla's stock price was $311 on May 3, 2017, $325 on August 2, 2017, and $321 on November 1, 2017 when the alleged class period ends. Ex. 33.

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

kinds of difficulties it had warned about as Q3 2017 progressed.  That is transparency, not fraud.

## B.    The Former Employee Allegations Offer Nothing To Establish Scienter

The accounts of former employees do nothing to bolster plaintiffs' position.  An anonymous "witness" must have personal knowledge of the alleged facts and offer statements "indicative of scienter."  *Zucco*, 552 F.3d at 995.  Each of the FEs fails this basic test.  As an initial matter, many left Tesla before Model 3 manufacturing even began, and thus lack credible knowledge of Model 3 production at the time of the alleged misstatements in May and August 2017.  *See In re Silicon Image, Inc. Sec. Litig.*, 2007 WL 2778414, at *2 (N.D. Cal. Sept. 21, 2007) (rejecting scienter assertions by confidential witness about events post-dating employment), *aff'd*, 325 F. App'x 560 (9th Cir. 2009); *Shurkin v. Golden State Vintners Inc.*, 471 F. Supp. 2d 998, 1015 (N.D. Cal. 2006) (confidential witness whose employment ended before class period lacks personal knowledge), *aff'd*, 303 F. App'x 431 (9th Cir. 2008); *Brodsky v. Yahoo! Inc.*, 592 F. Supp. 2d 1192, 1201 (N.D. Cal. 2008) ("temporal mismatch between a CW's statement and a Defendant's statement results in a failure to plead with particularity 'the reason or reasons why the statement is misleading.'").  As such, FE1, FE2, FE4, FE6, and FE7, with tenures fully predating the start of Model 3 production – sometimes by more than a year – are of no value in establishing scienter.

But all the FEs suffer from an even more fundamental problem.  ***Not one FE claims to know the plan for Model 3 production, at any time, or when automated lines were to be fully implemented, or when and how production was to ramp***.  Nor do they know anything about how Tesla's actual progress supposedly fell short of those plans nor why, if there were occasional shortfalls, they could not be overcome.  Absent that knowledge, no FE could possibly know whether Tesla was "on track" or "off track" as of the May 3 and August 2, 2017 statements.  Rather than plead that critical information, plaintiffs use the FEs (many of whom were never in a position to have any real insights) to make general observations about what was supposedly done or not done at various points in time, without ever linking such observations to Tesla's statements on May 2 and August 3, 2017.  *See* AC ¶¶ 144-45, 147, 153-56, 160, 163-67 (discussing FE 3, 4, 5 and 7).  In addition, most of these "witnesses" worked at the Fremont factory, not at the

Gigafactory, where the battery module constraint actually existed. Thus, ***none*** could claim that anything at the Fremont factory proved to be the actual constraint that led to the Q3 2017 production miss.

Indeed, only FE8 and FE9 (technicians at the Gigafactory) are alleged to have had any exposure to the battery module line at the Gigafactory, and, if anything, they validate Tesla's explanation of the miss. They state that it was in ***September 2017*** – well after the two challenged statements – that "automation-related malfunctions" and botched robotic supplier software programming hindered Tesla's battery module line. AC ¶¶ 182, 186, 192-93. That is exactly what Tesla said it experienced as Q3 2017 progressed. And FE10 (a production assistant) and FE11 (a materials handler) essentially describe the classic definition of a bottleneck, which is what Tesla had also disclosed. According to FE10, "[a] shutdown of any part of the line process stopped the work on the entire line." AC ¶¶ 197, 199. FE11 noted that "very few Model 3 batteries were completed," and FE9 said few battery packs (a module-dependent downstream component) were made. AC ¶¶ 195, 201. None of that is contrary to Tesla's statements, let alone anything even close to "strong" evidence that Tesla was intentionally lying.[17]

Equally lacking is any FE who claims that Mr. Musk, or any other senior executive, did not genuinely believe in Tesla's plan or public statements. ***Not one***. Instead, plaintiffs offer FE1, a former "plastics" employee in Fremont, who claims he told Mr. Musk "directly" in the ***first half of 2016*** that Tesla would never produce 5,000 Model 3s per week by the end of ***2017***. AC ¶¶ 124-25. Tellingly, nothing is pleaded even remotely suggesting that Mr. Musk agreed with him or that what he was saying made any substantive sense. In any event, putting aside whether a "plastics" employee was in a positon to offer an informed opinion, he was fired by Tesla in June 2016, ***over a year*** before production began and ***18 months*** before the 5,000 per week target. *Id.* ¶ 129. The outdated opinion of a dismissed, former employee is insufficient to plead securities

---

[17] FE2 also confirms what Tesla had repeatedly said: that the prospect of "dealing with hundreds, or thousands, of vendors, each with a different role" and "lead times for the equipment" would be "difficult and time-consuming." AC ¶¶ 140-41. FE2, who left Tesla in June 2016, also claims that Mr. Musk visited the Fremont factory once a week, and "knew" of these challenges. *Id.* ¶ 179. Given that Mr. Musk publicly disclosed such challenges, this is not a revelation. What is important is how Tesla addressed them in the ensuing year, about which FE2 could not possibly know anything.

fraud. *See In re Downey Sec. Litig.*, 2009 WL 2767670, at *11 (C.D. Cal. Aug. 21, 2009) ("second-guessing of management . . . does not provide a basis for securities fraud"). Moreover, FE1's speculation that the 5,000 per week target would not be met by the end of *2017* was based on the false premise that production would not start before January *2018*: FE1 says that told Mr. Musk that "the start of manufacturing" would be "at least 6 months later than July 2017." AC ¶ 128. He was flatly wrong: production started on time, in July 2017 (AC ¶ 115).

