Laurence M. Rosen, Esq. (SBN 219683)
**THE ROSEN LAW FIRM, P.A.**
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

*Lead Counsel for Plaintiffs and the Class*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

GREGORY WOCHOS, Individually and on Behalf of All Others Similarly Situated,

        Plaintiff,

    vs.

TESLA, INC., ELON R. MUSK, DEEPAK AHUJA, and JASON WHEELER,

        Defendants.

Case No. 3:17-cv-05828-CRB

<u>CLASS ACTION</u>

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT**

Date:      August 24, 2018
Time:      10 a.m.
Dept.:     Courtroom 6, 17th Floor
Judge:    Hon. Charles R. Breyer

## <u>TABLE OF CONTENTS</u>

I.     INTRODUCTION ................................................................................................ 1

II.    STATEMENT OF FACTS ................................................................................. 1

III.   ARGUMENT ...................................................................................................... 5

   A.   The Complaint Adequately Pleads Falsity ........................................................ 5

     1.   Defendants' August 2, 2017 Statement about Weekly Production of Model 3s Was
       Materially False ............................................................................................... 5

     2.   Defendants' "On Track" and "Preparedness" Statements are Actionable ..................... 6

     3.   Defendants' "Supply Chain" Statements are Materially False ..................................... 11

     4.   Defendants Risk Disclosures Were False ................................................................. 12

     5.   The Individual Defendants' Signed Certifications Attached to the May and August 10-
       Qs Were False .............................................................................................. 13

   B.   The Complaint Adequately Pleads Scienter ..................................................... 13

     1.   Legal Standard ................................................................................................ 13

     2.   The Complaint's Allegations Raise a Strong Inference of Recklessness ..................... 14

       a)   Musk Attended Meetings Where Tesla's Inability to Meet Production Targets Was
         Discussed ............................................................................................... 14

       b)   The Complaint Alleges that Each Defendant Knew or Deliberately Ignored
         Information Undermining His Public Statements ................................................ 15

       c)   Musk was Aware of the Fremont Facility's Inability to Meet Production Targets  16

       d)   Musk was Aware of the Gigafactory's Inability to Meet Production Targets ........ 16

       e)   The Former Employee Statements Must be Credited ............................................. 17

       f)   Musk's February 7, 2018 Admission ................................................................... 20

       g)   Tesla's Generalized Risk Disclosures Do Not Negate Scienter ........................... 21

     3.   The Core Operations Doctrine Supports a Strong Inference of Scienter ..................... 22

i

1

4.    The Motive Allegations Support a Strong Inference of Scienter ................................... 23

2

C.    The Complaint Adequately Pleads Loss Causation ....................................... 24

3

D.    The Complaint Adequately Pleads Control Person Liability ........................................ 25

4

IV.    CONCLUSION ................................................................................................ 26

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*3226701 Canada, Inc. v. Qualcomm, Inc.*,
    No. 15CV2678-MMA (WVG), 2017 WL 4759021 (S.D. Cal. Oct. 20, 2017) ......................... 8

*Aldridge v. A.T. Cross Corp.*,
    284 F.3d 72 (1st Cir. 2002) ................................................................................................ 15

*Allied Nevada Gold Corp. Sec. Litig.*, 3:14-CV-00175-LRH-WGC,
    2016 WL 4191017 (D. Nev. Aug. 8, 2016) ......................................................................... 9

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ........................................................................................................... 5

*Berson v. Applied Signal Tech., Inc.*,
    527 F.3d 982 (9th Cir. 2008) ......................................................................................... 5, 12

*Brodsky v. Yahoo! Inc.*,
    592 F. Supp. 2d 1192 (N.D. Cal. 2008) ............................................................................ 18

*Burritt v. NutraCea*,
    No. CV0900406PHXFJM, 2010 WL 668806 (D. Ariz. Feb. 25, 2010) ................................ 25

*Callan v. Motricity Inc.*,
    No. C11-1340 TSZ, 2013 WL 5492957 (W.D. Wash. Oct. 1, 2013) ........................................ 9

*Constr. Workers Pension Tr. Fun – Lake Cty. v. Genoptix, Inc.*,
    No. 10CV2502-CAB (DHB), 2013 WL 12123841 (S.D. Cal. Mar. 22, 2013) ....................... 20

*Curry v. Hansen Med., Inc.*, No. C,
    09-5094 CW, 2012 WL 3242447 (N.D. Cal. Aug. 10, 2012) ................................................ 25

iii

*ESG Capital Partners, LP v. Stratos*,

    828 F.3d 1023 (9th Cir. 2016) ....................................................................... 14, 15

*Ferber v. Travelers Corp.*,

    802 F. Supp. 698 (D. Conn. 1992) ...................................................................... 21

*Fitzpatrick v. Uni-Pixel, Inc.*,

    35 F. Supp. 3d 813 (S.D. Tex. 2014) ................................................................... 15

*Flynn v. Sientra, Inc.*,

    No. CV1507548SJORAOX, 2016 WL 3360676 (C.D. Cal. June 9, 2016) ...................... 13, 22

*Guangyi Xu v. ChinaCache Int'l Holdings Ltd.*,

    No. CV1507952CASRAOX, 2017 WL 114401 (C.D. Cal. Jan. 9, 2017) ....................... 9, 10

*Haque v. Tesla Motors, Inc.*,

    No. CV 12651-VCS, 2017 WL 448594 (Del. Ch. Feb. 2, 2017) ................................. 9

*Hatamian v. Advanced Micro Devices, Inc.*,

    87 F. Supp. 3d 1149 (N.D. Cal. 2015) ................................................................ 15

*Huddleston v. Herman & MacLean*,

    640 F.2d 534 (5th Cir. 1981) ............................................................................. 1

*In re Accuray, Inc. Sec. Litig.*,

    757 F. Supp. 2d 936 (N.D. Cal. 2010) ................................................................ 19

*In re Alstom SA*,

    406 F. Supp. 2d 433 (S.D.N.Y. 2005) ................................................................. 20

*In re Am. Apparel, Inc. S'holder Litig.*,

    855 F. Supp. 2d 1043 (C.D. Cal. 2012) ............................................................. 9, 10

*In re Amgen Inc. Sec. Litig.*,

No. CV072536PSGPLAX, 2014 WL 12585809 (C.D. Cal. Aug. 4, 2014) ............................ 15

*In re Apple Computer Sec. Litig.*,

886 F.2d 1109 (9th Cir. 1989) ................................................................................. ix, 1

*In re Atossa Genetics Inc Sec. Litig.*,

868 F.3d 784 (9th Cir. 2017) ................................................................................... x, 6

*In re Bare Escentuals, Inc. Sec. Litig.*,

745 F. Supp. 2d 1052 (N.D. Cal. 2010) ...................................................................... 24

*In re Cell Therapeutics, Inc. Class Action Litig.*,

No. 2:10-CV-00414-MJP, 2011 WL 444676 (W.D. Wash. Feb. 4, 2011) ............................ 25

*In re Countrywide Fin. Corp. Derivative Litig.*,

554 F. Supp. 2d 1044 (C.D. Cal. 2008) .................................................................... xi, 18

*In re Countrywide Fin. Corp. Sec. Litig.*,

588 F. Supp. 2d 1132 (C.D. Cal. 2008) ...................................................................... 22

*In re Extreme Networks, Inc. Sec. Litig.*,

No. 15-CV-04883-BLF, 2018 WL 1411129 (N.D. Cal. Mar. 21, 2018) ................................ 6

*In re Foundry Networks, Inc. Sec. Litig.*,

No. C 00-4823 MMC, 2003 WL 22077729 (N.D. Cal. Aug. 29, 2003) ................................ 9

*In re Fusion-io, Inc. Sec. Litig.*, No.:13-CV-05368-LHK,

2015 WL 661869 (N.D. Cal. Feb. 12, 2015) ................................................................. 9

*In re Immune Response Sec. Litig.*,

375 F. Supp. 2d 983 (S.D. Cal. 2005) .............................................................. xi, 15, 16

*In re MGM Mirage Sec. Litig.*,

    No. 2:09-CV-01558-GMN, 2013 WL 5435832 (D. Nev. Sept. 26, 2013) ............................ x, 7

*In re Nimble Storage, Inc. Sec. Litig.*,

    252 F. Supp. 3d 848 (N.D. Cal. 2017) ..................................................................... 9

*In re Quality Sys., Inc. Sec. Litig.*,

    865 F.3d 1130 (9th Cir. 2017) ............................................................................... 18

*In re Rigel Pharm., Inc. Sec. Litig.*,

    697 F.3d 869 (9th Cir. 2012) ................................................................................. 24

*In re Scholastic Corp. Sec. Litig.*,

    252 F.3d 63 (2d Cir. 2001) ..................................................................................... 18

*In re Secure Computing Corp. Sec. Litig.*,

    184 F. Supp. 2d 980 (N.D. Cal. 2001) .................................................................... 7

*In re Silicon Image, Inc. Sec. Litig.*,

    No. C-05-456 MMC, 2007 WL 2778414 (N.D. Cal. Sept. 21, 2007) ...................... 18

*In re UTStarcom, Inc. Sec. Litig.*,

    617 F. Supp. 2d 964 (N.D. Cal. 2009) .............................................................. 20, 24

*In re VeriFone Holdings, Inc. Sec. Litig.*,

    704 F.3d 694 (9th Cir. 2012) ................................................................................. 14

*In re Washington Mut., Inc. Sec., Derivative & ERISA Litig.*,

    694 F. Supp. 2d 1192 (W.D. Wash. 2009) ............................................................. 15

*In re Worlds of Wonder Sec. Litig.*,

    35 F.3d 1407 (9th Cir. 1994) ................................................................................. 21

*In re: Bofi Holding, Inc. Sec. Litig.*,
　　No. 315CV02324GPCKSC, 2016 WL 5390533 (S.D. Cal. Sept. 27, 2016) ............................ 24

*M & M Hart Living Tr. v. Glob. Eagle Entm't, Inc.*,
　　No. CV 17-1479 PA (MRWX), 2017 WL 5635425 (C.D. Cal. Oct. 30, 2017) ........................ 9

*Mineworkers' Pension Scheme v. First Solar Inc.*,
　　881 F.3d 750 (9th Cir. 2018) ............................................................................. 25

*Mulligan v. Impax Labs., Inc.*,
　　36 F. Supp. 3d 942 (N.D. Cal. 2014) .............................................................. ix, 6

*Murphy v. Precision Castparts Corportion*,
　　No. 3:16-CV-00521-SB, 2017 WL 3084274 (D. Or. June 27, 2017) ......................... 6

*No. 84 Employer-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*,
　　320 F.3d 920 (9th Cir. 2003) .............................................................................. 24

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*,
　　135 S. Ct. 1318 (2015) ......................................................................................... 6

*Oregon Pub. Employees Ret. Fund v. Apollo Grp. Inc.*,
　　774 F.3d 598 (9th Cir. 2014) .............................................................................. 24

*Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*,
　　759 F.3d 1051 (9th Cir. 2014) ............................................................................... 8

*Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*,
　　No. 10-CV-03451-LHK, 2012 WL 1868874 (N.D. Cal. May 22, 2012) ................................ 19

*Pompano Beach Police & Firefighters' Ret. Sys. v. Las Vegas Sands Corp.*,
　　No. 17-15216, 2018 WL 2015510 (9th Cir. May 1, 2018) ........................................... 8

*Pub. Employees' Ret. Sys. of Mississippi v. TreeHouse Foods, Inc.*,

    No. 16 C 10632, 2018 WL 844420 (N.D. Ill. Feb. 12, 2018)..................................... 7

*Reese v. Malone*,

    747 F.3d 557 (9th Cir. 2014) .................................................................. 13, 22

*Rihn v. Acadia Pharms. Inc.*,

    No.: 15cv00575 BTM(DHB), 2016 WL 5076147 *6 (S.D. Cal. Sept. 19, 2016), ................. 7, 8

*Roberti v. OSI Sys., Inc.*,

    No. CV 13-9174-MWF VBKX, 2015 WL 1985562 (C.D. Cal. Feb. 27, 2015)...................... 13

*S. Ferry LP #2 v. Killinger*,

    687 F. Supp. 2d 1248 (W.D. Wash. 2009) ................................................... 19

*S. Ferry LP, No. 2 v. Killinger*,

    542 F.3d 776 (9th Cir. 2008) ................................................................. 22

*Schueneman v. Arena Pharm., Inc.*,

    840 F.3d 698 (9th Cir. 2016) ................................................................. 15

*Schuster v. Symmetricon, Inc.*,

    No. C9420024RMW, 2000 WL 33115909 (N.D. Cal. Aug. 1, 2000)....................... 24

*Sharenow v. Impac Mortg. Holdings, Inc.*,

    385 F. App'x 714 (9th Cir. 2010)............................................................ 24

*Shenwick v. Twitter, Inc.*,

    282 F. Supp. 3d 1115 (N.D. Cal. 2017) .................................................... 24

*Shurkin v. Golden State Vintners Inc.*,

    471 F. Supp. 2d 998 (N.D. Cal. 2006) ..................................................... 18

*Silverman v. Motorola, Inc.*,

　　No. 07 C 4507, 2008 WL 4360648 (N.D. Ill. Sept. 23, 2008) ................................... 7

*Siracusano v. Matrixx Initiatives, Inc.*,

　　585 F.3d 1167 (9th Cir. 2009) ................................................................... xi, 12, 21

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,

　　551 U.S. 308 (2007) ................................................................... 5, 13, 14, 24

*Westley v. Oclaro, Inc.*,

　　897 F. Supp. 2d 902 (N.D. Cal. 2012) ........................................................ ix, x, 6, 8

*Yanek v. Staar Surgical Co.*,

　　388 F. Supp. 2d 1110 (C.D. Cal. 2005) ............................................................. 5

*Zucco Partners, LLC v. Digimarc Corp.*,

　　552 F.3d 981 (9th Cir. 2009) .......................................................... 17, 18, 22

**Rules**

Fed. R. Civ. P. 9(b) ............................................................................... 24

## SUMMARY OF ARGUMENT

"[T]here is a difference between knowing that any product-in-development may run into a few snags, and knowing that a particular product has already developed problems so significant as to require months of delay." *In re Apple Computer Sec. Litig.*, 886 F.2d 1109, 1115 (9th Cir. 1989). As 2017 started Tesla faced an existential crisis. It had burned through more than a billion dollars in 2016 developing the Model 3, diverting profits from its existing luxury cars to satisfy the cash demand for the Model 3. By the beginning of the Class Period, Defendants disclosed that they would mass produce the Model 3 by the end of 2017 despite contemporaneous facts and warnings from executives, suppliers, and vendors that Tesla's timeline was impossible to meet. Tesla had to build and operate automated production lines for the Model 3 body in its Fremont, California facility, and mass produce 5,000 batteries per week in its "Gigafactory" in Reno, Nevada.

*First*, the Complaint adequately pleads material falsity. In May and August, 2017, in SEC filings and in earnings calls with analysts, Defendants reported on their progress in first building, and then operating, automated production lines in Fremont and at the Gigafactory. Defendants leveraged these statements of present progress, claiming to be on track to meet Tesla's mass production goal by late 2017. These statements of present progress were materially false. Tesla was building small numbers of Model 3s *by hand* in its beta shop, where prototypes were constructed. In May, 2017, the automated line, itself, was in the very early stages of construction. Tesla continued to build Model 3s by hand as neither the automated production line, nor the body in white line, would produce a single Model 3 in Fremont until at least October, 2017. As with the Fremont facility, it was only in October, 2017 that the first car-ready battery came off an automated line at the Gigafactory. Similarly, supply issues abounded, and workers constructing the automated production line were regularly idle, lacking parts and instructions.

Defendants' statements that they were "on track" to meet mass production goals are actionable representations of present or historical fact. *See Mulligan v. Impax Labs., Inc.*, 36 F. Supp. 3d 942, 946, 964 (N.D. Cal. 2014); *Westley v. Oclaro, Inc.*, 897 F. Supp. 2d 902, 918–19

(N.D. Cal. 2012); In *In re MGM Mirage Sec. Litig.*, No. 2:09-CV-01558-GMN, 2013 WL 5435832, at *8 (D. Nev. Sept. 26, 2013). Further, Defendants are liable for expressions of opinion when they know facts undermining the positive statements. *See In re Atossa Genetics Inc Sec. Litig.*, 868 F.3d 784, 802–03 (9th Cir. 2017) dismissal of opinion because it did not fairly align with facts in possession at the time).

By August, 2017, Tesla was, by its own timeline, supposed to have been in the second month of automated production at both facilities. Again, Tesla told investors about progress they claimed *had already occurred* in Fremont and at the Gigafactory that supported its readiness to mass produce the Model 3 in 2017. And, again, Tesla repeatedly lied. About automated production, Tesla told investors that a "gigantic machine" meant to produce 5,000 vehicles weekly was—at that time—"producing a few hundred vehicles a week." Directly contrary to that statement, not a single complete Model 3 had been produced on the still-incomplete production line in Fremont, necessary robots were not even on site, and all Model 3s continued to be built by hand. Similarly, at the Gigafactory, no automated production occurred until September, 2017, and as late as October, 2017, only two batteries per day were completed. There had been no "great progress."

Defendants' warnings of risk to their mass production goals were meaningless in the context of the facts they knew to be true no later than May 3, 2017. Their statements were provably false, and therefore, not forward-looking. *Oclaro*, 897 F. Supp.2d at 918-19 ("a statement about a past or present fact can demonstrably be proven false" and is not forward-looking). Warnings about possible problems is insufficient to rebut falsity allegations when the risks are no longer theoretical, but have materialized. Nor do Defendants' remaining arguments undermine the falsity allegations. The cases they cite in support of their claim that Plaintiffs must produce Tesla's specific timelines for specific tasks offer no support for this assertion. The "on track" cases they cite are distinguishable; almost all concern financial projections, and not statements of existing fact, on the ground.

*Second*, the Complaint adequately pleads a strong inference of scienter. The well-pleaded facts, considered holistically, adequately allege Defendants' scienter. Defendants saw, regularly, the lack of progress in both Fremont and in the Gigafactory. They knew their statements about present progress were false. This alone establishes their scienter. The Complaint cites to a multitude of Former Employees who corroborate the lack of progress and chaos at both facilities. *In re Immune Response Sec. Litig.*, 375 F. Supp. 2d 983, 1022 (S.D. Cal. 2005) (making statements while knowing facts "suggesting the statements were inaccurate or misleadingly incomplete is classic evidence of scienter."). Further, Defendants were told, repeatedly, that their timeline for mass production was unachievable. Their knowledge strengthens the scienter inference. *Id.* at 1022. Contrary to Defendants' contention, the Former Employees' titles, responsibilities, and access to the information they observe or hear is adequately described, and their allegations must be considered. *In re Countrywide Fin. Corp. Derivative Litig.*, 554 F. Supp. 2d 1044, 1058–59 (C.D. Cal. 2008) (strong inference of scienter where, as here, "confidential and non-confidential accounts cited in the Complaint … span different levels of the Company hierarchy … remain consistent across different time periods … [and] tell what is essentially the same story … from markedly different angles"). Finally, Defendants *knew* that a production line necessary to mass produce batteries at the Gigafactory was in Germany during the *entire* Class Period, and indeed into 2018.

Defendants lastly rely on their risk warnings to combat the allegations of scienter. But Defendants cite pre-PSLRA case law that does not stand for the proposition they claim. Defendants ignore recent, Ninth Circuit precedent, *Siracusano v. Matrixx Initiatives, Inc.*, 585 F.3d 1167 (9th Cir. 2009), *aff'd sub nom Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27 (2011), where the Court ruled, rejecting an argument identical to Tesla's here, that reference to risk, in the abstract, "with no indication that the risk may already have come to fruition" is insufficient to parry well-pleaded facts that Defendants recklessly disregarded then-existing potential problems. *Id.* at 1181.

The risks about which Defendants spoke hypothetically had actually occurred, Defendants knew it, they told lies about present, knowable facts, and their scienter is established.

*Third*, the Complaint adequately pleads loss causation. Defendants concede that following publication of the October 6, 2017 *Wall Street Journal* article, the stock price fell significantly, and concede, by arguing that the published information mischaracterized the actual problems with production, that the information in the article was previously unpublished. Similarly, Defendants concede that following their own November 1, 2017 announcement that they would not, in fact, mass produce the Model 3 in 2017, and the publication, the next day, of a Jalopnik article revealing new information about production woes, Tesla's stock price again fell precipitously. The Complaint having alleged that Defendants concealed information, and misrepresented facts, surrounding Tesla's inability to mass produce the Model 3 in 2017, the stock price decline upon revelations relating to these allegations adequately pleads loss causation.

Fourth, because the Complaint adequately pleads a primary violation, the Court should sustain Plaintiffs' claim for control person liability.

xiii

Lead Plaintiff Kurt Friedman, and Named Plaintiffs Gregory Wochos and Uppili Srinivasan (collectively, "Plaintiffs"), respectfully submit this Memorandum in opposition to Defendants' Motion to Dismiss the Amended Class Action Complaint (the "Complaint') and state the following:[1]

## I.   INTRODUCTION

Distilled to its essence, Defendants argue that because Tesla was the first and only mass producer of electric cars,[2] its extensive risk warnings "eviscerate" any evidence of fraudulent intent with respect to their materially false statements. As the Ninth Circuit has stated, however, "there is a difference between knowing that any product-in-development may run into a few snags, and knowing that a particular product has already developed problems so significant as to require months of delay." *In re Apple Computer Securities Litigation*, 886 F.2d at 1115. Indeed, among the pillars of federal securities law enforcement is that "[]caution[ing] that it is only possible for the unfavorable events to happen when they have already occurred is deceit."[3] For the following reasons, this Court should deny Defendants' Motion to Dismiss.

## II.   STATEMENT OF FACTS

Tesla's ability to mass produce an affordable electric vehicle presented an existential challenge to the Company. ¶¶11, 22, 49, 95, 97.[4] To evolve from a niche luxury electric car producer into a mass producer of affordable electric cars, Tesla would burn through a billion dollars a quarter

---

[1] Defendants are Tesla, Inc. ("Tesla" or the "Company"), Chief Executive Officer ("CEO") Elon R. Musk, and Chief Financial Officer ("CFO") Deepak Ahuja. References to "¶_" are to the Complaint. References to "DMem. _" are to Defendants' Memorandum in support of their Motion to Dismiss the Complaint (ECF No. 30).

[2] Defendants' Memorandum is imprecise. They claim that Tesla was in "uncharted territory" because no other automobile manufacturer "had ever before attempted to introduce a mass market all-electric vehicle." DMem. 1. In 2010, Nissan introduced its Leaf and continues producing it at three factories around the world. Chevrolet began manufacturing its Bolt in late 2016 with initial production estimates of between 22,000 to 50,000 units per year, depending on demand.

[3] *Huddleston v. Herman & MacLean*, 640 F.2d 534, 544 (5th Cir. 1981), *aff'd in relevant part and rev'd in part on other grounds*, 459 U.S. 375 (1983).

[4] Tesla had produced only luxury electric vehicles, with a history of overpromising, by years, on production dates. Its vehicles all suffered from production issues leading to recalls. ¶¶50-70.

on the Model 3. ¶¶10, 96, 98 & n. 24, 99, 102. Compounding the complexity of this process, competitors—established auto manufacturers with decades of experience producing millions of affordable vehicles—were investing billions of dollars in their own electric vehicles. ¶¶103-105.

In 2016, Tesla executives with direct access to Defendant Musk, including Josh Ensign, Tesla's Vice President of Manufacturing, warned the Company that Tesla would not be able to mass produce the Model 3 by the end of 2017 in the Company's Fremont, California plant. They supported their conclusions with detailed explanations. ¶¶123-130.[5] Echoing internal assessments, Tesla's suppliers told the Company its mass production timeline was "impossible." ¶136. As of mid-2016, only one supplier had a signed contract with Tesla to supply production line equipment, and the complexity of hundreds of vendors building the automated line simultaneously would prolong the process beyond Tesla's public deadline. ¶¶138, 140. Mass producing 5,000 Model 3s per week also required the Company to produce 5,000 batteries per week at its "Gigafactory." The Company had, however, determined not to use its existing battery production lines for its luxury models, requiring it to build and operate new, untested battery production lines. ¶92.

On May 3, 2017, the start of the Class Period,[6] in Tesla's "First Quarter 2017 Update," Defendants stated that "preparations at our production facilities are on track to support the ramp of Model 3 production to 5,000 per week at some point in 2017…." ¶¶107, 209. That same day, during an earnings conference call, Musk stated that "I don't know anything that would prevent us from starting firstly in July, and exceeding 5,000 units per week by the end of the year." ¶¶108, 211.[7] Also during the May 3, 2017 call, Defendants claimed that there were "no issues" with the supply chain for the Model 3. ¶¶82, 214. On May 10, 2017, Tesla filed its 10-Q for the first quarter of 2017

---

[5] FE1 also told Defendant Musk that the Fremont plant needed to be expanded if Tesla was to mass produce the Model 3, an idea Musk rejected. ¶128.

[6] The Class Period is from May 3, 2017 through November 1, 2017, both dates inclusive.

[7] Defendants claim that they met the July start of production deadline. DMem. 14. Instead, Tesla built all Model 3s by hand in July, in the beta shop, for lack of a functioning automated production line in Fremont or at the Gigafactory. ¶¶152-155, 157-158.

2

again touting that "preparations at our production facilities are progressing to support the ramp of Model 3 production to 5,000 vehicles per week at some point in 2017…" ¶¶107, 209. They stated further that "we continue to remain on track with our progress at Gigafactory 1." ¶¶111, 220. Analysts wrote that progress is "ahead of our expectations," ¶113, noting the Company's confidence that it would reach Model 3 mass production in 2017. ¶114. Following delivery of the first thirty Model 3s at a "handover event" on July 28, 2017, analysts expressed confidence that the Company's actual progress on the ground supported the promise of mass production in 2017. ¶115.[8]

On May 3, 2017, Tesla disclosed its progress constructing automated lines for mass production at Fremont and Gigafactory that was starkly at odds with reality. ¶¶17-19, 122, 176-177, 179, 205-206. Through mid-October 2017, Tesla manufactured no Model 3 on an automated line. The "body in white line" for welding Model 3 bodies was not operational. ¶¶145, 148-149. Rather, Tesla was building Model 3s by hand in its beta, or pilot shop, where it developed prototypes and test versions. ¶¶152, 158. Indeed, through late June, 2017, the Fremont automated line was in the very early stages of construction and was not operational. ¶¶160, 163. Existing conditions at the Gigafactory, too, differed materially from Defendants' claim. Defendants claimed that the Company was "on track" to mass produce batteries in 2017. As of May 2017, however, all Gigafactory battery module assembly was manual, messy, and slow. ¶188. Tesla's Gigafactory partner, Panasonic, later confirmed the lack of automated battery production to this point. ¶189.

In August, 2017, reporting second quarter 2017 results, despite their actual knowledge of the lack of progress towards mass production of either the Model 3 body in Fremont or batteries at the Gigafactory, ¶¶17-19, 122, 176-177, 179, 205-206, Defendants doubled down on their May statements, falsely describing progress toward their mass production goal they claimed *had already occurred* in both facilities. On August 2, 2017, in the Company's Second Quarter 2017 Update, Defendants wrote that "[b]ased on our preparedness at this time, we are confident we can… achieve a run rate of 5,000 vehicles per week by the end of 2017." ¶¶117, 225. During the earnings call on

---

[8] All 30 Model 3s were built by hand, none were produced on an automated line. *See* ¶¶152-155.

the same date, Musk stated that "we remain – we believe on track to achieve a 5,000 unit week by the end of this year." ¶¶118, 227. About the Gigafactory, Musk boasted "[a]nd then batteries-also making great progress on the battery front." ¶¶119, 229.[9] Finally, with respect to the automated line in Fremont, Musk stated that there existed "a gigantic machine producing – that's meant for 5,000 vehicles a week and it's producing a few hundred vehicles a week." ¶¶100, 231. Analysts conveyed Tesla's purported "level of preparedness to achieve production targets," and that "Model 3 production began in July," when, in reality, automated production had not yet begun. ¶¶120-121.

Defendants' August, 2017, assertions of present progress toward mass production goals were false. There was no "gigantic machine producing" any Model 3s in Fremont as of August, or long thereafter. As of August, 2017, Tesla continued to build *all* Model 3s by hand in its Fremont "beta shop," its prototype assembly shop. ¶152. Robot installation on the automated line was still incomplete. As of September, 2017, Tesla had yet to receive many robot parts, and the body shop remained far from completion. ¶¶164-167. As of mid-October 2017, the production line remained incomplete, and Tesla had still not built a single Model 3 on an automated line, much less "a few hundred a week," as they claimed. ¶¶145-147, 150.

In August 2017 the Gigafactory was equally unproductive. Tesla did not begin automated battery production until September, 2017, when unresolved production and supply issues plagued the process. ¶¶188, 192. As of October, 2017, the Gigafactory produced no more than two battery packs per day. ¶195.[10] Production problems persisted through the end of 2017. ¶¶197-199. Even in January, 2018, Gigafactory completed no more than 14 finished Model 3 batteries every 1-2 weeks. ¶¶200-202. Defendants have admitted that Gigafactory could never have produced more than 2,500 batteries per week in 2017; necessary production equipment remained in Germany in February 2018. ¶¶207-208.

---

[9] In the Second Quarter 2017 10-Q filed on August 4, 2017, Defendants similarly claimed that progress at "Gigafactory 1 will allow us to reach our production targets…." ¶235.

[10] When the first "customer saleable [battery] pack" was completed in October 2017, a congratulatory company-wide email was distributed, according to FE9. ¶196.

On October 6, 2017, an article in *The Wall Street Journal* revealed that Tesla continued to build only three 3 Model 3s per day, by hand, that the production line was not yet complete, and that Telsa had failed to install the "body in white line" as of September 2017. ¶243. On this news, Tesla stock fell $13.94, or 3.91%, harming investors. ¶244. On November 1, 2017, after market close, Tesla admitted that it would not mass produce the Model 3 in 2017. ¶245. On November 2, 2017, at 12 p.m. EST, *Jalopnik* published that Tesla continued to build Model 3s by hand in October, 2017, in an area separate from the uncompleted, non-functioning automated line. ¶246. Some suppliers for the automated line had not yet even received approval for their tooling. ¶246. On these disclosures, Tesla stock fell $21.82, or 6.8%.

## III.   ARGUMENT[11]

### A.   The Complaint Adequately Pleads Falsity[12]

#### 1.   Defendants' August 2, 2017 Statement about Weekly Production of Model 3s Was Materially False

Defendants concede the material falsity of Defendant Musk's August 2, 2017 statement, conveying then current facts, about "a gigantic machine producing – that's meant for 5,000 vehicles a week and it's producing a few hundred vehicles a week." ¶¶100, 231-232. As of August 2, 2017, Tesla still built Model 3s by hand in the beta shop. ¶152. It had neither completed nor produced vehicles on its automated production line, ¶¶145-149, 150, 152, 158, 160, 163-167, 243, 246, and Musk, who regularly visited Fremont, personally witnessed that the automated line had produced no Model 3s, much less hundreds a week. ¶¶17-19, 122, 176-177, 179, 205-206.

Defendants tacitly concede both that Musk lied, and that the lie was material and actionable. D. Mem. 19 n. 14. Rather, they assert that Musk lied while responding to a question

---

[11] The Court will accept all well-pleaded factual allegations as true, *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007), drawing all reasonable inferences from the allegations in the light most favorable to Plaintiffs. *Yanek v. Staar Surgical Co.*, 388 F. Supp. 2d 1110, 1120 (C.D. Cal. 2005). The Complaint's allegations must "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotation omitted).

[12] A statement is misleading when it gives a reasonable investor the "impression of a state of affairs that differs in a material way from the one that actually exists." *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 985 (9th Cir. 2008).

about gross margins. Defendants cite no law supporting their right to lie about material facts when answering questions on a related subject. The Complaint adequately alleges the material falsity of Musk's knowing lie about automated production in August.

### 2. Defendants' "On Track" and "Preparedness" Statements are Actionable

Unable to counter the well-pleaded allegations of falsity, Defendants instead argue that the "on track" statements, specifically, are not actionable as forward-looking, or mere puffery. DMem. 15-17. Defendants are wrong, and their cited cases inapposite.

Statements that a process is "on track" are expressions of present fact. Companies and their officials are liable for opinions and statements of optimism when unflattering facts in the defendants' possession undermine such positive sentiments. *See, e.g., In re Atossa Genetics Inc Securities Litigation*, 868 F.3d at 802–03 (reversing dismissal of opinion because it did not fairly align with facts in possession at the time) (citing *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 135 S. Ct. 1318, 1329 (2015)). For example, in *Mulligan*, 36 F. Supp. 3d 942, the plaintiffs claimed defendants misrepresented "remediation efforts in response to FDA warnings." *Id.* at 946. Rejecting arguments identical to Tesla's here, the court ruled that the statements "all contain representations of present or historical fact," including that tasks to address an issue were "well under way." *Id.* at 964. The court rejected that statements of present fact become forward-looking when they "are used to make predictions about the future." *Id.* at 965 (*quoting Westley v. Oclaro, Inc.*, 897 F. Supp. 2d 902, 918-19 (N.D. Cal. 2012) ("a statement about a past or present fact can demonstrably be proven false" and is not forward-looking).[13]

Aware of the existential threat failure to timely mass produce the Model 3 posed to Tesla, Defendants expressed confidence in their 2017 mass production goal, reassuring about purported,

---

[13] *See also In re Extreme Networks, Inc. Sec. Litig.*, No. 15-CV-04883-BLF, 2018 WL 1411129, at *18 (N.D. Cal. Mar. 21, 2018) (denying motion to dismiss, holding statements that integration plan was "on track" and "ahead of plan" were then-current and actionable statements where complaint pleaded little if any progress); *Murphy v. Precision Castparts Corportion*, No. 3:16-CV-00521-SB, 2017 WL 3084274, at *13 (D. Or. June 27, 2017) (recommending denial of motion to dismiss, holding statements of "current market status" and "hitting benchmarks," related to annual earnings goal, are actionable statements of current fact).

then-current, actual progress toward their goal. On May 3, 2017, Tesla wrote that "[p]reparations at our production facilities are on track to support the ramp" to 5,000 vehicles per week in 2017. ¶209. With respect to "critical outstanding items" that could thwart mass production of Model 3, Defendants stated that "preparations at our production facilities are progressing to support the ramp of Model 3 production to 5,000 vehicles per week at some point in 2017….", ¶216, and "we continue to remain on track with our progress at Gigafactory 1…." ¶220. In *In re MGM Mirage Sec. Litig.*, No. 2:09–cv–01558-GMN-VCF, 2013 WL 5435832 (D. Nev. Sept. 26, 2013), with respect to substantially similar statements about the progress of a development project, the court held that that "statements that a project is 'on-track,' 'on-budget,' or 'on-schedule,' are not forward-looking but statements relating to current conditions." *Id.* at *8 (representing that construction was proceeding on schedule was false in context of then existing changes, and "would make any on-schedule statement misleading").[14]

Defendants' May, 2017 statements about then-existing "progress" towards mass production of the Model 3, too, were materially false. Critical gating items abounded. At Fremont, the automated line was nowhere near completion, ¶¶160, 163, necessitating hand production of Model 3s. ¶¶147, 152. Serious supply issues existed, further complicating Tesla's completing the automated lines. ¶¶136, 138, 140, 161, 179, 186, 192. With no automated line near completion, the Gigafactory too was still manually assembling batteries, ¶¶188-189, with necessary equipment on another Continent. ¶¶207-208. In context, facts on the ground belied Defendants' statements of progress, rendering Defendants' May, 2017 statements materially false. *See Rihn*, 2016 WL

---

[14] *See also Rihn v. Acadia Pharms. Inc.*, No.: 15cv00575 BTM(DHB), 2016 WL 5076147 *6 (S.D. Cal. Sept. 19, 2016) (statements that submission of NDA to FDA was on track "were representations about the current state of affairs with respect to the NDA process"); *In re Secure Computing Corp. Sec. Litig.*, 184 F. Supp. 2d 980, 990 (N.D. Cal. 2001) ("on track" to meet expectations "are not forward-looking, but rather are statements of current business conditions."); *Pub. Employees' Ret. Sys. of Mississippi v. TreeHouse Foods, Inc.*, No. 16 C 10632, 2018 WL 844420, at *3 (N.D. Ill. Feb. 12, 2018) (same); *Silverman v. Motorola, Inc.*, No. 07 C 4507, 2008 WL 4360648, at *10 (N.D. Ill. Sept. 23, 2008) (statements that rollout of 3G network was on track "are statements of present fact.").

5076147, at *6 ("on track" to submit the NDA was a statement of current condition "not vague statements of optimism, but, rather, statements premised on facts"). *Id.*[15]

Defendants attempt to parry, relying on their disclosure that Tesla faced hard work to meet its 2017 mass production goal and arguing that their ostensible "transparency" ends any discussion of fraud. D. Mem. 9, 17. That an upstart automobile manufacturer faced "hard work" is puffery, a meaningless axiom. That Defendants repeatedly misrepresented the present state of progress is materially misleading. Thus, even as Musk stated on July 28, 2017 that the next few months would be "production hell," he led investors to believe that Tesla's automated production line had built the Model 3s it had just delivered, when Tesla built those cars by hand. As of that date, Tesla had not yet completed its automated line. ¶147. When investors heard other "transparent" statements, they understood them in the context of there being no critical gating issues or any serious supply issues as of May 2017, when in fact the Company had lied about both. Finally, in August, 2017, when investors considered Defendants' statements about the hard work that remained to mass produce the Model 3 in 2017, it was in the context of Musk's stating that "hundreds" of Model 3s per week were already coming off a completed production line, when in fact not a single Model 3 had ever come off an automated line.

Defendants' "on track" statements—their denial that supply issues and critical gating issues existed and their false boast that automated production began in July, 2017—were representations of present or historical fact. One can prove them demonstrably false. *Oclaro, Inc.*, 897 F. Supp. 2d at 918. They were, therefore, not forward-looking. Defendants misrepresented the then-current

---

[15] The cases Defendants cite are inapposite. *See e.g. Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1058 (9th Cir. 2014) (assumptions underlying financial projections are forward looking); *Pompano Beach Police & Firefighters' Ret. Sys. v. Las Vegas Sands Corp.*, No. 17-15216, 2018 WL 2015510, at *1–2 (9th Cir. May 1, 2018) (statements constituting "plans and objectives of management for future operations" are not statements of present fact); *3226701 Canada, Inc. v. Qualcomm, Inc.*, No. 15CV2678-MMA (WVG), 2017 WL 4759021, at *15 (S.D. Cal. Oct. 20, 2017) ("on track" statements referred to future use of the company's Snapdragon 810 microprocessor in commercial devices, and not specific present facts concerning production).

status of their mass production capabilities. The Complaint, therefore, adequately pleads the material falsity of the "on track" statements.[16]

Defendants' assertion that for the "on track" statements to be actionable Plaintiffs must "allege specific facts detailing the production plan as it stood on May 3" (or in August 2017), DMem. 14, 16, misreads the cases they cite in support. In *Guangyi Xu v. ChinaCache Int'l Holdings Ltd.*, No. CV1507952CASRAOX, 2017 WL 114401 (C.D. Cal. Jan. 9, 2017), the court did not impose such a requirement. Rather, the court held that the plaintiff did not "allege a timeline against which the 'on track' claim might be verified." The missing timeline was not the intermediate steps, or plan, towards a known completion date, but the actual completion date, which the court found had never been definitively stated. *Id.* at *6. Similarly, in *In re Am. Apparel, Inc. S'holder Litig.*, 855 F. Supp. 2d 1043 (C.D. Cal. 2012), the court held that the "on track" to "making significant progress" remediating internal controls deficiencies claim did not relate to a "date certain…." *Id.* at 1072.[17] Here, by contrast, Defendants disclosed a completion date—mass

---

[16] Most of Defendants' cited cases involve financial performance goals or projections. *M & M Hart Living Tr. v. Glob. Eagle Entm't, Inc.*, No. CV 17-1479 PA (MRWX), 2017 WL 5635425 (C.D. Cal. Oct. 30, 2017) ("on track for $15 million in savings in 2017, growing to at least $40 million in 2018 and thereafter" forward-looking because it related to earnings guidance and projections); *In re Allied Nevada Gold Corp. Sec. Litig.*, 3:14-CV-00175-LRH-WGC, 2016 WL 4191017 (D. Nev. Aug. 8, 2016) ("on track" statement pertained to financial performance goals); *In re Nimble Storage, Inc. Sec. Litig.*, 252 F. Supp. 3d 848 (N.D. Cal. 2017) (similar); *In re Foundry Networks, Inc. Sec. Litig.*, No. C 00-4823 MMC, 2003 WL 22077729 (N.D. Cal. Aug. 29, 2003) (general statement that "business remains on track" related to financial performance goals, did not reference any prior specific statement, estimates or report); *Callan v. Motricity Inc.*, No. C11-1340 TSZ, 2013 WL 5492957, at *6–7 (W.D. Wash. Oct. 1, 2013) (general statements that company's Asian business was "on track" relates to financial performance goals, did not reference any prior specific statement, estimates or report); *In re Fusion-io, Inc. Sec. Litig.*, No.:13-CV-05368-LHK, 2015 WL 661869, at *12 (N.D. Cal. Feb. 12, 2015) (statements made "in the context of Fusion-io's guidance for its third-quarter revenues").

[17] Defendants' citation to *Haque v. Tesla Motors, Inc.*, No. CV 12651-VCS, 2017 WL 448594 (Del. Ch. Feb. 2, 2017), D. Mem. 17 n. 12, an unpublished Delaware state court case, is misleading. In *Haque*, a shareholder sought discovery, to bring a derivative claim for breach of fiduciary duty, claiming that Tesla invented production problems for its Model S in order to hide lower than reported demand for the vehicle. Defendants include a partial quote from the case that seems to indicate that failure to meet stated production goals is unforeseeable. In fact, Tesla did meet the stated production goal of 20,000 in that instance. *Id.* at *9, 11. The case had nothing to do with

9

production of Model 3s by the end of 2017. ¶¶107-108, 111, 209, 211, 220. Unlike in *ChinaCache* and *In re American Apparel*, there was a date against which the "on track statements might be verified." *ChinaCache*, 2017 WL 114401 at \*6. Defendants' cases are inapposite and their May, 2017 statements actionable.[18]

As it did in May, in August the Company made numerous false statements of present circumstances, all in support of their assertions to investors that Tesla would mass produce the Model 3 in 2017. In Tesla's August 2, 2017, Second Quarter 2017 Update, the Company wrote that "based on our preparedness at this time, we are confident we can produce just over 1,500 vehicles in Q3, and achieve a run rate of 5,000 vehicles per week by the end of 2017." ¶225. During an earnings call that same day, Musk stated that "we remain – we believe on track to achieve a 5,000 unit week by the end of this year." ¶227. Musk further stated, with respect to the Gigafactory, that "[a]nd then batteries – also making great progress on the battery front." ¶229. In the August 4, 2017 10-Q, the Company wrote that "While we currently believe that our progress at Gigafactory 1 will allow us to reach our production targets…." ¶235.

The Complaint adequately alleges that each of these statements was materially false. As of August, 2017, Tesla still built all Model 3s by hand. ¶152. FE5, a robot programmer in Fremont, stated that robot installation on the automated line was still not complete, many robot parts had not been delivered, and the body shop was not even near completion as of September, 2017. ¶¶164-167. FE3 stated that as of mid-October 2017, the production line was not operational, and not a single Model 3 was constructed on an automated line, much less "a few hundred a week." ¶¶145-147, 150.

---

false statements of present fact; unlike *Haque*, Defendants here did not need to foresee production problems, they could actually *see* the production problems, yet misrepresented existing facts.

[18] Even if interim details were required, Defendants essentially laid out their "production plan" through their misstatements. Apparently, Defendants believed that to be "on track" for mass production in 2017, all supply issues should be resolved by May 2017, ¶¶82, 214, and hundreds of Model 3s should by rolling off the automated production line in Fremont in August 2017. ¶¶100, 231. These are the lies Defendants told investors to convince the market that Tesla was "on track" to reach its mass production goal in 2017.

The situation at the Gigafactory in August 2017 was equally unproductive. According to FE9, partial automated battery production, not encompassing the entire production process, did not even begin at the Gigafactory until September 2017, and the partial process was plagued with unresolved production and supply issues. ¶¶188, 192. According to FE9, as of October 2017, no more than two battery packs per day were produced at the Gigafactory. ¶195. These production issues persisted through the end of 2017, according to FE10. ¶¶197-199. FE11, who worked at the Gigafactory through January 2018, stated that no more than 14 finished Model 3 batteries were completed every 1-2 weeks by then. ¶¶200-202. After the Class Period, Defendants admitted that the Gigafactory could never have produced 5,000 batteries per week in 2017, as production equipment necessary to ever achieve production beyond 2,500 batteries per week was still in Germany in February 2018. ¶¶207-208. For the foregoing reasons, the Complaint adequately pleads the material falsity of Defendants' statements that Tesla was on track and prepared to meet its mass production goal.

### 3.   Defendants' "Supply Chain" Statements are Materially False

Defendants' claim that no supply issues existed until September 2017. D. Mem. 15. This directly contradicts the Complaint's well pleaded allegations. The Complaint adequately alleges that Musk's statement of present fact during the May 3 earnings call that "there are no issues" with the "supply chain," ¶214, was materially false.[19]

The complaint describes observable issues with the supply chain for the Model 3 at the start of and during the Class Period. As of June 2016, Tesla had exactly one completed contract with a supplier to supply equipment for the production lines, ¶138, out of hundreds, or thousands, of vendors supplying more than 10,000 unique parts for the Model 3 and the automated lines. ¶140 & n. 42. At that time, FE1 told Musk directly that this fact alone made a 2017 mass production timeline impossible. ¶127. Further, Musk knew, ¶179, that the suppliers themselves, including major suppliers, informed Tesla that its timelines were "impossible" to meet, and stated that other

---

[19] Defendants' statements did not specify the Fremont or Gigafactory facilities; they applied to both. ¶214.

suppliers with whom the major suppliers were dealing were saying the same thing. ¶136. Those same suppliers told Tesla that the process would be further delayed from having to work simultaneously in the same area as other suppliers and workers. ¶140. FE5 stated that as of June, 2017, hundreds of robot parts had not arrived, meaning that this number, or more, were missing in May, 2017, when Tesla was telling investors that automated production would begin in July, and that there were "no issues" with the supply chain. ¶168. Finally, further supporting the falsity of Musk's statement, FE4, who was in the Fremont plant in May 2017, stated that construction workers building the automated line in Fremont often had no more than a half-day's work to do because there was nothing available to install or build on most days. ¶161.

With respect to the Gigafactory, as of May, 2017, FE8 stated that production downtime, often lasting a full shift, was common, due to a "lack of parts." ¶186. FE9 stated that long after Musk claimed there were no supply issues, insufficient supplies still caused production issues. ¶192. Thus, the Complaint adequately pleads the material falsity of Defendants' supply chain comments.

### 4.  Defendants Risk Disclosures Were False

Risk warnings are actionable as material omissions when the warning speaks to "entirely… as-yet-unrealized risks and contingencies" and fails to alert "the reader that some of these risks may already have come to fruition." *Berson, 527 F.3d at 986*; *see also Siracusano v. Matrixx Initiatives, Inc.*, 585 F.3d 1167, 1181 (9th Cir. 2009) ("By choosing to speak about the [topic] Defendants assumed a duty to disclose material information" about it), *aff'd*, 563 U.S. 27.

The Complaint alleges false and misleading omissions with respect to three separate risk warnings. The first, in the May 10, 2017 10-Q, relates to delays in timelines and volume targets. ¶218. As detailed above, *supra.* at 2-5, this risk had materialized by May of 2017. The second, from the August 4, 2017 10-Q, ¶233, is identical, except that it states that "we commenced production… of Model 3 in July 2017," omitting that Tesla hand-built those units but had not yet commenced automated production. As detailed above, *supra.* at 2-5, this risk had materialized by August of 2017. Finally, the August 10-Q included a risk warning relating to battery production at

the Gigafactory, including a statement that "we currently believe that we will reach our production targets…." ¶237. As detailed above, *supra.* at 2-5, the risk of production delays at the Gigafactory had materialized by May of 2017.

*Flynn v. Sientra, Inc.*, No. CV1507548SJORAOX, 2016 WL 3360676, at *10–11 (C.D. Cal. June 9, 2016), is directly on point. In *Flynn*, finding falsity and scienter, the court found that though defendants warned generally about risks of product contamination in production facilities, similar to Defendants' general warnings here, they "knew or recklessly disregarded" that the risk had specifically materialized. *Id.* As in *Flynn*, Defendants here had a duty to inform investors that the risks about which they had warned had materialized. Their failure to include this information renders the risk warnings false.

### 5. The Individual Defendants' Signed Certifications Attached to the May and August 10-Qs Were False

The complaint alleges the falsity of Musk's and Ahuja's Certifications, attached to both the May 10, 2017, and August 4, 2017, 10-Qs. ¶¶222-223, 239-240. Both defendants certify that the filings do "not contain any untrue statement of material fact or omit to state a fact necessary to make the statements, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report[.]" As detailed above, Defendants were aware, or were reckless in not being aware, that statements in each 10-Q were materially false, and thus the Certifications are actionably false. *See Roberti v. OSI Sys., Inc.*, No. CV 13-9174-MWF VBKX, 2015 WL 1985562, at *10–11 (C.D. Cal. Feb. 27, 2015) (false certification adequately alleged when falsity of certification arises from same basic facts as other misrepresentations).

### B. The Complaint Adequately Pleads Scienter

#### 1. Legal Standard

The Complaint establishes a strong inference of scienter, at least as compelling as any non-culpable inference, satisfying the pleading standard for scienter. *See Tellabs, Inc.*, 551 U.S. at 326. The Court will evaluate the Complaint's scienter allegations holistically, avoiding scrutinizing each allegation in isolation. *Id.*, 551 U.S. 308 at 326; *Reese v. Malone*, 747 F.3d 557, 580–81 (9th

13

Cir. 2014). "[A]n extreme departure from the standards of ordinary care . . . that is either known to the defendant or is so obvious that the actor must have been aware of it" suffices. *In re VeriFone Holdings, Inc. Sec. Litig.*, 704 F.3d 694, 702 (9th Cir. 2012) (internal quotation marks and citations omitted).

A strong inference "need not be irrefutable, i.e., of the 'smoking-gun genre,' or even the 'most plausible of competing inferences.'" *Tellabs, Inc.*, 551 U.S. at 324 (internal citations omitted). Because a "reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged," this Court will deny Defendants' motion. *Tellabs, Inc.*, 551 U.S. at 324.

### 2.      The Complaint's Allegations Raise a Strong Inference of Recklessness

A holistic analysis of the Complaint's scienter allegations supports a strong inference that Defendants were at least reckless. Defendants knew or deliberately ignored adverse information about whether the Company was "on track" to mass produce the Model 3 in May and in August of 2017, whether "progress" had been made supporting Defendants' claims that Tesla would mass produce Model 3s by the end of 2017, whether supply chain problems existed, and whether the automated line in Fremont was producing hundreds of Model 3s a week in August 2017. Therefore, the Complaint adequately pleads a strong inference of scienter that is "at least as plausible as a nonfraudulent alternative." *ESG Capital Partners, LP v. Stratos*, 828 F.3d 1023, 1035 (9th Cir. 2016).

### a)      Musk Attended Meetings Where Tesla's Inability to Meet Production Targets Was Discussed

The Complaint alleges that Musk attended a meeting with CFO Jason Wheeler, in late April or early May of 2016, prior to the Class Period statements, where he was directly informed by FE1, Director of Manufacturing at Tesla's Fremont plant, that "there was zero chance that the plant would be able to produce 5,000 Model 3s per week by the end of 2017." ¶125. FE1 told Musk that the ***start*** of manufacturing would be at least six months later than July 2017, *i.e.*, in 2018. ¶128. FE1 further told Musk that Tesla needed to expand the area needed at the Fremont plant to prepare the body of the Model 3, an idea that Musk flatly rejected. *Id.*

14

Senior manufacturing engineer William Zochodne also attended meetings with Musk where the production targets were discussed. ¶175. No later than January 2017, Zochodne expressed that the deadlines for production were unrealistic, and wondered aloud when Musk would change the timeline and admit that producing 5,000 Model 3s per week in 2017 would not happen. *Id.* Musk's presence at meetings, discussing internally the same adverse information he withheld from investors, supports a strong inference of scienter. *See Hatamian v. Advanced Micro Devices, Inc.*, 87 F. Supp. 3d 1149, 1162–63 (N.D. Cal. 2015); *In re Amgen Inc. Sec. Litig.*, No. CV072536PSGPLAX, 2014 WL 12585809, at *17 (C.D. Cal. Aug. 4, 2014); *In re Washington Mut., Inc. Sec., Derivative & ERISA Litig.*, 694 F. Supp. 2d 1192, 1220 (W.D. Wash. 2009).

> **b)**  **The Complaint Alleges that Each Defendant Knew or Deliberately Ignored Information Undermining His Public Statements**

A plaintiff alleges scienter with sufficient particularity by demonstrating that defendants knew of specific information undermining their public statements to investors. *Schueneman v. Arena Pharm., Inc.*, 840 F.3d 698, 707 (9th Cir. 2016). Making statements while knowing facts "suggesting the statements were inaccurate or misleadingly incomplete is classic evidence of scienter." *In re Immune Response Securities Litigation*, 375 F. Supp. 2d at 1022 (quoting *Aldridge v. A.T. Cross Corp.*, 284 F.3d 72, 83 (1st Cir. 2002)). In *Fitzpatrick v. Uni-Pixel, Inc.*, 35 F. Supp. 3d 813, 832 (S.D. Tex. 2014), the court stated, regarding production targets, that "[t]he gross disparity between the defendants' predictions and Uni-Pixel's actual results …. raises a strong inference that defendants' false and misleading predictions about the manufacturing capacity and commercial release of UniBoss were made with scienter." Similarly, Plaintiffs here allege that no facts available to Defendants either in May 2017 or in August 2017 supported Defendants' statements to investors. ¶122. In particular, the Complaint pleads that "Musk was personally aware of existing facts that prevented Model 3 mass production in 2017." ¶109.

### c) Musk was Aware of the Fremont Facility's Inability to Meet Production Targets

As discussed above, high-ranking Tesla employees told Musk personally, as far back as mid-2016, that there was zero chance of mass producing the Model 3 in 2017. ¶¶125, 128, 175. FE1 further stated that Josh Ensign, the Vice President of Manufacturing, also told Musk directly that the Company would never be able to meet Musk's unrealistic timeline for production of 5,000 Model 3s per week by the end of 2017, and that Ensign was forced out of the Company for doing so. ¶130. In addition, FE2 – a Senior Project Engineer in Material Flow Engineering for the Model 3 who was personally tasked with dealing with Tesla's Model 3-related suppliers – stated that these suppliers told Tesla no later than June 2016 that the timelines Tesla wanted them to meet were "impossible," and could not be met. ¶¶135-136.

The Complaint also cites FE2, FE3, and FE7 corroboratively attesting that for virtually the entire Class Period it was "common knowledge" at the Fremont facility and "openly visible" that construction and assembly of the automated production line for the Model 3 was delayed, and not yet completed. ¶¶22, 139, 150, 160, 163. These statements are buttressed by the fact that Musk and Ahuja visited the Fremont factory on a regular basis. ¶¶17-18, 177, 179. FE2 confirmed that his superiors raised Tesla's suppliers' concerns about "impossible" timelines with Musk during his weekly visits to the Fremont facility. ¶179. Defendants had direct knowledge undermining their Class Period statements concerning the capability of Tesla's production line, giving rise to a strong inference of scienter. *Immune Response Sec. Litig.*, 375 F. Supp. 2d at 1022.

### d) Musk was Aware of the Gigafactory's Inability to Meet Production Targets

The Complaint cites FE8 who, in direct contravention of Defendants' Class Period claims to have been "on track with our progress at Gigafactory 1" and/or "making great progress on the battery front" (see ¶¶111 & 119), stated that there was a high failure rate for Model 3 battery modules for the entire time FE8 worked at the Gigafactory, from January of 2014 through September 2017. ¶¶182-185. FE8 further stated that production downtime was common, often lasting seven to eight hours. ¶186. FE9, who was a Process Technician at the Gigafactory, stated

that as of March 2017, all battery module assembly was manual, and partial automated battery production only began in September 2017. ¶188. This is consonant with the post-Class Period admission by Gigafactory partner Panasonic that battery production was not automated at any time during the Class Period. ¶188. Critically, FE9 revealed that almost to the end of the Class Period, the Gigafactory produced no more than two battery packs, at most, per day, sufficient for two cars. ¶195. FE11 – who worked as a Materials Handler at the Gigafactory from December 2016 to January 2018 – clarified that was a best-case-scenario figure, stating that it took 1-2 weeks for each production line at the Gigafactory to produce one (1) finished battery, so no more than 14 finished Model 3 batteries were completed. ¶202. FE10 – a Production Associate at the Gigafactory toward the end of the Class Period – describes an environment of production stoppages and breakdowns that is directly at odds with Musk's August 2017 statement to investors during the Class Period that battery production at the Gigafactory was making "great progress." *Compare* ¶¶197-199 with ¶229. Ultimately, Defendants admitted – though not until after the Class Period – that the Gigafactory never had the ability to meet Defendants' Class Period production targets for the Model 3. ¶¶207-208.

As with the Fremont factory, the Gigafactory's production capabilities would have been apparent to anybody walking through it both before and during the Class Period, ¶22. Musk, in particular, did not merely walk through the Gigafactory but slept there. ¶206. Accordingly, Musk was aware at all times of the vast gulf separating what he told investors about Tesla's battery production operations from the true status of those operations during the Class Period. *Immune* at 1022. Defendants' scienter with respect to the Gigafactory is properly alleged.

### e)       The Former Employee Statements Must be Credited

Defendants argue that because *some* of the FEs cited in the Complaint left Tesla before the Class Period started, they "lack credible knowledge of Model 3 production at the time of the alleged misstatements in May and August 2017." DMem. 22. Defendants cite *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981 (9th Cir. 2009) for the proposition that confidential witness

17

testimony must be precisely contemporaneous with a defendants' misstatement. Yet *Zucco* says no such thing.[20] Instead, the Ninth Circuit instructed that confidential witness reliability be gauged in relation to "the level of detail provided by the confidential sources, the corroborative nature of the other facts alleged (including from other sources), the coherence and plausibility of the allegations, the number of sources, the reliability of the sources, and similar indicia." *Id.* at 995. Here, the testimony of the FEs may be relied upon because the FEs were sufficiently described and were in positions to possess knowledge of the information they provided, and such information, when considered in its totality, supports an inference of scienter. Moreover, the consistency and corroboration provided by the FEs enhances their reliability. *See id.* at 995; *In re Countrywide Fin. Corp. Derivative Litig.*, 554 F. Supp. 2d 1044, 1058-59 (C.D. Cal. 2008) (strong inference of scienter where, as here, "confidential and non-confidential accounts cited in the Complaint ... span different levels of the Company hierarchy ... remain consistent across different time periods ... [and] tell what is essentially the same story ... from markedly different angles").

Courts routinely rely on information outside of the class period that tends to "shed light on what a defendant should have known during the class period." *In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1135 (9th Cir. 2017) (crediting statements from witness who "was not at [defendant company] during the Class Period," but who "had personal knowledge of executive-level management's real-time access to" relevant reports); *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 72 (2d Cir. 2001) (finding "[p]re-class [period] data" to be "relevant" for purposes of establishing knowledge "at the start of the class period").

---

[20] The cases cited by Defendants for this point, *see* DMem. 22, fare no better and are inapposite. In *In re Silicon Image, Inc. Sec. Litig.*, No. C-05-456 MMC, 2007 WL 2778414, at *1–2 (N.D. Cal. Sept. 21, 2007), the court discounted confidential witness statements not for their timing, but rather lack of probative value. *See also Shurkin v. Golden State Vintners Inc.*, 471 F. Supp. 2d 998, 1015 (N.D. Cal. 2006) (same); *Brodsky v. Yahoo! Inc.*, 592 F. Supp. 2d 1192, 1201 (N.D. Cal. 2008) (confidential witnesses lacked first-hand knowledge of Defendants' accounting decisions). As discussed herein, the pre-Class Period FE statements regarding Tesla's production capabilities were based on personal knowledge of what could be achieved based on baseline industry metrics and/or the contemporaneous state of affairs at the Fremont plant.

Defendants refer to FE1, Tesla's Director of Manufacturing who reported directly to Musk, ¶123, as a "plastics' employee" and question whether he "was in a positon to offer an informed opinion …" DMem. 23. But the Complaint sets forth the basis for FE1's knowledge, ¶¶126-127, discussing that in June 2016, Tesla (i) did not yet even have a finalized design for the Model 3, rendering it unable to release information so that molds, which themselves would take nine to twelve months to produce, could be built; and (ii) had not yet begun ordering manufacturing equipment to be installed at the Fremont plant, which would then trigger a post-order timeline of nineteen to twenty months. Thus, Defendants' claim that "***[n]ot one FE claims to know the plan for Model 3 production,***" represents a willful misreading of the Complaint. DMem. 22 (emphasis in original).[21]

Defendants' other objections to the FEs are equally baseless. Defendants proffer that the Complaint lacks "any FE who claims that Mr. Musk, or any other senior executive, did not genuinely believe in Tesla's plan or public statements. ***Not one***." DMem. 22 (emphasis in original). The law does not require, however, that confidential informants be mind-readers. *See S. Ferry LP #2 v. Killinger*, 687 F. Supp. 2d 1248, 1254 (W.D. Wash. 2009) ("*South Ferry II*") (a complaint may rely on either direct or circumstantial evidence to plead scienter adequately). Nor is it required that every confidential witness report personal interactions with individually-named defendants, particularly where Defendants admit that Musk was directly aware of the same goings-on at the Fremont facility. *See* DMem. 23 n. 17.[22] Plaintiffs are also not required to "link" confidential

---

[21] Notably, it is Defendants, rather than Plaintiffs, who are confused about "the plan for Model 3" production: in a collateral attack on FE1's credibility, Defendants claim that Model 3 "production started on time, in July 2017." D. Mem. 22 (citing ¶128). But ¶127 makes clear that FE1 was referring to *mass* production, and not the then-current phenomenon of vehicles being banged-out by hand in Tesla's pilot shop. *See, e.g.*, ¶¶157, 165.

[22] Defendants' reliance on *Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, No. 10-CV-03451-LHK, 2012 WL 1868874, at *20–22 (N.D. Cal. May 22, 2012) and *In re Accuray, Inc. Sec. Litig.*, 757 F. Supp. 2d 936, 949 (N.D. Cal. 2010), D. Mem. 24, is misplaced. These cases do not set forth a blanket requirement of personal contact for confidential witnesses generally. Such a requirement would make little sense, as here, where several of the FE statements relate exclusively to "commonly known" and readily observable conditions.

witness statements to specific misstatements alleged in the Complaint. D Mem. 22.[23]  Instead, courts have accepted confidential witness statements concerning "widely known" problems throughout a company. *See, e.g., In re UTStarcom, Inc. Sec. Litig.*, 617 F. Supp. 2d 964, 975 (N.D. Cal. 2009) (noting in scienter analysis that revenue problems were well known throughout the company); *In re Alstom SA*, 406 F. Supp. 2d 433, 504–05 (S.D.N.Y. 2005) (finding scienter based in part on confidential witness account that cost overruns were "widely known" at the company).

### f)   Musk's February 7, 2018 Admission

A defendant's post-class period statements may support class period knowledge or recklessness. *See Constr. Workers Pension Tr. Fun – Lake Cty. v. Genoptix, Inc.*, No. 10CV2502-CAB (DHB), 2013 WL 12123841, at *7 (S.D. Cal. Mar. 22, 2013) (post class period statements about decline in demand corroborate witness account that management learned of negative trend in sales meetings). On February 7, 2018, Tesla admitted that its ability *ever* to produce more than 2,500 Model 3 batteries per week at the Gigafactory required the Company to disassemble a production line that was still in Germany, ship it to Nevada, and reassemble it in Nevada. ¶¶21, 207. Specifically, Musk stated that:

> [We] expect the new automated lines to arrive next month in March. And then it's already working in Germany so that's going to be disassembled, brought out to the Gigafactory and reassembled and then go into operation at the Gigafactory. It's not a question whether it works or not. It's just a question of disassembly, transport and reassembly. So we expect to alleviate that constraint. With alleviating that constraint, that's what gets us to the roughly 2,000 to 2,500 unit per week production rate. [¶207].

Musk's February 7, 2018 comments are damning, and directly contradict Defendants' Class Period statements, which reassured investors, *inter alia*, that "preparations at our production

---

[23] Defendants' assertion that individualized FE allegations relate only to "various points in time," DMem. 22, is redolent of Defendants' incorrect view that these statements should be considered piecemeal, rather than holistically, as *Tellabs* requires. Collectively, the FE allegations encompass a period before, through, and after the Class Period. ¶¶123-204. Despite Defendants' claim, no one FE is required to "prove[] … the actual constraint that led to the Q3 2017 production miss." DMem. 23. Defendants' attempt to cherry-pick the Gigafactory FE allegations to include production slowdowns, but not limited production capabilities independent of those slowdowns (*compare* D. Mem. 23 *with* ¶¶182-204), further contravenes *Tellabs*'s mandate of holistic review.

20

facilities are on track to support the ramp of Model 3 production to 5,000 vehicles per week at some point in 2017….", ¶107, that "we continue to remain on track with our progress at Gigafactory 1 . . . .", ¶111, "[a]nd then batteries – also making great progress on the battery front." ¶119.[24] Musk's admission supports a strong inference of scienter.[25]

### g)    Tesla's Generalized Risk Disclosures Do Not Negate Scienter

Defendants assert that their "plain-language" risk disclosures are "incompatible with scienter." DMem. 20. Defendants, however, ignore *Siracusano v. Matrixx Initiatives, Inc.*, 585 F.3d 1167 (9th Cir. 2009), *aff'd sub nom Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27 (2011) (reversing district court's dismissal for failure to plead scienter).[26] Reference to risk, in the abstract, "with no indication that the risk may already have come to fruition" cannot parry well-pleaded facts that Defendants recklessly disregarded then existing potential problems. *Id.* at 1181. Defendants' ambiguous claim of being in "production hell" and other such general warnings failed to disclose *in any manner*, detailed or otherwise, that "the Company did not have working production lines, and could not possibly build the production lines in the promised timeframe, and was woefully unprepared to mass produce the Model 3 sedan and Model 3 battery as claimed …." ¶¶27, 112. Instead, Defendants' "cautionary warnings" themselves were materially false, ¶¶218-

---

[24] While "clarifying" Musk's admission two days later, Tesla admitted that mass production of Model 3 batteries in the Gigafactory had never been possible in 2017. ¶207.

[25] More, Musk's February 7, 2018 statement undermines Defendants' assertion of fraud by hindsight. Far from a "false narrative," the Complaint does not assert that Defendants claimed to be "done" in May, 2017. DMem. 15. Rather, the Complaint alleges that Defendants were not on track to mass produce the Model 3 in 2017 because, among other reasons, equipment necessary to manufacture sufficient batteries to reach weekly mass production was still half a world away. Thus, even if the chaos at Fremont was not, itself, debilitating, battery production constraints disabled Tesla from manufacturing 5,000 Model 3s per week.

[26] Defendants' citation to *In re Worlds of Wonder Sec. Litig.*, 35 F.3d 1407 (9th Cir. 1994) ("*WoW*") betrays the profound weakness in their scienter argument. In *WoW*, cursorily and indirectly citing *Ferber v. Travelers Corp.*, 802 F. Supp. 698, 714 (D. Conn. 1992), the Ninth Circuit simply affirmed the axiom that a defendant who provides to the public ***actual adverse information*** likely has no intent to defraud. *WoW*, at 1425. It did not hold that detailed risk disclosures—what could go wrong—immunize a defendant from having to disclose what she knew or recklessly disregarded had actually gone wrong. In any event, to the extent the *dictum* in *WoW* had continuing viability, the Ninth Circuit's *Siracusano* opinion, as affirmed, abrogates it.

219, 233, 237, inadequate warnings of hypothetical risks when the risks have already come to fruition. *See Flynn*, 2016 WL 3360676, at *11; *see also* ¶224 (alleging that "Defendants were duty bound, but failed, to disclose that the hypothetical 'risks' warned of had already occurred, rendering the foregoing risk disclosures meaningless."). Defendants' purported "disclosures" do not, therefore, negate scienter.

### 3. The Core Operations Doctrine Supports a Strong Inference of Scienter

Allegations regarding management's role add to the PSLRA's scienter calculus. *See In re Countrywide Fin. Corp. Sec. Litig.*, 588 F. Supp. 2d 1132, 1191 (C.D. Cal. 2008) ("a defendant's position within the company is a relevant circumstance to consider in the *Tellabs* analysis"). Scienter can be imputed to Tesla's key officers "based on the inference that they have knowledge of the 'core operations' of the company." *Reese*, 747 F.3d at 575.

The Complaint alleges particularized facts that "suggest that defendants had actual access to the disputed information" about Tesla's Model 3 production capabilities both before and during the Class Period. *See* pp. 2-5, *supra*. When "the nature of the relevant fact is of such prominence that it would be 'absurd' to suggest that management was without knowledge of the matter," as is the case here, scienter may be inferred just on the basis of the core operations doctrine. *S. Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 786 (9th Cir. 2008).

Here, it would be "absurd" to imagine that Defendants would be unaware that Tesla could not, in fact, mass produce the Model 3 in a self-imposed timeframe – particularly given that Defendants were hands-on managers who undertook regular on-site visits, ¶¶17-18, 177, 179, slept at Tesla production facilities, ¶206, signed the Company's SEC filings, ¶¶107, 117, 209, 213, 222-223, 233, 239-240, led conference calls with analysts, ¶¶99-101, 108, 118-119, 211, 214, 227, 229, 231, and generally represented that they had superior knowledge of the specific matters at issue here, matters at the core of the Company's operations. ¶¶99-101, 107-108, 110-111, 117-119, 209-249. The Complaint contains "particular details about the defendants' access to information within the company," *Zucco*, 552 F.3d at 1000, and thus adequately alleges scienter.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### 4.      The Motive Allegations Support a Strong Inference of Scienter

Though not required, motive may be relevant to a Section 10(b) claim. *See Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 48 ("absence of a motive allegation, though relevant, is not dispositive") (citation omitted). The Complaint alleges that producing the Model 3 was of "existential" importance to Tesla and that the pressure to achieve mass production of the Model 3 "motivated Defendants to mislead investors during the Class Period to preserve Tesla's stock price and its ability to raise money to fund operations." *See, e.g.*, ¶95. Tesla burned through billions to develop and mass produce the Model 3, depending on Model 3 sales to increase cash flow and allow the Company to continue its development as an electric vehicle company. ¶96. Tesla's failure to mass produce the Model 3 would inevitably lead to a funding crisis. ¶97. Analysts noted that until Tesla mass produces 5,000 Model 3s per month, it will continue burning through cash. Tesla had only $3.4 billion cash in hand at the end of 2017, meaning that burning through $4 billion without mass production had created a cash crunch, and failure to mass produce the Model 3 would require Tesla to raise funds through debt or equity markets, which would be more difficult if investors lost confidence in the Company's ability to quickly mass produce Model 3s, and the stock price fell. ¶102. Tesla's existential dilemma was also attributable to losing any advantage it once had for being first on the market, as far more experienced competitors invested billions of dollars to compete with Tesla, with some beating Tesla to market. ¶¶103-105.

Defendants argue that "[i]f Tesla could not afford a production glitch, the last thing it would do is lie, knowing that the lie would be revealed with much fanfare almost immediately in the very first quarter of production." DMem. 21. This ignores (a) that Defendants were incentivized to buy as much time as possible for themselves to avoid a cash crunch while their attempts to mass produce an "affordable" electric car floundered; and (b) Tesla's well-documented history of overpromising in production goals for earlier vehicles. ¶¶50-70. In the face of detailed, particularized pleading to the contrary, Defendants' argument that the "[t]he only rational, reasonable inference to draw from these actions is that Tesla believed in earnest that it could reach

its Model 3 goals," DMem. 5, is at odds with every well-pleaded fact in the Complaint, is far weaker than the strong inference of scienter alleged in the Complaint, and is insufficient to compel dismissal of the Complaint. *See UTStarcom*, 617 F. Supp. 2d at 975.

Contrary to Defendants' assertion, *see* DMem. 20, the absence of insider sales does not suggest innocence. *Tellabs*, 551 U.S. at 325 (lack of sales by executive did not establish lack of scienter). "Scienter can be established even if the officers who made the misleading statements did not sell stock during the class period." *No. 84 Employer-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 944 (9th Cir. 2003). A lack of stock sales does not justify a negative inference. *See Shenwick v. Twitter, Inc.*, 282 F. Supp. 3d 1115, 1148 (N.D. Cal. 2017) (citing *Sharenow v. Impac Mortg. Holdings, Inc.*, 385 F. App'x 714, 717 n.2 (9th Cir. 2010)).[27]

## C. The Complaint Adequately Pleads Loss Causation[28]

Defendants concede that the October 6 *WSJ* article caused Tesla share price to drop on October 9, 2017. They assert, instead, that the *WSJ* article comprised "previously-disclosed" information, identifying nothing specifically. DMem. 24-25. This argument fails because Defendants acknowledge that the *WSJ* article "mischaracterized the production constraint." DMem. 24.[29] Rather than repackaging already public information, the *WSJ* reported new

---

[27] In *In re Rigel Pharm., Inc. Sec. Litig.*, 697 F.3d 869, 884–85 (9th Cir. 2012), on which Defendants rely, the Ninth Circuit considered stock sales because the plaintiffs specifically alleged that defendants had an individualized "financial motive" to commit fraud. The Complaint does not allege an individualized "financial motive" to commit fraud. Defendants' citation to *Schuster v. Symmetricon, Inc.*, No. C9420024RMW, 2000 WL 33115909, at *8 (N.D. Cal. Aug. 1, 2000), is similarly inapposite; the court's single-factor scienter analysis predates the holistic analysis required under *Tellabs*.

[28] While Fed. R. Civ. P. 9(b) applies to pleading loss causation, *Oregon Pub. Employees Ret. Fund v. Apollo Grp. Inc.*, 774 F.3d 598, 605 (9th Cir. 2014), the Ninth Circuit has yet to define the parameters of review on a motion to dismiss.

[29] This Court must not credit for the truth of the matter Defendants' self-serving assertion that the WSJ "mischaracterized" facts when such an assertion contravenes the Complaint's well-pleaded allegations. *Cf. In re: Bofi Holding, Inc. Sec. Litig.*, No. 315CV02324GPCKSC, 2016 WL 5390533, at *15 (S.D. Cal. Sept. 27, 2016) (courts will consider documents of which they can take judicial notice but not for the truth of the matter of any statement) (citing *In re Bare Escentuals,*

24

information that differed materially from their self-serving, demonstrably misleading statements.

Next, Defendants argue, unsupported, that an October 10 increase in Tesla's stock price defeats loss causation. D. Mem. 25. A loss causation inquiry focuses on the trading day after the alleged correction and not on subsequent fluctuations in price that any number of factors might cause. *See In re Cell Therapeutics, Inc. Class Action Litig.*, No. 2:10-CV-00414-MJP, 2011 WL 444676, at *6 (W.D. Wash. Feb. 4, 2011).[30] The October 10 increase cannot defeat loss causation.

Last, the November 2, 2017 *Jalopnik* article revealed new information, causing a price decline and establing loss causation with respect to that disclosure for the stock price decline on November 2, 2017. With respect to Tesla's November 1 post-close disclosure, Defendants' argument about Tesla's prior guidance ignores well-settled Ninth Circuit law that "the ultimate issue is whether the defendant's misstatement, as opposed to some other fact, foreseeably caused the plaintiff's loss." *Mineworkers' Pension Scheme v. First Solar Inc.*, 881 F.3d 750, 753 (9th Cir. 2018). Because the Complaint alleges that Defendants concealed underlying circumstances surrounding Tesla's inability to mass produce the Model 3, it adequately pleads loss causation. *See Nuveen Mun. High Income Opportunity Fund v. City of Alameda*, 7301 F.3d 1111, 1120 (9th Cir. 2013) (citation omitted) (citing, *in dictum*, the materialization of risk theory of loss causation).

### D.     The Complaint Adequately Pleads Control Person Liability

Defendants argue only that the Complaint's Section 20(a) claim is inadequate for its failure to plead a primary violation of Section 10(b). DMem. 25. Because Plaintiffs have adequately pleaded an underlying violation, the Court should hold that the Complaint adequately pleads a Section 20(a) violation.

---

*Inc. Sec. Litig.*, 745 F. Supp. 2d 1052, 1067 (N.D. Cal. 2010); *Curry v. Hansen Med., Inc.*, No. C 09-5094 CW, 2012 WL 3242447, at *3 (N.D. Cal. Aug. 10, 2012)).

[30] Defendants concede, at this stage, the efficiency of the market for Tesla common stock. As such, they concede, too, that information is immediately incorporated into the price of Tesla common stock. Whatever caused an increase in price on October 10, 2017 cannot, therefore defeat loss causation. *Burritt v. NutraCea*, No. CV0900406PHXFJM, 2010 WL 668806, at *9 (D. Ariz. Feb. 25, 2010) (immediate response of price to new information adequately plead efficient market supports pleading of loss causation).

1    **IV.    <u>CONCLUSION</u>**

2          For the foregoing reasons, the Court should deny Defendants' motion to dismiss in its

3    entirety.[31]

4    Dated: July 11, 2018                          **THE ROSEN LAW FIRM, P.A.**

5
                                                    <u>/s/ *Laurence M. Rosen*</u>
6                                                   Laurence M. Rosen (SBN 219683)
                                                    355 S. Grand Avenue, Suite 2450
7                                                   Los Angeles, CA 90071
                                                    Tel: (213) 785-2610
8                                                   Fax: (213) 226-4684
                                                    lrosen@rosenlegal.com
9
10                                                  and

11
                                                    Jacob A. Goldberg
12                                                  Gonen Haklay
                                                    101 Greenwood Avenue, Suite 440
13                                                  Jenkintown, PA 19046
                                                    Telephone: (215) 600-2817
14                                                  Facsimile: (212) 202-3827
                                                    Email: ghaklay@rosenlegal.com
15                                                          jgoldberg@rosenlegal.com
16

17                                                  ***Lead Counsel for Lead Plaintiffs and the
                                                    Class***
18

19                                                  **POMERANTZ LLP**
20                                                  Jeremy A. Lieberman
                                                    J. Alexander Hood
21                                                  600 Third Avenue, 20th Floor
                                                    New York, NY 10016
22                                                  Telephone:  (212) 661-1100
                                                    Facsimile:  (212) 661-8665
23                                                  Email: jalieberman@pomlaw.com
24                                                         ahood@pomlaw.com

25

26

27    ―――――――――――――――

28    [31] If the Court dismisses the case, Lead Plaintiff seeks leave further to amend the Complaint.

**POMERANTZ LLP**
Patrick V. Dahlstrom
Louis C. Ludwig
10 South LaSalle Street
Chicago, IL 60603
Telephone: (312) 377-1181
Email: pdahlstrom@pomlaw.com
          lcludwig@pomlaw.com


*Additional Counsel for Plaintiffs*

1

**<u>CERTIFICATE OF SERVICE</u>**

2

I, Jacob A. Goldberg, hereby declare under penalty of perjury as follows:

3

I am attorney with The Rosen Law Firm, P.A., with offices at 101 Greenwood Avenue,

4

Suite 440, Jenkintown, PA 19046. I am over the age of eighteen.

5

On July 11, 2018, I electronically filed the foregoing **PLAINTIFFS' OPPOSITION TO**

6

**DEFENDANTS' MOTION TO DISMISS THE AMENDED CLASS ACTION**

7

**COMPLAINT** with the Clerk of the Court using the CM/ECF system, which sent notification of

8

such filing to counsel of record.

9

10

Executed on July 11, 2018

11

12

13
/s/ Jacob A. Goldberg

14
Jacob A. Goldberg

15

16

17

18

19

20

21

22

23

24

25

26

27

28