1   DEAN S. KRISTY (CSB NO. 157646)
    dkristy@fenwick.com
2   JENNIFER C. BRETAN (CSB NO. 233475)
    jbretan@fenwick.com
3   FENWICK & WEST LLP
    555 California Street, 12th Floor
4   San Francisco, CA  94104
    Telephone:    (415) 875-2300
5   Facsimile:    (415) 281-1350

6   Attorneys for Defendants Tesla, Inc.,
    Elon R. Musk, and Deepak Ahuja
7

8

9                   UNITED STATES DISTRICT COURT

10                 NORTHERN DISTRICT OF CALIFORNIA

11                    SAN FRANCISCO DIVISION

12

13  GREGORY WOCHOS, Individually and on         Case No.: 3:17-cv-05828-CRB
    Behalf of All Others Similarly Situated,
14                                              **DEFENDANTS' REPLY
              Plaintiff,                        MEMORANDUM IN SUPPORT OF
15                                              MOTION TO DISMISS AMENDED
        v.                                      COMPLAINT**
16
                                                Date:    August 24, 2018
17  TESLA, INC., ELON R. MUSK, DEEPAK           Time:    10:00 a.m.
    AHUJA, and JASON WHEELER,                   Dept.:   Courtroom 6, 17th Floor
18                                              Judge:   Hon. Charles R. Breyer
              Defendants.
19
                                                Date Action Filed:  October 10, 2017
20

21

22

23

24

25

26

27

28

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

# TABLE OF CONTENTS

**Page**

SUMMARY OF ARGUMENT ............................................................................... vi

I.  INTRODUCTION .......................................................................................... 1

II. THE OPPOSITION SHOWS THAT PLAINTIFFS CANNOT ALLEGE A FALSE OR
    MISLEADING STATEMENT ........................................................................ 1

    A.  Plaintiffs' Arguments Regarding The May 3, 2017 Statements Ignore Tesla's
        Disclosures And Instead Rest On Plaintiffs' False Narrative ............................... 1

    B.  Plaintiffs' Arguments Regarding The August 2, 2017 Statements Also Ignore
        Tesla's Disclosures And Rest On Plaintiffs' False Narrative .............................. 4

III. THE OPPOSITION FAILS TO IDENTIFY PARTICULARIZED FACTS NEEDED TO
     SUPPORT A STRONG INFERENCE OF SCIENTER .................................................. 6

    A.  Plaintiffs' Theory Makes No Sense, Is Contrary To Ninth Circuit Law, And
        Ignores The Facts Showing Good Faith Belief In Tesla's Model 3 Plans ............. 6

    B.  Repeating Deficient Former Employee Allegations Does Not Support A Cogent
        And Compelling Inference Of Scienter .......................................................... 9

    C.  Plaintiffs' Baseless "Admission" Argument Cannot Establish Scienter .............. 12

    D.  Plaintiffs' Unpleaded Core Operations Theory Cannot Salvage Their Claim ...... 12

IV. THE OPPOSITION CANNOT CURE THE ABSENCE OF LOSS CAUSATION ........ 13

V.  LEAVE TO AMEND SHOULD BE DENIED ................................................. 15

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*3226701 Canada, Inc. v. Qualcomm, Inc.*,
2017 WL 4759021 (S.D. Cal. Oct. 20, 2017) ........................................................... viii, 2, 3, 14

*Allison v. Brooktree Corp.*,
999 F. Supp. 1342 (S.D. Cal. 1998) ............................................................................ viii, 2, 7

*Berger v. Ludwick*,
2000 WL 1262646 (N.D. Cal. Aug. 17, 2000), *aff'd*, 15 F. App'x 528 (9th Cir.
2001) ..............................................................................................................................12

*Brodsky v. Yahoo! Inc.*,
592 F. Supp. 2d 1192 (N.D. Cal. 2008) ..................................................................... 11, 13

*Brody v. Transitional Hosps. Corp.*,
280 F.3d 997 (9th Cir. 2002) ....................................................................................... vii, 2

*Callan v. Motricity*,
2013 WL 5492957 (W.D. Wash. Oct. 1, 2013) ..................................................................2

*City of Royal Oak Ret. Sys. v. Juniper Networks, Inc.*,
880 F. Supp. 2d 1045 (N.D. Cal. 2012) ...................................................................... viii, 2, 7

*Colyer v. Acelrx Pharms., Inc.*,
2015 WL 7566809 (N.D. Cal. Nov. 25, 2015) ......................................................... *passim*

*Constr. Workers Pension Tr. Fun – Lake Cty. v. Genoptix, Inc.*,
2013 WL 12123841 (S.D. Cal. Mar. 22, 2013) ..............................................................12

*Dura Pharms., Inc. v. Broudo*,
544 U.S. 336 (2005) .......................................................................................................14

*Greenburg v. Sunrun, Inc.*,
233 F. Supp. 3d 764 (N.D. Cal. 2017) ......................................................................... xi, 15

*Haque v. Tesla Motors, Inc.*,
2017 WL 448594 (Del. Ch. Feb. 2, 2017) ........................................................................9

*Hatamian v. Advanced Micro Devices, Inc.*,
87 F. Supp. 3d 1149 (N.D. Cal. 2015) ...........................................................................11

*In re Am. Apparel Inc. S'holder Litig.*,
855 F. Supp. 2d 1043 (C.D. Cal. 2012) .........................................................................2, 3

*In re Amgen Inc. Sec. Litig.*,
2014 WL 12585809 (C.D. Cal. Aug. 4, 2014) ................................................................11

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1

2

## TABLE OF AUTHORITIES
## (CONTINUED)

Page(s)

3

*In re Apple Computer Sec. Litig.*,
886 F. 2d 1109 (9th Cir. 1989) ............................................................................ 3, 9

4

5

*In re Convergent Tech. Sec. Litig.*,
948 F.2d 507 (9th Cir. 1991) ...................................................................................... 3

6

*In re Downey Sec. Litig.*,
2009 WL 2767670 (C.D. Cal. Aug. 21, 2009) ........................................................ 12

7

8

*In re Fusion-io Sec. Litig.*,
2015 WL 661869 (N.D. Cal. Feb. 12, 2015) ........................................................... 11

9

*In re FVC.com Sec. Litig.*,
136 F. Supp. 2d 1031 (N.D. Cal. 2000), *aff'd,* 32 F. App'x 338 (9th Cir. 2002) ...................... 8

10

11

*In re Intrexon Corp. Sec. Litig.*,
2017 WL 732952 (N.D. Cal. Feb. 24, 2017) ..................................................... xi, 13

12

13

*In re NVIDIA Corp. Sec. Litig.*,
768 F.3d 1046 (9th Cir. 2014) ................................................................................ 13

14

*In re Quality Sys. Inc. Sec. Litig.*,
865 F.3d 1130 (9th Cir. 2017) ................................................................................ 10

15

16

*In re Rigel Pharms., Inc. Sec. Litig.*,
697 F.3d 869 (9th Cir. 2012) ......................................................................... *passim*

17

18

*In re Silicon Image, Inc. Sec. Litig.*,
2007 WL 2778414 (N.D. Cal. Sep. 21, 2007), *aff'd*, 325 F. App'x 560 (9th Cir.
2009) ....................................................................................................................... 10

19

20

*In re Tesla Motors, Inc. Sec. Litig.*,
75 F. Supp. 3d 1034 (N.D. Cal. 2014), *aff'd*, 671 F. App'x 670 (9th Cir. 2016) ............. vii, 11

21

22

*In re Wet Seal, Inc. Sec. Litig.*,
518 F. Supp. 2d 1148 (C.D. Cal. 2007) ................................................................ ix, 7

23

24

*In re Worlds of Wonder Sec. Litig.*,
35 F.3d 1407 (9th Cir. 1994) ................................................................................ ix, 7

25

*In re Yahoo! Inc. Sec. Litig.*,
2012 WL 3282819 (N.D. Cal. Aug. 10, 2012), *aff'd*, 611 F. App'x 387 (9th
Cir. 2015) ............................................................................................................... 12

26

27

*Lipton v. Pathogenesis Corp.*,
284 F.3d 1027 (9th Cir. 2002) .................................................................................. 8

28

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1

## TABLE OF AUTHORITIES
## (CONTINUED)

2

**Page(s)**

3

*Loos v. Immersion Corp.*,
    762 F.3d 880 (9th Cir. 2014).................................................................................14

4

5

*Metzler GmbH v. Corinthian Colls., Inc.*,
    540 F.3d 1049 (9th Cir. 2008)........................................................................ *passim*

6

*No. 84 Employer-Teamster Joint Council Pen. Tr. Fund v. Am. W. Holding Corp.*,
    320 F.3d 920 (9th Cir. 2003)..................................................................................8

7

8

*Or. Pub. Emp. Ret. Fund v. Apollo Grp., Inc.*,
    774 F.3d 598 (9th Cir. 2014)......................................................................... xi, 14

9

10

*Police Ret. Sys. v. Intuitive Surgical, Inc.*,
    759 F.3d 1051 (9th Cir. 2014)..................................................... vii, 2, 6, 13

11

*Pompano Beach Police & Firefighters Ret. Sys. v. Las Vegas Sands Corp.*,
    2018 WL 2015510 (9th Cir. May 1, 2018) ..............................................................2

12

13

*Ronconi v. Larkin*,
    253 F.3d 423 (9th Cir. 2001)......................................................................... viii, 6

14

15

*S. Ferry LP, # 2 v. Killinger*,
    542 F.3d 776 (9th Cir. 2008).................................................................................12

16

*Shurkin v. Gold State Vintners, Inc.*,
    471 F. Supp. 2d 998 (N.D. Cal. 2006), *aff'd*, 303 F. App'x 431 (9th Cir. 2008) ......................9

17

18

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007) ........................................................................................ ix, 6

19

20

*Webb v. SolarCity Corp.*,
    884 F.3d 844 (9th Cir. 2018)............................................................... ix, 6, 7, 8

21

*Xu v. ChinaCache Int'l Holdings, Ltd.*,
    2017 WL 114401 (C.D. Cal. Jan. 9, 2017) .................................................. viii, 2, 3

22

23

*Zucco Partners, LLC v. Digimarc Corp.*,
    552 F.3d 981 (9th Cir. 2009).....................................................................9, 11, 13

24

**OTHER AUTHORITIES**

25

B. Alpert, *Tesla Calls Lawsuit's Claims A Complete Lie*, Barron's, July 24, 2018, *available
    at* https://www.barrons.com/articles/tesla-calls-lawsuits-claims-a-complete-lie-
    1532459164...................................................................................................14

26

27

28

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1

**TABLE OF AUTHORITIES**
**(CONTINUED)**

2

**Page(s)**

3  F. Lambert, *Tesla Reaches Model 3 Production Milestone and Record 7,000-Car Week*
      *Total Production, Says Elon Musk*, Electrek, July 1, 2018, *available at*
4      https://electrek.co/2018/07/01/tesla-model-3-production-milestone-record-total-
       production-elon-musk/. ...........................................................................................................15
5

6  P. Williams & D. Hull, *Musk Heads To Australia To Unveil Progress On Giant*
      *Battery, Mars Mission,* Bloomberg, Sept. 28, 2017, *available at*
7      https://www.bloomberg.com/news/articles/2017-09-28/musk-heads-down-
       under-with-giant-battery-red-planet-on-his-mind ..................................................................10
8

9  Tesla Second Quarter 2018 Update, *available at* http://ir.tesla.com/static-files/
      7235e525-db16-470c-8dce-9ecac0ad7712 .............................................................................15

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

## SUMMARY OF ARGUMENT

The Opposition is most notable for what it fails to do: (i) address Tesla's ***actual disclosures*** on May 3 and August 2, 2017, which demonstrate that this entire case is based on a false narrative, (ii) provide any coherent response to the facts that eviscerate scienter, including Tesla's blunt warnings about the challenges of Model 3 production, the absence of any financial or other benefit to defendants (which plaintiffs now concede), and the overwhelming facts demonstrating Tesla's good faith, and (iii) identify the detailed, pleaded facts required to show loss causation.

**No Falsity.** Plaintiffs' main argument is that, by stating on May 3 and August 2, 2017 that Tesla's "preparations" were "on track to support the ramp" of Model 3 production to 5,000 vehicles per week by the end of 2017, Tesla "led investors to believe that Tesla's automated production line had [been] built." Opp. at 8. That is a complete fiction. Tesla not only did not "imply" that its automated production lines had been built, it repeatedly stated the ***opposite*** in plain, unambiguous terms.  In May, two months before Model 3 production even began, Tesla said it had just "***started the installation*** of Model 3 manufacturing equipment," was "on track for initial production in July" (a target Tesla hit), would "increase automation and add production capacity" through the remainder of the year and "will need to complete building," "equipping," and "installing" production equipment and lines on its "projected timeline" to hit its year-end goal of producing up to 5,000 vehicles per week. Mot. at 3, 13-14. Likewise, in August, shortly after production began, Tesla clearly stated that it was "***continuing preparations*** at our production facilities," it "***will need to complete the implementation and ramp of efficient, automated*** . . . ***manufacturing capabilities, processes and supply chains necessary to support***" volume production "on our projected timeline," and that to achieve its plans, it will need "***to add production lines and capacity as planned.***" *Id*. at 3, 17-18.

The Opposition ***completely ignores Tesla's disclosures***. Instead, in an effort to sweep aside Tesla's actual words about the state of its automated manufacturing, plaintiffs point to Mr. Musk's answer to an analyst's question on August 2 concerning expected Model 3 gross margins (not production readiness), in which he made reference to a "gigantic machine" producing a few

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1   hundred cars a week as an illustration to explain why margins would be negative for a while.

2   According to plaintiffs, this passing reference somehow indicated that all automation was already

3   in place. That is nonsense. Tesla expressly stated that it had ***not*** completed the installations, and

4   Mr. Musk was merely making the point that margins would be negative until production ramps.

5   Indeed, Tesla's Model 3 manufacturing occurs on multiple lines across two factories in two

6   states, not through a single "gigantic" machine spitting out cars. Moreover, on August 2, Tesla

7   also disclosed that it expected to produce 1,500 cars ***for the entire*** 13-week third quarter (ending

8   September 2017). Knowing that, no investor could believe that this illustrative example was a

9   representation that Tesla was already producing a few hundred each week.

10       A securities fraud claim must be based on what a company actually disclosed to investors

11   and is evaluated in context, including Tesla's contemporaneous statements. *See Police Ret. Sys. v.*

12   *Intuitive Surgical, Inc.,* 759 F.3d 1051, 1060 (9th Cir. 2014); *Brody v. Transitional Hosps. Corp.,*

13   280 F.3d 997, 1006 (9th Cir. 2002). The disclosures dealing with the status of manufacturing

14   readiness uniformly stated in express terms that Tesla's work was ongoing and there was more to

15   be done. No reasonable investor reading Tesla's disclosures, including Mr. Musk's gross margin

16   illustration, would have concluded that Tesla claimed to have fully automated production in place

17   on May 3 or August 2. *See id.* at 1006-07 (actual words did not convey alleged misimpression); *In*

18   *re Rigel Pharms., Inc. Sec. Litig.,* 697 F.3d 869, 880-81 (9th Cir. 2012) (dismissing "on track"

19   and other claims in light of disclosures); *Colyer v. Acelrx Pharms., Inc.,* 2015 WL 7566809, at *6

20   (N.D. Cal. Nov. 25, 2015) (dismissing claims that were "not a reasonable interpretation of

21   Defendants' statements"); *In re Tesla Motors, Inc. Sec. Litig.,* 75 F. Supp. 3d 1034, 1043 (N.D.

22   Cal. 2014) (disclosures negated plaintiffs' ability to plausibly plead that a reader was misled),

23   *aff'd*, 671 F. App'x 670 (9th Cir. 2016).

24       Plaintiffs' Opposition is also premised on another underlying false assumption: that

25   Model 3 production would not even commence unless and until full automation was in place. But

26   full automation was not necessary for initial Model 3 production to begin. That Tesla was

27   ultimately planning to install and utilize unprecedented manufacturing techniques, involving a

28   high degree of automation, to ramp to an anticipated production rate of 5,000 ***by year end***, does

not mean that no Model 3s would be built in the interim. Although plaintiffs pejoratively refer to vehicles "being banged out by hand," there is nothing surprising or untoward about Tesla using some manual and semi-automated processes, particularly at the beginning of a production ramp. Tesla meant just what it said: Model 3 production began (in July, as it said it would), and preparations continued with the installation and implementation of highly automated manufacturing. Underscoring the point, at the July launch event, Mr. Musk displayed a manufacturing S-curve graphic showing that Tesla expected Model 3 production to be exceedingly modest in the short run, only ramping up in October 2017 (completely in line with the notion that more automation would come online around that time). Ex. 16 at 2. In other words, the Opposition's oft-repeated assertion that cars or batteries were not produced on fully automated equipment until October is *perfectly consistent* with Tesla's disclosures. *See Ronconi v. Larkin,* 253 F.3d 423, 434 (9th Cir. 2001).

Further, it is especially telling that, despite claiming that Tesla's "preparations" were "not on track" as of May 3 and August 2, 2017, plaintiffs still identify *no facts* detailing the production plan, when various automated processes were scheduled to be fully implemented under that plan, and then how Tesla's actual progress compared – much less any facts suggesting that any delays were so insurmountable that the year-end forecast could not be met. Mot. at 3, 14, 18. Plaintiffs never explain how a court could determine whether Tesla was "off track" without knowing what the track was. *See Rigel,* 697 F.3d at 881-82 (on track statement not actionable where plaintiffs failed to show that plans and expectations deviated from statement); *Xu v. ChinaCache Int'l Holdings, Ltd.,* 2017 WL 114401, at *6 (C.D. Cal. Jan. 9, 2017) ("Plaintiff does not allege a timeline against which the 'on track' claim might be verified. Accordingly, plaintiff does not allege that the migration …was off-track"); *3226701 Canada, Inc. v. Qualcomm, Inc.,* 2017 WL 4759021, at *18 (S.D. Cal. Oct. 20, 2017) (statement that company was unaware of any significant technical issue that would cause delay not actionable absent facts showing problem was known to be "insurmountable"); *City of Royal Oak Ret. Sys. v. Juniper Networks, Inc.,* 880 F. Supp. 2d 1045, 1064 (N.D. Cal. 2012) (plaintiffs failed to plead specific facts showing known problems necessarily precluded company from reaching projected growth rate); *Allison v.*

viii

*Brooktree Corp.,* 999 F. Supp. 1342, 1348 (S.D. Cal. 1998) (problems introducing new product are the norm, and notably absent were allegations that they were viewed as insurmountable by management).

More devastating still, plaintiffs do not contest (because their own witnesses corroborate it) that it was not until ***September –*** well after the challenged statements – that Tesla encountered the unexpected problems with the Gigafactory's module line, and that those were the problems that proved to be the bottleneck on production. It goes without saying that fraud cannot be committed in May or August by not disclosing problems that only arose for the first time one to four months later, in September. Plaintiffs' claim is simply fraud by hindsight.

**No Scienter.** Nor does the Opposition point to facts giving rise to any inference of scienter, let alone a strong, cogent and compelling one. *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* 551 U.S. 308, 323 (2007); *Webb v. SolarCity Corp.,* 884 F.3d 844, 855 (9th Cir. 2018). To the contrary, given the absence of any stock trading or other benefit to defendants, plaintiffs have now abandoned any suggestion that there was a "financial motive" to commit fraud. Nor do plaintiffs have any answer to the blunt and specific warnings of the many challenges associated with Model 3 production – detailed at length at pages 1-3 and 8-10 of defendants' motion – which also weigh heavily against scienter. *See Rigel,* 697 F.3d at 884 (disclosure of significant adverse event inconsistent with scienter); *In re Worlds of Wonder Sec. Litig.,* 35 F.3d 1407, 1425 (9th Cir. 1994) ("detailed risk disclosure…negates an inference of scienter"); *In re Wet Seal, Inc. Sec. Litig.,* 518 F. Supp. 2d 1148, 1152, 1164-65 (C.D. Cal. 2007) (dismissing claims given contemporaneous cautionary disclosures).

Instead, plaintiffs lapse into generalities, parroting the superficial argument that Tesla's concrete warnings were mere "hypotheticals." Yet plaintiffs point to nothing to support the notion that some undisclosed "risk" had already materialized as of May 3 (months before production started) or August 2 (just after it began); to the contrary, their own FEs corroborate that the module line bottleneck did not occur until September. Nor do plaintiffs cite a single case holding that disclosures like Tesla's (that it was entering "production hell," faced an "incredibly difficult production ramp" and warned of "inevitable" and "unavoidable" problems) were merely

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

"hypothetical" or boilerplate. There is no such case for a good reason: no one deliberately trying to paint an overly rosy view of Model 3 production would ever make such statements. Lacking any case support or response, plaintiffs make the unprecedented claim that Tesla's warnings were pessimistic "puffery" (Opp. at 8) – a concept not recognized in law and wholly at odds with the notion of securities fraud.

Ultimately, plaintiffs' scienter argument boils down to the assertion that defendants "were told, repeatedly, that their timeline for mass production was unachievable." Opp. at xii. But plaintiffs' only support for that proposition is a single FE (FE1), a former "plastics" employee fired by Tesla in June 2016, *over a year before production even began* (and 18 months before the 5,000 per week by end of 2017 target date). Beyond that, FE1 based his opinion on the incorrect premise that Tesla would not *even start* production until January 2018 when, in fact, initial production started on time in July 2017. The Opposition's attempt to explain away that fatal flaw – by claiming that FE1 meant "mass" production would not be underway until 2018 – flatly misrepresents their own AC, which emphasized his assertion that production would not "*start*" until six months after the July 2017 date.  AC ¶ 128 (emphasis in original). But no matter how much plaintiffs attempt to backtrack and rewrite FE1's opinion back in June 2016, it is telling that plaintiffs do not plead that any defendant agreed with his view. In any event, uniform like-mindedness is not expected in a 37,000 employee company like Tesla and is not a requirement of the securities laws. It is absurd to suggest that the outdated opinion of a single fired employee based on an entirely false premise comes close to establishing a cogent and compelling inference of scienter. If such a thin allegation were to meet that standard, a securities fraud case would be adequately pled every time there is a single contrarian in a company of many thousands of people. That standard is unworkable in practice and is not close to the law.

**No Loss Causation.** Plaintiffs abandon any pretense that Tesla's October 2 disclosure of Model 3 production bottlenecks (and the missed guidance for Q3) caused any loss, as Tesla's stock price actually *increased* after that disclosure. *See Metzler GmbH v. Corinthian Colls., Inc.*, 540 F.3d 1049, 1063 (9th Cir. 2008). Plaintiffs' reliance on the October 6 *WSJ* story is also misplaced. This was not a "corrective" disclosure by Tesla, but a hearsay article speculating that

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1    the absence of complete automation (such as welding certain parts by hand) was behind the

2    bottleneck. But again, Tesla *never said* that all automated systems were in place as of May 3 or

3    August 2 (it said the opposite) so the *WSJ* did not "correct" any Tesla statement made months

4    earlier. *See In re Intrexon Corp. Sec. Litig.,* 2017 WL 732952, at *7 (N.D. Cal. Feb. 24, 2017).

5    Nor can the temporary one-day decline that followed establish loss causation. *See Metzler,* 540

6    F.3d at 1065 (no loss causation because, within three days, "stock quickly recovered from the

7    10% drop" following a *Financial Times* story). Finally, because plaintiffs have made no claim

8    based on Tesla's November 1, 2017 release of revised forward-looking guidance, they cannot

9    establish loss causation based on that disclosure. Plaintiffs' effort to avoid dismissal based on a

10   November 2 mid-day website article fails, as plaintiffs have not and cannot plead that Tesla's

11   stock price declined following that posting, as opposed to earlier in the day in response to the

12   guidance change.  *See Or. Pub. Emp. Ret. Fund v. Apollo Grp., Inc.,* 774 F.3d 598, 605 (9th Cir.

13   2014) (loss causation must be pleaded with specificity).

14        **No Leave to Amend.** Plaintiffs' allegations are irreconcilable with Tesla's disclosures

15   about Model 3 production. They rest on a fraud theory that makes no sense, benefitted no one,

16   and is contrary to overwhelming facts defeating scienter. Because repleading will not fix these

17   ills, and plaintiffs have not even tried to identify further facts they could plead, leave to amend

18   should be denied. *See Greenburg v. Sunrun, Inc.,* 233 F. Supp. 3d 764, 775 (N.D. Cal. 2017). In

19   this respect, despite plaintiffs' purported reliance on "post class period" events and "public

20   information," such events illustrate why leave to amend would be futile: Tesla has **reached** the

21   Model 3 production milestone of 5,000 vehicles a week and, even before that, Model 3 had

22   already become the best-selling electric vehicle in the United States and the best-selling mid-sized

23   premium sedan of all kinds (outselling the Mercedes C class, BMW 3 Series, Audi A4 and Lexus

24   IS, **combined**).

25        Tesla encountered a temporary speedbump at the very outset of a particularly complicated

26   production ramp – one that Tesla warned it could face.  That is not the basis for a securities fraud

27   suit.

28

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

I.     **INTRODUCTION**

Defendants' motion detailed Tesla's disclosures of the many challenges it faced in seeking to become the first automobile company to introduce a mass-market all-electric vehicle, including the need to install, complete and ramp never-before-tried manufacturing systems incorporating an extraordinary amount of automation, including at the new Gigafactory it had just built. Given the enormity of the Model 3 undertaking and the lack of certainty around precisely how long it would to take to ramp production, defendants provided an array of blunt, plain-English warnings about the likely challenges Tesla would face.

The Opposition ignores these disclosures and pursues an irrational thesis that, despite extensive detailed warnings and the lack of any financial benefit, defendants engaged in a short-term "fraud" to mislead investors about Model 3. Once plaintiffs' evasions and errors are exposed and disregarded (as they must be), there are no facts showing that any defendant made a false or misleading statement, much less supporting a strong, cogent and compelling inference that defendants intended to mislead anyone at any time.

II.    **THE OPPOSITION SHOWS THAT PLAINTIFFS CANNOT ALLEGE A FALSE OR MISLEADING STATEMENT**

A.     **Plaintiffs' Arguments Regarding The May 3, 2017 Statements Ignore Tesla's Disclosures And Instead Rest On Plaintiffs' False Narrative**

Plaintiffs avoid discussing Tesla's statements because they cannot be reconciled with the false narrative on which they premise this case. Tesla's May 3 statements were made two months before Model 3 production started. As defendants explained on this motion, Tesla said it had just "***started the installation*** of Model 3 manufacturing equipment," was "on track for the start of …production in July 2017" (a target it hit), "expected to make additional investments through the remainder of the year to increase automation and add production capacity," and "will need to complete building," "equipping," and "installing" production equipment and lines on its "projected timeline" to hit its year-end goal. Mot. at 3, 14; Ex. 15 at 30-31, 40-43; Ex. 13 at 1.

Yet plaintiffs continue to ***ignore*** these disclosures entirely. Instead, they argue that by saying "preparations at our production facilities are progressing to support the ramp of Model 3 production to 5,000 vehicles per week at some point in 2017," Tesla "led investors to believe that

Tesla's automated production line had [been] built." Opp. at 8; *see* AC ¶¶ 210, 212. A securities fraud claim must be based on what a company actually disclosed to investors (and the underlying statements must be evaluated in context). *See. e.g., Intuitive Surgical,* 759 F.3d at 1060. Here, it is obvious that no reasonable investor would have concluded that Tesla claimed to have fully automated production in place on May 3 since it said the opposite. *See Brody,* 280 F.3d at 1006; *Colyer,* 2015 WL 7566809, at *6. Indeed, the May 4 analyst report referenced in the AC (¶ 113) correctly noted that Tesla "has an exceptionally large volume of work to do in upcoming months" to reach its year-end target. *See* Ex. 30.

Moreover, the Opposition never identifies facts detailing the production plan as it stood on May 3, or when various automated processes were scheduled to be fully implemented under that plan, much less how Tesla's actual progress fell short of that plan or rendered its year end goal insurmountable. Mot. at 14.  One cannot claim that a company is so far behind its planned schedule that targets could not be met without knowing what the planned schedule was compared to the actual progress. Yet plaintiffs provide none of these facts, asserting that they are not required (Opp. at 9). That is simply incorrect. *See Xu,* 2017 WL 114401, at *6 (failure to allege actual timeline for comparison fatal); *Qualcomm,* 2017 WL 4759021, at *18 (problem must be viewed as "insurmountable" and would cause delay); *Juniper,* 880 F. Supp. 2d at 1064 (problems must necessarily preclude projected growth rate); *Allison,* 999 F. Supp. at 1348 (problem must be insurmountable).[1]

Even putting aside that Tesla said the opposite of what plaintiffs claim, Tesla's

---

[1] Nor can plaintiffs dodge the need for such specifics by arguing that the pertinent "timeline" is the end of 2017 (when Tesla hoped to ramp to 5,000). Opp. at 10. That goal is not a ***contemporaneous fact*** showing Tesla was off-plan as of May 3. Plaintiffs' argument also highlights that the assailed statement is forward-looking – concerning "preparations to support the ramp to 5,000 by year end" – and thus protected by the PSLRA safe harbor. *See Intuitive Surgical,* 759 F.3d at 1059; *Pompano Beach Police & Firefighters Ret. Sys. v. Las Vegas Sands Corp.,* 2018 WL 2015510, at *2 (9th Cir. May 1, 2018) ("on track" forward-looking); *see also* Mot. at 16. In any event, because plaintiffs cannot plead falsity, their claim fails ***regardless*** of whether or not the statement is deemed forward-looking. Mot. at 15-16 n.10. Finally, plaintiffs' assertion that defendants' cases all involved financial goals (Opp. at n.14), as opposed to production goals, is flatly wrong (and a meaningless distinction in any event*). See Qualcomm,* 2017 WL 4759021, at *15-17 (on track for release and availability of new device*); Xu,* 2017 WL 114401, at *6 (on track to migrating products to new platform*); In re Am. Apparel S'holder Litig.,* 855 F. Supp. 2d 1043, 1072 (C.D. Cal. 2012) (on track to remediating internal control issues*); Callan v. Motricity,* 2013 WL 5492957, at *6-7 (W.D. Wash. Oct. 1, 2013) (product contracts on track).

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

disclosures included an array of blunt warnings about the challenges and uncertainties of Model 3 production (Mot. at 1-4, 8-10). These warnings, which even called the difficult challenge ahead "production hell," are fundamentally incompatible with some notion that Tesla was guaranteeing it would achieve its year-end goal. *See Am. Apparel,* 855 F. Supp. 2d at 1072-73 ("it is difficult to find deception in statements that the company was 'on track' to 'making significant progress . . . by year-end' since the comment can hardly be construed as a guarantee"); *Xu,* 2017 WL 114401, at *5 ("Where contemporaneous statements . . . qualify the alleged false statements, plaintiffs must allege why they remain misleading"). Regardless, there was no statement that even needed qualifying here since Tesla stated, point blank, that automation was not complete.

Plaintiffs' citation to a pre-PSLRA case, *In re Apple Computer Sec. Litig.,* 886 F. 2d 1109 (9th Cir. 1989), without *any* analysis, completely backfires. In *Apple,* the court actually affirmed the dismissal of all claims relating to the Lisa computer because, while expressing optimism, the statements were made in the context of disclosed risks and uncertainties (*id.* at 1118-19), and Apple's "massive investment in Lisa demonstrates this good faith" (*id.* at 1117). The same holds true here. As to Apple's disk-drive product Twiggy, that claim was sustained *only* because plaintiffs identified ***specific facts*** showing defendants knew the product suffered from a profound design flaw, yet at the same time represented that it had "undergone extensive testing and design verification during the past year." *Id.* at 1115-16. In other words, they offered what plaintiffs lack here: specific facts undermining defendants' ***actual statements.*** By contrast, plaintiffs do not even address Tesla's actual words. *See In re Convergent Tech. Sec. Litig.,* 948 F.2d 507, 515-16 (9th Cir. 1991) (addressing *Apple* and affirming dismissal of claims relating to breakthrough product in light of disclosed manufacturing risks); *Qualcomm,* 2017 WL 4759021, at *18.

Finally, plaintiffs assail Mr. Musk's May 3 statement that Tesla had "a much better supply chain in place" and, "as far as we know there are no issues." Mot. at 15; AC ¶ 214. However, plaintiffs offer nothing to suggest these statements were false (or that Mr. Musk did not hold that opinion). Indeed, plaintiffs do not even try to address what their own witness concedes: that the module line issues did not emerge until ***September 2017*** as Tesla sought to ramp production (AC ¶ 192), long after the May 3 statement. Instead, plaintiffs cite AC paragraphs about what three

3

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

*potential* suppliers of unspecified parts (out of thousands of suppliers for Model 3) supposedly said a year earlier in ***June 2016*** (AC ¶¶ 136, 138, 140) and other assertions that have nothing to do with the supply chain (AC ¶¶ 161, 179). Opp. at 7, 11. But the notion that some potential suppliers in 2016 found Tesla's timetable challenging was no secret: Mr. Musk discussed it on the May 4, 2016 earnings call (Ex. 2 at 4, 7, 8, 11), and the August 3, 2016 earnings call (Ex. 5 at 8), and such risks were discussed in Tesla's Form 10-Qs as well (Ex. 3 at 33, 35; Ex. 6 at 33, 35). *See also* Ex. 11 at 6, 9-10, 15.[2]  Supposed concerns of potential suppliers back in 2016 have nothing to do with Tesla's actual statements on May 3 and August 2, 2017.

### B.   Plaintiffs' Arguments Regarding The August 2, 2017 Statements Also Ignore Tesla's Disclosures And Rest On Plaintiffs' False Narrative

Plaintiffs' claim that Tesla's August 2 "on track" statement meant that "the automated production line" was complete is equally false. Again, Tesla said precisely the opposite. It said it was "***continuing preparations*** at our production facilities," it "***will need to complete the implementation and ramp of efficient, automated …manufacturing capabilities, processes and supply chains necessary to support***" volume production *"*on our projected timeline," and that to achieve its plans, it will need "***to add production lines and capacity as planned.***" Mot. at 3, 18. Tesla also disclosed that it was still procuring equipment for Model 3 production. *Id.* at 18. These disclosures put the lie to plaintiffs' false narrative that Tesla said that all automated production processes were complete as of August 2. *See Colyer,* 2015 WL 7566809, at *13 ("more importantly, the facts in this case simply do not corroborate Plaintiffs' narrative").

Nor do plaintiffs address the context surrounding Tesla's statement, in which it warned: "what we have ahead of us, of course, is an incredibly difficult production ramp"; Tesla was headed into "manufacturing …and supply chain hell"; it is "fundamentally impossible" and "crazy hard" to predict when production will ramp; and Tesla will undoubtedly face "a series of constraints" and "sometimes production will go backwards" due to equipment failures and other

---

[2] Tesla repeatedly warned that it would only be able to move as fast as the slowest and least lucky component among the 10,000 parts in Model 3. *See* Mot. at 1, 9-10, 17. And it disclosed that it had "engaged a significant number of new suppliers [that] will have to ramp to achieve our needs in a short period of time," and there was no assurance they would do so. *E.g.,* Ex. 15 at 42; Ex. 19 at 43. Plaintiffs ignore these disclosures too.

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1   problems. *Id.* Just days earlier at the Model 3 launch event, Mr. Musk also stressed that Tesla was

2   entering "production hell" for at least the next "six to nine months." *Id.* And, to underscore the

3   point, he displayed a manufacturing S-curve graphic showing an exceedingly modest Model 3

4   production anticipated in the short run, only ramping up in October (completely in line with the

5   notion that more automation would be brought online around that time). Ex. 16 at 2. In other

6   words, the assertion that full automation was not in place until October is ***perfectly consistent***

7   with Tesla's actual disclosures. Plaintiffs' ***total silence*** on these contemporaneous disclosures is

8   telling and irreconcilable with their claim.

9        There is clearly nothing nefarious about Tesla utilizing semi-automated and manual

10   processes at the outset of production (all manufacturers do), yet plaintiffs pejoratively

11   characterize it as "banging out cars by hand" on "beta" or pilot lines (terms they never define and

12   which are distinctly different from each other). Production is not an all-or-nothing proposition.

13   Simply because Tesla was planning to use a high degree of automation to meet its year-end goal

14   of 5,000 per week does not mean that it would not start to build Model 3s sooner.

15        Ignoring this, plaintiffs resort to arguing that a single answer to an analyst's question on

16   August 2 concerning anticipated gross margins (not production readiness) somehow suggested

17   that all automated manufacturing processes were already complete.[3] But it is obvious that Mr.

18   Musk was not talking about how many cars Tesla was producing (much less that Model 3

19   manufacturing in two factories in two states was one "gigantic machine" making cars). The

20   August 2 letter stated that Tesla projected 1,500 cars for the entire 13-week third quarter, not that

21   it was already producing a few hundred each week. Mr. Musk was merely illustrating the

22   economic point that Model 3 gross margins would be negative because, until production

23   increases, "you've got a gigantic machine . . . that's meant for 5,000 vehicles a week and it's

24   producing a few hundred vehicles a week," noting that "[t]his is true of anything. If . . . you had

25   . . . a soap factory, let me tell you, your first bar of soap would be like millions of dollars. But

26   then you get into volume production and then it's like $2 … [s]o true for any manufacturing

27   situation." Ex. 18 at 13-14. Put another way, Tesla was spending vast sums on Model 3, and

28    

---

[3] Plaintiffs' assertion that defendants "concede the material falsity" of Mr. Musk's statement (Opp. at 5) is specious.  Defendants actually said plaintiffs' allegations "fall flat." Mot. at 19 n.14.

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

margins would not be positive until volume production was achieved. No reasonable investor could have interpreted Mr. Musk's response as plaintiffs do. *See, e.g., Intuitive Surgical*, 759 F.3d at 1060.

## III.   THE OPPOSITION FAILS TO IDENTIFY PARTICULARIZED FACTS NEEDED TO SUPPORT A STRONG INFERENCE OF SCIENTER

### A.   Plaintiffs' Theory Makes No Sense, Is Contrary To Ninth Circuit Law, And Ignores The Facts Showing Good Faith Belief In Tesla's Model 3 Plans

To show scienter, plaintiffs were required to plead facts that are "persuasive," "effective" and "powerful." *Tellabs,* 551 U.S. at 323. "The bar set by *Tellabs* is not easy to satisfy." *Webb,* 884 F.3d at 855. Viewed holistically, the inference of fraud must be cogent and compelling, and at least as strong as any opposing inference. *Tellabs,* 551 U.S. at 314, 326; *Webb,* 884 F.3d at 850. Plaintiffs do not come close to meeting that exacting standard.

To the contrary, plaintiffs devote most of their scienter argument to repeating the same false narrative: that Tesla supposedly "knew" its preparations were not "on track" to achieve its year-end goal because fully automated lines were not in place on May 3 and August 2, 2017. *See* Opp. at 14-20. But as demonstrated above, Tesla said the opposite about automation, so such arguments cannot possibly show scienter (much less falsity). Critically, plaintiffs do not even try to argue that issues with the Gigafactory's module line, which proved to be the actual constraint on production, had even occurred on May 3 or August 2, much less that they were known to be constraints by Mr. Musk or Mr. Ahuja as of those dates. *See Rigel,* 697 F.3d at 881-82. That's because the problem did not arise (as plaintiffs' own FE confirms – AC ¶ 192) until September 2017, **long after** the challenged statements. That alone is dispositive.

Plaintiffs' other arguments are beside the point and equally unavailing. It is not enough to allege that there were various problems or challenges associated with the Model 3 manufacturing ramp (particularly when they did not prove to be the actual constraint on production). As the Ninth Circuit has emphasized, "[m]uch of any business consists of having problems and dealing with them . . . That they exist does not make a lie out of any of the alleged false statements." *Ronconi,* 253 F.3d at 430, 435; *see Rigel,* 697 F.3d at 883-84 (knowledge of problems does not show defendants believed they were making false and misleading statements*); see Juniper*, 880 F.

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

Supp. 2d at 1064; *Allison*, 999 F. Supp. at 1348. That is especially true here, where Tesla warned the market repeatedly of the many challenges it would face in stark terms.

Far from downplaying risks, Tesla said it was entering "production hell over the next six to nine months," that it faced "an incredibly difficult production ramp," that with "ten thousand unique items" in Model 3, "the production will move as fast as the slowest and least luck[y] component in the whole mix," that the outset of production will be "complicated and bumpy and dealing with a lot of unexpected issues" and thus "very uncertain," that the production rate is "fundamentally impossible to predict," that it would be utilizing "cutting edge" manufacturing technology that will be "really hard to scale up," and that Tesla had "no experience" attempting to ramp this sort of manufacturing. Mot. at 1-4, 9-10. And these were not in boilerplate; they were front and center in what Tesla said. No one deliberately trying to mislead would ever make such repeated and consistent statements.

Under established law, such disclosures are meaningful and weigh heavily against scienter. *See Rigel*, 697 F.3d at 884-85 (disclosure of adverse events inconsistent with scienter); *Worlds of Wonder*, 35 F.3d at 1425 (detailed risk disclosure negates scienter); *Wet Seal*, 518 F. Supp. 2d at 1152, 1164-65 (dismissing claim given cautionary disclosures). Rather than trying to address them, plaintiffs parrot a superficial refrain about "generalized risk disclosures" not being effective (Opp. at 21) where the "hypothetical" risk had supposedly "materialized." But plaintiffs cite no case in which such blunt warnings have ever been deemed "hypothetical" or "generic." And their own FE concedes that the actual constraint *had not* materialized until September, well after the statements. Lacking any authority or facts, plaintiffs resort to the unprecedented argument that some of Tesla's warnings were mere pessimistic "puffery" (*id*. at 8), a concept not recognized in any case and wholly at odds with the basic premise of securities fraud.

The lack of any financial motive further weighs against scienter. No defendant sold Tesla stock during the alleged class period – even though Mr. Musk is Tesla's largest stockholder (and experienced the same price decline) – or obtained any other benefit whatsoever. *See Webb*, 884 F.3d at 856 ("we have recognized that a lack of stock sales can detract from a scienter finding"); *Rigel*, 697 F.3d at 884-85 (absence of stock sales weighs against scienter); *Metzler*, 540 F.3d at

1067 (same); *In re FVC.com Sec. Litig.,* 136 F. Supp. 2d 1031, 1039 (N.D. Cal. 2000) (Breyer, J.) (no stock sales by CEO "negates any slight inference of scienter"), *aff'd,* 32 F. App'x 338 (9th Cir. 2002). And, as noted in the motion, Mr. Musk's compensation package, which fully aligns his interests with the long-term success of Model 3, is similarly consistent with good faith. Mot. at 20-21. Lacking any response, the Opposition now ***affirmatively disclaims*** any "financial motive" to commit fraud in an overt effort to ward off these powerful facts. Opp. at 24 n.27.[4]

Instead, plaintiffs just make up a motive, speculating that defendants "were incentivized to buy as much time as possible to avoid a cash crunch while their attempts to mass produce [Model 3] floundered." Opp. at 23. That makes no sense (and no witness even purports to support it). A "cash crunch" – whatever that means – is not averted by "falsely" saying in May or August 2017 that preparations were on track to hit a year-end goal, while supposedly knowing with certainty that investors would be disappointed just two months later (on October 2). Plaintiffs do not even attempt to explain how intentionally creating false expectations for this short period of time alleviates (rather than exacerbates) a cash crunch. To the contrary, a "cash crunch" would be alleviated by producing Model 3s and generating revenues as soon as possible. The desire to earn revenues and believing one can do so is shared by every business and does not support scienter. *See, e.g., Lipton v. Pathogenesis Corp.,* 284 F.3d 1027, 1038 (9th Cir. 2002) ("If scienter could be pleaded merely by alleging that officers and directors possess motive and opportunity to enhance a company's business prospects, virtually every company . . . that experiences a downturn in stock price could be forced to defend securities actions"); *Webb,* 884 F.3d at 856 (desire to maximize profitability insufficient for scienter).[5]

Finally, plaintiffs' theory fails under the inherently comparative, holistic analysis demanded to evaluate scienter. Tesla's belief in the Model 3 program is reflected in everything it

---

[4] Plaintiffs' cases stand for the unremarkable proposition that the absence of stock sales is not in and of itself dispositive. *See, e.g., No. 84 Employer-Teamster Joint Council Pen. Tr. Fund v. Am. W. Holding Corp.,* 320 F.3d 920, 944 (9th Cir. 2003). Defendants do not argue otherwise. However, under Ninth Circuit law, the absence of sales does weigh against scienter. Mot. at 20.

[5] Plaintiffs also offer a *non sequitur*, asserting that Tesla had a motive in light of its "well-documented history of overpromising production goals for earlier vehicles." Opp. at 23. But rather than suggest fraud, those experiences underscore the many challenges Tesla faces when introducing newly-designed cars, and utilizing new manufacturing processes and supply chains. Mot. at 7. Even traditional automakers, building legacy vehicles with existing processes, experience production problems. *Id.* Plaintiffs ignore both points.

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1   has done: the $4 billion it invested, the buildout of the Gigafactory, and the equipment and

2   processes it commissioned to support high volume production (a goal it has now **met**). *See Apple,*

3   886 F.2d at 1117. The only reasonable inference is that, as of May 3 and August 2, 2017, Tesla

4   believed it could reach its goals, disclosed that there were serious challenges it would face, and

5   then experienced unexpected difficulties in September as production progressed during Q3 2017.

6   *See* Mot. at 4, 20-22. Those are the realities of complex manufacturing.  *See Haque v. Tesla*

7   *Motors, Inc.,* 2017 WL 448594, at *10-11 (Del. Ch. Feb. 2, 2017) (plaintiffs' position "reflects a

8   basic misunderstanding of Tesla's complex manufacturing," and "[s]imply because Tesla did not

9   foresee production challenges it might face later in the quarter does not support an inference that

10  its statement halfway through the quarter … was false when made").

**B.      Repeating Deficient Former Employee Allegations Does Not Support A
Cogent And Compelling Inference Of Scienter**

13          While plaintiffs rely on FEs for their scienter argument, they never try to address the most

14  fundamental problem identified in Tesla's motion: ***not one FE*** claims to know the planned

15  schedule for Model 3 production as of May 3 or August 2, 2017, nor when automated lines were

16  to be fully implemented, nor how the planned implementation compared to Tesla's actual

17  progress. Mot. 4-5, 22-24. Without knowing what the "track" actually was, no FE could possibly

18  know whether Tesla's preparations were "off track," much less know that Mr. Musk or Mr. Ahuja

19  deliberately sought to mislead anyone about the state of Tesla's preparations for production at any

20  time. The FE statements fail because they "must themselves be indicative of scienter," and show

21  that the ***actual statements*** were deliberately false.  *See Zucco Partners, LLC v. Digimarc Corp.,*

22  552 F.3d 981, 995 (9th Cir. 2009). The FEs also fail for four further, independent reasons:

23          *First,* five FEs (FEs 1, 2, 4, 6, 7) left Tesla before Model 3 production even began – in

24  some cases by more than a year – and thus lack any insight into Tesla's ability to meet its goals

25  by the end of 2017. *See Shurkin v. Gold State Vintners, Inc.,* 471 F. Supp. 2d 998, 1015 (N.D.

26  Cal. 2006) (witness whose employment ended before class period lacks personal knowledge of

27  subsequent activity), *aff'd,* 303 F. App'x 431 (9th Cir. 2008); *In re Silicon Image, Inc. Sec. Litig.,*

28  2007 WL 2778414, at *2 (N.D. Cal. Sep. 21, 2007) (witnesses lack personal knowledge because

1    they were no longer at company at relevant time), *aff'd*, 325 F. App'x 560 (9th Cir. 2009). While

2    plaintiffs say that, in some instances, stale witness allegations can "shed light" on statements that

3    post-date their employment (Opp. at 18), they fail to show why these allegations, which do not

4    address Tesla's statements (or disclosed risks) or the planned production schedule or the actual

5    constraint on production, should be given any weight here.[6]

6         *Second,* the only FEs who purport to have any involvement with battery module

7    production (FEs 8 and 9) ***corroborate*** what Tesla said: that in September 2017, well ***after*** the

8    challenged statements, the automated module line at the Gigafactory suffered "malfunctions" and

9    experienced faulty software, and this had an adverse impact on production, as any bottleneck

10   would. Mot. at 23; AC ¶¶ 182, 186, 192-93. The Opposition avoids this devastating fact.[7]

11        *Third,* apparently to deflect attention, plaintiffs devote a section of their brief to FE

12   statements relating to Fremont (downstream from the bottleneck). Opp. at 11-12, 16 (concerning

13   FEs1-7). But nothing at Fremont was the actual constraint on production at the time, and no FE

14   contends otherwise. Mot. at 22-23. And while plaintiffs appear to include these allegations to

15   assert that fully automated lines were not installed at Fremont on May 3 or August 2, 2017, this is

16   just a retread of plaintiffs' false "fully automated" narrative. In fact, several FEs, both at Fremont

17   and the Gigafactory, do not even purport to address Model 3 production vehicles, which Tesla

18

19   [6] In *In re Quality Sys. Inc. Sec. Litig.,* 865 F.3d 1130, 1145 (9th Cir. 2017), the court credited a statement by a very senior executive, the former COO, about management's real time access to

20   Salesforce reports – a fact that did not change with the passage of time and that was corroborated by other witnesses in the class period. That decision has no bearing on the circumstances here,

21   where Tesla obviously continued to develop Model 3 plans and progress with implementation long after the former employees left.

22   [7] Plaintiffs intentionally confuse the issues by trying to compare a few FE allegations about battery modules and packs to Mr. Musk's August 2 comment that Tesla was "making great

23   progress on the battery front." Opp. at 16-17. But Mr. Musk's statement was ***not even about Model 3***. As the context (Ex. 18 at 4-5) and August 2 letter (Ex. 17 at 3) both make clear, the

24   statement concerned the large scale battery storage products Tesla was producing for Australia to avoid blackouts. *See also* P. Williams & D. Hull, *Musk Heads To Australia To Unveil Progress*

25   *On Giant Battery, Mars Mission,* Bloomberg, Sept. 28, 2017. And even if the statement had been about Model 3, plaintiffs' assertions would fail, as there is a fundamental difference between a

26   battery (Mr. Musk's statement), and a module or pack (the FEs). And this even disregards overt reliability issues. For example, plaintiffs claim "there was a high failure rate for Model 3 battery

27   modules for the entire time FE8 worked at the Gigafactory, from January 2014 through September 2017." Opp. at 16. But the Model 3 was not even unveiled until 2016 (Ex. 1 at 1) and

28   the Gigafactory had not even been built in January 2014 (Ex. 3 at 25, Ex. 15 at 32, stating that "we broke ground" in June 2014), so such allegations cannot possibly be credited.

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

started to build in July 2017, but instead discuss **test vehicles** that were being built earlier. *See* AC

¶¶ 153-57 (FE4), 170-71 (FE6), 155, 158 (FE7), 188 (FE9); *see also* Ex. 10 at 2 (began building

prototypes in February). Hence statements by these FEs have no bearing on falsity or scienter.

*See Tesla,* 75 F. Supp. 3d at 1043 (rejecting witness accounts relating to battery prototype).

*Fourth,* it is not enough to point generally to FE accounts of meetings attended by one or

more defendants (Opp. at 14-15) or to claim that problems were "widely known" (*id*. at 19-20).

*See Zucco,* 552 F.3d at 998 (rejecting "had to have known" allegation); *In re Fusion-io Sec. Litig.,*

2015 WL 661869, at *19 (N.D. Cal. Feb. 12, 2015) (rejecting "everyone knew" allegation). Such

generalities are a far cry from the contemporaneous, specific facts needed to plead scienter.[8]

Apparently recognizing this, plaintiffs return to FE1, the alleged "plastics" employee fired

in **June 2016**, who claims to have expressed an opinion to Mr. Musk that Tesla would not be able

to hit its 5,000 per week goal by the end of 2017. *See* AC ¶¶ 123, 125. Tellingly, nothing is

pleaded even remotely suggesting that Mr. Musk agreed with FE1. Moreover, FE1's opinion

rested on a false premise, which plaintiffs put in bold italics in the AC, that production would not

even "**start**" until January 2018. Mot. at 6, 23; AC ¶ 128. In fact, production started in July 2017,

just as Tesla said it would. The Opposition's attempt to explain away this fatal flaw – by claiming

that FE1 really meant that "mass" production would not begin until 2018 – simply rewrites their

own crystal clear allegation. Furthermore, it is obvious that uniform like-mindedness does not

exist in a 37,000 employee company, and the outdated – and demonstrably incorrect – opinion of

a single dismissed employee **over a year** before production began and **18 months** before the 5,000

per week target only shows plaintiffs' desperation, not scienter. *See Brodsky v. Yahoo! Inc.,* 592

F. Supp. 2d 1192, 1201 (N.D. Cal. 2008) (rejecting witness account where substantial "temporal

mismatch" existed with alleged misstatement); *In re Downey Sec. Litig.,* 2009 WL 2767670, at

*11 (C.D. Cal. Aug. 21, 2009) ("second-guessing of management" insufficient to plead scienter).[9]

---

[8] Plaintiffs' cases are inapposite. *See In re Amgen Inc. Sec. Litig.,* 2014 WL 12585809, at *17 (C.D. Cal. Aug. 4, 2014) ("close topical and temporal proximity" of meeting where defendant was put on notice of a hard fact (an adverse study), not just an opinion, right before alleged misstatement); *Hatamian v. Advanced Micro Devices, Inc.,* 87 F. Supp. 3d 1149, 1162-63 (N.D. Cal. 2015) (witness accounts providing details of weekly and daily meetings, during which specific production problems were discussed, just prior to allegedly false statements).

[9] For the same reasons, the statement of FE2, who was also gone by June 2016, that a few

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

### C.   Plaintiffs' Baseless "Admission" Argument Cannot Establish Scienter

Plaintiffs persist in arguing that Tesla admitted, in February 2018, that it knew in May and August 2017 that it could not manufacture sufficient battery modules to ramp to 5,000 units per week by the end of 2017. This statement says nothing of the sort. *See* Mot. at 19. Tesla merely discussed the actions it was ***then taking*** to remediate the module line issues that started in September, now utilizing its German subsidiary in place of the outside robotics firm. *See* Ex. 24; AC ¶ 207. In fact, Tesla's November 1 disclosures – which plaintiffs do not assail – stated that the problem with that outside vendor did not arise "until quite recently" as Tesla attempted to ramp production in Q3 2017. Mot. at 11; Exs. 21, 22. *See In re Yahoo! Inc. Sec. Litig.,* 2012 WL 3282819, at *13 (N.D. Cal. Aug. 10, 2012) ("simply disclosing something at some point does not 'admit' that it should have been disclosed earlier"), *aff'd,* 611 F. App'x 387 (9th Cir. 2015); *see Berger v. Ludwick,* 2000 WL 1262646, at *8 (N.D. Cal. Aug. 17, 2000) (calling later statement an "admission" is pure hindsight), *aff'd,* 15 F. App'x 528 (9th Cir. 2001).[10]

### D.   Plaintiffs' Unpleaded Core Operations Theory Cannot Salvage Their Claim

The Opposition's attempt to justify application of the core operations theory fails. That unpleaded theory, of course, "require[s] management to have, at a minimum, made false or misleading statements" (*Colyer,* 2015 WL 7566809, at *13) and plaintiffs have not cleared that fundamental hurdle. That alone disposes of this argument.

In addition, the core operations inference is permitted only in an "exceedingly rare category of cases." *S. Ferry LP, # 2 v. Killinger,* 542 F.3d 776, 785 n.3 (9th Cir. 2008). It is not sufficient to allege that Model 3 was "important" or even "existential" or to claim that Mr. Musk "visited" Tesla's factories. *See In re NVIDIA Corp. Sec. Litig.,* 768 F.3d 1046, 1064 (9th Cir. 2014) (rejecting presumption of knowledge of financial impact of chip defect affecting "flagship product" and problems with "two largest customers"); *Colyer,* 2015 WL 7566809, at *12

*potential* suppliers out of thousands doubted their ability to meet Tesla's timelines says nothing about how actual suppliers subsequently addressed the start of production over the next year.

[10] Plaintiffs cite *Constr. Workers Pension Tr. Fun – Lake Cty. v. Genoptix, Inc.,* 2013 WL 12123841 (S.D. Cal. Mar. 22, 2013), but that case only underscores the deficiencies here. There, defendants later acknowledged a trend of declining demand over the prior twelve months, directly conflicting with earlier statements about strong demand in the same period. *Id.* at *6. Combined with first-hand witness accounts that defendants knew demand was declining, the court founds scienter sufficiently pled. *Id.* at *7. Such allegations are wholly absent here.

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

(insufficient to claim that key product was at issue). Instead, plaintiffs need to allege facts showing that *falsity* would have been "patently obvious" or "detailed involvement in the minutia of a company's operations" demonstrating each defendant's knowledge of falsity. *See Zucco,* 552 F.3d at 1001; *Intuitive Surgical,* 759 F.3d at 1062. Plaintiffs do neither.

They offer no details concerning the production plan as it stood on May 3 or August 2, 2017, much less contemporaneous facts that would have made it "patently obvious" that Tesla would be unable to hit – *by year-end* – its goal as it continued to install, implement and ramp production lines over the ensuing months. Nor do they allege facts showing that Mr. Musk (or Mr. Ahuja, who plaintiffs barely mention) was involved in the "minutia" of the module line until it became an actual constraint on production long after the statements plaintiffs assail in Q3 2017. This is not "core operations," but fraud by hindsight.[11]

## IV.   THE OPPOSITION CANNOT CURE THE ABSENCE OF LOSS CAUSATION

Plaintiffs abandon any pretense that Tesla's October 2 disclosure of Model 3 production bottlenecks (and the missed production guidance for Q3) caused any loss since Tesla's stock price actually *increased* after that disclosure.[12] Loss causation requires a price decrease following revelation of the alleged "fraud." *Metzler,* 540 F.3d at 1063.

Plaintiffs' reliance on the October 6 *WSJ* story is misplaced. This was not a "corrective" disclosure by Tesla. It was a hearsay article speculating that the absence of complete automation (such as welding parts by hand) was behind the bottleneck. But again, Tesla *never said* that all automated systems were in place, but said the opposite. Thus, the *WSJ* did not "correct" an allegedly "fraudulent statement" made months earlier in May or August. *See Intrexon,* 2017 WL 732952, at *7. In addition, plaintiffs cannot establish that a temporary, single day stock decline is sufficient to show loss causation. *See Metzler,* 540 F.3d at 1065 (no loss causation where, just three days later, "stock quickly recovered from the 10% drop" following a *Financial Times*

---

[11] Plaintiffs' contention that Sarbanes-Oxley certifications raise a strong inference of scienter is contrary to law. *See, e.g., Brodsky,* 592 F. Supp. 2d at 1205.

[12] To the extent the Opposition puts misplaced reliance on Mr. Musk's August 2 illustrative point about a "gigantic machine" producing a few hundred cars per week, this price reaction further defeats plaintiffs' claim.  On October 2, Tesla disclosed that it had produced only 260 vehicles in all of Q3, and its stock price *rose*. That shows that reasonable investors did not construe Mr. Musk's comment as plaintiffs attempt to do, and there is no loss causation in any event.

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

story); *Loos v. Immersion Corp.,* 762 F.3d 880, 889 (9th Cir. 2014) (citing *Metzler).* Any other result would allow a plaintiff to establish loss causation any time a reporter writes a negative article, regardless of whether it is "corrective," so long as a temporary price decline follows.[13] That is just what *Dura Pharms., Inc. v. Broudo,* 544 U.S. 336, 343 (2005) was intended to prevent. *See also Qualcomm,* 2017 WL 3226701, at *15, 19 (agreeing that "false deducements made by Plaintiffs and/or journalists" do not support a claim).

Finally, loss causation cannot be based on Tesla's November 1, 2017 disclosure of revised forward-looking guidance, because plaintiffs have made no claim based on Tesla's forecast. *See* Mot. at 25. Instead, plaintiffs argue that a posting on a website (called Jalopnik) at noon EST on November 2 revealed "new" information unrelated to the guidance change "causing a price decline." Opp. at 25; *see* AC ¶ 246. But this fails for two reasons. First, "new" information is not the test; the test is whether the Jalopnik posting revealed a prior misstatement in May or August. Because Tesla never said that all automation was in place back then, the Jalopnik posting does not comport with *Dura.* Second, that defect aside, plaintiffs fail to identify facts showing that Tesla's stock price declined ***in response*** to the mid-day posting, as opposed to earlier in the day in response to the guidance change. That omission is fatal to their claim. *See Apollo Grp.,* 774 F.3d at 605 (loss causation must be pled with specificity).[14] Furthermore, plaintiffs (who filed suit on October 10) had always stated that the class period ended on October 6 – through the entire lead plaintiff process, including the PSLRA public notice and lead plaintiff motion filed well after the November 1 disclosure. They cannot abandon that position merely to seize on a later stock price decline untethered to any alleged misstatement.

---

[13] Proving the point that false reports can affect Tesla's stock irrespective of any corrective disclosure, short sellers and the press recently re-broadcast the Opposition's inaccurate assertion that "Defendants concede the material falsity of Defendant Musk's August 2, 2017 statement" (Opp. at 5), resulting in a completely unwarranted 2.75% drop in Tesla's stock price on July 24. *See, e.g.,* B. Alpert, *Tesla Calls Lawsuit's Claims A Complete Lie,* Barron's, July 24, 2018.

[14] Plaintiffs try to conceal this deficiency with a vague allegation that the stock declined due to both announcements combined.  AC ¶ 247. But the announcements were made at distinctly different times. If plaintiffs now wish to rely on Jalopnik, they were required to plead a decline in response to it as opposed to a decline ***earlier*** in the day. They cannot do so in good faith in light of intraday trading information, which is why their pleading is entirely vague on this issue.

1

## V.   LEAVE TO AMEND SHOULD BE DENIED

2

3

4

5

6

7

Leave to amend is not automatic. While liberal, amendment must be in the interests of justice, and it is denied where it is futile or unfairly prejudicial. Plaintiffs' allegations are irreconcilable with Tesla's disclosures about Model 3 production. They rest on a fraud theory that makes no sense, benefitted no one, and is contrary to overwhelming facts defeating scienter. Repleading cannot cure these deficiencies, and it is telling that plaintiffs identify no further facts they could allege. *See Greenberg,* 233 F. Supp. 3d at 775.

8

9

10

11

12

13

14

15

16

17

Plaintiffs rely on post-class period events and publicly available information (AC at 2, ¶¶ 249-54), but such events illustrate why leave to amend is futile. Tesla has reached its Model 3 production milestone of 5,000 units a week. *See, e.g.,* F. Lambert, *Tesla Reaches Model 3 Production Milestone and Record 7,000-Car Week Total Production, Says Elon Musk,* Electrek, July 1, 2018. Model 3 is the best-selling electric vehicle in the United States and the best-selling mid-sized premium sedan of all kinds, outselling the Mercedes C class, BMW 3 Series, Audi A4 and Lexus IS combined. *See, e.g.,* Tesla Second Quarter 2018 Update (filed Aug. 1, 2018 with SEC on Form 8-K). So all that plaintiffs are left with is a temporary setback at the very outset of a particularly complicated production ramp – one that Tesla warned it could face. That is not, and never has been, the basis for a securities fraud suit.

18

Dated:   August 17, 2018

19

20

21

22

Respectfully submitted,

FENWICK & WEST LLP

By: /s/      *Dean S. Kristy*
          Dean S. Kristy

Attorneys for Defendants Tesla, Inc.,
Elon R. Musk, and Deepak Ahuja

23

24

25

26

27

28

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

REPLY MEM. ISO MOT. TO DISMISS AMENDED
COMPLAINT

15

CASE NO.: 3:17-cv-05828-CRB