No other FE claims to have ever interacted with Mr. Musk (much less Mr. Ahuja), so are not in a position to speak to any defendant's knowledge or intent. *See Intuitive Surgical*, 2012 WL 1868874, at *20 (rejecting accounts of witnesses who did not communicate with defendants); *In re Accuray, Inc. Sec. Litig.*, 757 F. Supp. 2d 936, 949 (N.D. Cal. 2010) (same). Indeed, Mr. Musk said that Tesla faced "an incredibly difficult production ramp" and was entering "production hell." The notion that he was deliberately misleading shareholders is preposterous and has no pleaded basis.

## VI.    PLAINTIFFS HAVE NOT ADEQUATELY PLEADED LOSS CAUSATION

Loss causation is a "context dependent" inquiry and requires plaintiffs to trace a loss back to "the very facts about which the defendant lied." *Mineworkers' Pension Scheme v. First Solar, Inc.*, 881 F.3d 750, 753 (9th Cir. 2018). *See Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 343 (2005). The market must have "learned of and reacted to this fraud." *Metzler*, 540 F.3d at 1063; *Loos*, 762 F.3d at 887-88; *see Rok v. Identiv, Inc.*, 2018 WL 807147, at *7-8 (N.D. Cal. Feb. 9, 2018), *aff'd*, 716 F. App'x 663 (9th Cir. 2018).

Plaintiffs cite three alleged "corrective disclosures." The first was Tesla's October 2, 2017 press release, disclosing that Tesla missed its Q3 production guidance due to bottlenecks. Given Tesla's extensive warnings about production challenges, it was a non-event. Tesla's stock price *increased* after the release (rising from $341.53 per share on October 2 to $348.14 on October 3). Clearly, when the stock price increases, there can be no loss causation.

The second alleged "corrective" disclosure came a few days later on October 6, 2017, when the *WSJ* published a story negatively depicting the Model 3 production miss. That report, which mischaracterized the production constraint that led to the miss, also fails to support loss

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1  causation. "A negative journalistic characterization of previously disclosed facts does not

2  constitute a corrective disclosure." *In re Omnicom Grp. Inc. Sec. Litig.*, 597 F.3d 501, 512 (2d

3  Cir. 2010); *see Meyer v. Greene*, 710 F.3d 1189, 1199 (11th Cir. 2013) ("[T]he mere repackaging

4  of already-public information by an analyst or short-seller is simply insufficient to constitute a

5  corrective disclosure").[18]  And even if this could constitute a corrective disclosure, the claim

6  would still fail.  While Tesla's stock price declined for a single day following the *WSJ* report

7  (from $356.88 to $342.94), it rebounded to close at $355.59 the very next day, and soon closed

8  almost $3 per share in excess of the pre-article price.  Ex. 33.  Plaintiffs offer no clue as to how

9  loss causation arises where the market temporarily reacts – not to revelation of a fraud – but to a

10  journalist's report and then quickly recovers to an even higher price.

11      Nor can plaintiffs allege loss causation based on Tesla's November 1, 2017 disclosure,

12  when Tesla revised its guidance.  Plaintiffs have abandoned any claim based on Tesla's prior

13  guidance, so the change to guidance cannot possibly have been a "fraud" revealed to the market.[19]

14  **VII.    CONCLUSION**

15      The allegations here are irreconcilable with Tesla's actual disclosures.  The theory of

16  fraud ignores Tesla's repeated, blunt warnings about Model 3 production risks, benefitted no one,

17  and is contrary to overwhelming facts that eviscerate scienter.  The case should be dismissed.

18  Dated:   May 25, 2018            Respectfully submitted,

19                                  FENWICK & WEST LLP

20                                  By: /s/      *Dean S. Kristy*
                                            Dean S. Kristy

21

22                                  Attorneys for Defendants Tesla, Inc.,
                                    Elon R. Musk, and Deepak Ahuja

23

24

25

26  [18] The *WSJ* speculated that the absence of fully implemented automation (such as welding parts by hand), was behind the Q3 bottleneck.  But, as indicated above, Tesla never said that all automation had been implemented as of May 3 or August 2, 2017, and in fact said the ***opposite***.

27  Nor did the *WSJ* even mention the battery module line that was the actual constraint.

28  [19] Because the predicate Section 10(b) claim fails, so does the Section 20(a) claim. *See City of Royal Oak Ret. Sys. v. Juniper Networks, Inc.*, 880 F. Supp. 2d 1045, 1070 (N.D. Cal. 2012).

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO