IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GREGORY WOCHOS,<br><br>　　　　Plaintiff,<br><br>　　v.<br><br>TESLA, INC., et al.,<br><br>　　　　Defendants. | Case No. 17-cv-05828-CRB<br><br>**ORDER DISMISSING COMPLAINT WITH LEAVE TO AMEND** |

　　In this non-Twitter-related securities action against Tesla, Inc., a purported class of shareholders ("Plaintiffs") alleges that the carmaker misled the public regarding the progress of production on the "Model 3," Tesla's attempted first foray into producing a mass-market vehicle.  However, while Plaintiffs claim that Tesla and its officers (collectively "Defendants") fell short of their production goals, a firm's failure to meet projections is only actionable if the firm did not accompany those projections with meaningful qualifications.  Because Plaintiffs fail to allege that Defendants made any projections that were not so qualified, their claims fail.  Federal securities laws do not punish companies for failing to achieve their targets.  The Court accordingly grants Defendants' motion to dismiss the First Amended Complaint ("FAC") with leave to amend, and takes judicial notice of certain statements Tesla made to the market that are not included in the FAC for the limited purpose of determining what Tesla's public representations in fact were.

## I.   BACKGROUND[1]

Tesla manufactures luxury electric vehicles. FAC (dkt. 24) ¶ 43. In 2016, the company announced plans to produce an affordable, mass-market electric vehicle called the "Model 3." Id. ¶ 72. Given that previous models had suffered from stagnant demand and production difficulties, Tesla planned to price the Model 3 at $35,000 and designed the car for ease of manufacturing. Id. ¶¶ 6, 48, 73, 76. The Model 3 was well-received by consumers, attracting deposits from over 500,000 potential customers after its launch in 2017. Id. ¶ 3.

To achieve mass production of the Model 3, Tesla planned to develop a fully automated production line at its Fremont, California, facility to assemble the car body, as well as a fully-automated line at its Reno, Nevada, factory to build the battery. Id. ¶ 12. Given that no other automobile company had ever attempted to mass-manufacture an all-electric vehicle, Tesla's plan to ramp up production put it in unchartered territory. Id. ¶ 88. Nevertheless, Tesla consistently stated that it planned to ramp up production to a rate of 5,000 finished vehicles per week by the end of 2017. Id. ¶ 13.

However, production did not proceed as expected. On October 2, 2017, the company issued a press release stating that Tesla had failed to meet its Model 3 production goals for the third quarter of 2017 because of "production bottlenecks." Id. ¶ 242. Four days later, the Wall Street Journal published an article entitled, "Behind Tesla's Production Delays: Parts of Model 3 Were Being Made by Hand," reporting that the few Model 3s that were being built at the Fremont facility were being constructed by hand rather than on an automated production line. Id. ¶ 25. On November 2, 2017, Tesla moved its production goal of 5,000 Model 3s per week to the end of the first quarter of 2018, citing bottlenecks at its Reno battery factory. Id. ¶ 245. Plaintiffs contend, however, that Tesla knew it would be impossible to reach this goal long before it disclosed this fact to the market, and that it defrauded investors by failing to revise its projections earlier.

---

[1] This section recounts the facts as stated in the complaint.

2

## I. LEGAL STANDARD

To withstand a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Dismissal may be based on either "the lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory." Balistreri v. Pacifica Police Dep't, 901 F.2d 696, 699 (9th Cir. 1990). The facts pleaded must make the claim "plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). In addition, claims of securities fraud must be pled with particularity. Fed. R. Civ. P. 9(b); 15 U.S.C. § 78u-4(b)(1).

Following dismissal, a court "should liberally allow a party to amend its pleading." Sonoma Cty. Ass'n of Retired Emps. v. Sonoma Cty., 708 F.3d 1109, 1117 (9th Cir. 2013). However, it need not grant leave to amend if there is no set of facts under which the plaintiff can state a valid and sufficient claim. DCD Programs, Ltd. v. Leighton, 833 F.2d 183, 188 (9th Cir. 1987).

## II. DISCUSSION

### A. Request for Judicial Notice

In reviewing a motion to dismiss, a district court is usually limited to the facts stated in the complaint. Arpin v. Santa Clara Valley Transp. Agency, 261 F.3d 912, 925 (9th Cir. 2001). "A court may, however, consider certain materials—documents attached to the complaint, documents incorporated by reference in the complaint, or matters of judicial notice—without converting the motion to dismiss into a motion for summary judgment." United States v. Ritchie, 342 F.3d 903, 908 (9th Cir. 2003). Courts may take judicial notice of facts that are "not subject to reasonable dispute" because they (1) are "generally known within the trial court's territorial jurisdiction," or (2) "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."

1    Fed. R. Evid. 201(b).

2      Defendants ask the Court to take notice of 33 documents that contain public
3    statements made by Tesla and its officers regarding Model 3 production. Plaintiffs,
4    however, object to the Court considering "any document . . . the Complaint did not
5    reference," identifying these documents as Exhibits 1, 3–4, 6–10, 12, 25, and 32 of the
6    Bretan declaration (dkt. 34). See Pl's' Objection to Judicial Notice (dkt. 36) at 2, 5.

7      Exhibits 1, 3, 4, 6, 7, 9, 10, 12, 25, and 32 are documents that Tesla filed with the
8    SEC. Given that Tesla publicly filed these documents, their accuracy cannot reasonably be
9    questioned, and they are therefore appropriate subjects of judicial notice. See Fed. R.
10   Evid. 201(b). Similarly, Exhibit 8 is an earnings call disclosed under the fair disclosure
11   wire, the accuracy of which is not reasonably subject to dispute. See id. Moreover, while
12   the complaint does not specifically incorporate these documents by reference, they
13   constitute the subject matter of the claim: Tesla's public statements. The Court considers
14   them in evaluating the motion to dismiss for the sole purpose of determining what
15   representations Tesla made to the market. The Court is not taking notice of the truth of
16   any of the facts asserted. Cf. Khoja v. Orexigen Therapeutics, Inc., —F.3d—, No. 16-
17   56069, 2018 WL 3826298, at *7 (9th Cir. Aug. 13, 2018).

18    **B. Motion to Dismiss**

19     Defendants move to dismiss Plaintiffs' claims pursuant to §§ 10(b) and 20(a) of the
20   Securities Exchange Act of 1934 ("Exchange Act") and SEC Rule 10b-5. Section 10(b)
21   makes it unlawful "to use or employ in connection with the purchase or sale of any
22   security . . . any manipulative or deceptive device or contrivance in contravention of" SEC
23   rules. 15 U.S.C. § 78j(b). Meanwhile, Rule 10b-5 proscribes, in connection with the
24   purchase or sale of any security, (1) employing any device, scheme, or artifice to defraud;
25   (2) making a material misstatement or omission; or (3) engaging in any act, practice, or
26   course of business which operates or would operate a fraud or deceit upon any person.
27   17 C.F.R. § 240.10b-5. To state a claim under § 10(b) and Rule 10b-5, a plaintiff must
28   allege (1) a misrepresentation or omission of (2) material fact (3) made with intent (4) on

4

which the plaintiff justifiably relied (5) that proximately caused the alleged loss.  Binder v. Gillespie, 184 F.3d 1059, 1063 (9th Cir. 1999).  Section 20(a), meanwhile, provides for joint and several liability for violations of the securities laws.

The statements identified in the complaint fall into basically three categories: (1) representations that preparations on the Model 3 were "on track" or "progressing" to Tesla's goal of producing 5,000 vehicles per week by the end of 2017; (2) positive assessments of the Model 3 production process; and (3) a representation regarding the then-current status of Model 3 production.

### 1. Representations re: production goals

#### a. Plaintiffs' allegations

Plaintiffs state that Defendants' representations regarding the progress Tesla was making toward its production goals were misleading because the carmaker had no chance of actually achieving those goals.  See FAC ¶¶ 209–12, 216–28, 231–41.  Plaintiffs plead the following facts in support of their contention that Tesla's goals were impossible:

(1)  An employee referred to in the FAC as "Former Employee 1" ("FE1"), a director of manufacturing at Tesla's Fremont plant who specialized in plastics and coating, told Tesla CEO Elon Musk in late April or early May of 2016 that it would be impossible to produce 5,000 vehicles per week by the end of 2017.  Id. ¶¶ 125, 210.  FE1 believed this to be the case because Tesla had not released plans for body-part molds as of June 2016, and molds take 9 to 12 months to make; and because Tesla had not yet begun ordering manufacturing equipment to be installed at the Fremont plant as of June 2016, and it takes 19 to 20 months to get a manufacturing plant up and running.  Id. ¶¶ 126–27; see also id. ¶ 171.  FE1 stated that Josh Ensign, a vice president of manufacturing, agreed with FE1's assessment, and that Musk later forced both Ensign and FE1 out of the company. Id. ¶¶ 129–30.

(2)  The automated production lines in Fremont were "not built, or close to completion" when Tesla made the statements.  Id. ¶ 210.  FE2, a senior project engineer involved in supplying parts for the production line, stated that the firms supplying parts for

the production lines told it that its timelines were "impossible" to meet. Id. ¶¶ 136, 217. She stated that, when she left the company in June 2016, she and her team "had not yet even finalized their plans for the production line, nor settled on all of the suppliers for the equipment and/or solutions," and that she heard through the grapevine that plans were still not finalized as of July or August 2016. Id. ¶¶ 135, 142, 217. She stated that the goal of completing the production lines by Tesla's planned deadline was impossible because "it would take 18–24 months to construct the system and get it up and running and ready for production to begin." Id. ¶ 139. She said that her superiors were aware of the difficulties she identified. Id. ¶ 141. Similarly, FE6, who worked in processing and manufacturing, stated that during his last few months at Tesla in late 2016, "everyone at the Fremont plant, including Musk, was aware that the Company would not be able to produce 5,000 Model 3s a week by the end of 2017, and that the timeline was unrealistic." Id. ¶ 174.

(3)   Meanwhile, according to FE9, the Reno facility was "plagued by problems related to producing usable modules, and the first battery module was completed long past the deadline when the Model 3 was supposed to have been launched." Id. ¶ 190. "During FE9's tenure, which lasted almost to the end of the Class Period, the [Reno factory] produced no more than two battery packs, at most, per day, sufficient for two cars." Id. ¶ 195.

(4)   The individual defendants visited the factories, and "were personally aware from eyewitness observation" that "mass production of the Model 3 was not possible in 2017." Id. ¶ 210.

(5)   Production equipment necessary to produce batteries at the Reno facility was in Germany during the class period (May 3, 2017, through Nov. 1, 2017). Id. ¶¶ 207–208, 210.

(6)   During the class period, "there were no fully automated lines to produce" car bodies or batteries sufficient to reach Tesla's production goals. Id. ¶ 210.

### b.   Tesla's representations

To determine whether Plaintiffs have stated a claim for securities fraud, the Court

6

must compare their allegations about the true state of affairs with Defendants' public representations. Tesla first announced its Model 3 production goals in a quarterly report filed with the SEC on May 10, 2016, stating that it "expect[ed] to achieve volume production and deliveries in late 2017." Bretan Decl. at 23 (Ex. 3). In an earnings call around the same time, Musk acknowledged that Tesla's expectations of suppliers were higher than those of other manufacturers, saying he would seek "a commitment from [the supply team] that they intend to work harder than they ever have on any other program"—otherwise Tesla would not work with them. Id. (Ex. 2) at 19.

In that quarterly report, Tesla described a host of uncertainties regarding the production process. It stated, "We have experienced in the past . . . significant delays or other complications in the design, manufacture, launch and production ramp of new vehicles and other products," and "may experience similar delays or other complications in bringing to market and ramping production of new vehicles, such as Model 3." Id. at 26. It further cautioned that it had "no experience to date in manufacturing vehicles at the high volumes that we anticipate for the Model 3," and noted that its production plan was based on a number of assumptions. Id. at 27. It went on to spell out those assumptions in detail. Id. It stated, "Our ability to achieve these plans will depend upon a number of factors, including our ability to add production lines and capacity as planned while maintaining our desired quality levels and optimize designs and production changes, and our suppliers' ability to support our needs." Id. It noted the complexity of building the planned Reno battery factory and the difficulties of dealing with single-source suppliers as particular sources of risk. Id. at 28–29. Tesla reiterated these risk factors in later quarterly reports. See id. at 54–57 (Ex. 6).

On an Oct. 26, 2017, earnings call, Musk stated that "it's looking good for production volume second half of 2017," but cautioned that "a car consists of several thousand unique items," and that Tesla could "only go as fast as the slowest item." Id. at 73 (Ex. 8). He also cautioned that the production ramp is "exponential," and that "it's very difficult to predict exactly where the beginning part of the exponential curve . . . fits in

7

between quarterly reporting." Id. He added, "I think things will look very good exiting 2017, but it will be complicated and bumpy and dealing with a lot of unexpected issues . . . at the beginning of Model 3 production in Q3, Q4." Id. The quarterly report that followed, filed Nov. 2, 2016, repeated Tesla's earlier statements about the possibility that it would not hit its targets in Model 3 production. Id. at 81–84 (Ex. 9).

Musk repeatedly reiterated his statements regarding production difficulties. For instance, during an earnings call on Feb, 22, 2017, he stated: "There are new issues that pop up every week and we attack them and get them to solve for schedule. But then another issue will pop up in the following week. It's schedule whack-a-mole . . . some of these things only come to light late in the game." Id. at 102 (Ex. 11). He described dealing with suppliers as the "term paper problem," noting that some were going to be late in deliveries, but that it was impossible to predict which ones. Id. at 103–04. "The things that are likely to be schedule issues are things that we actually just don't know about today." Id. at 105. On an earnings call on May 3, 2017, Musk again described the difficulties of predicting an exponential production curve, stating, "predicting the rapidly changing portion of the S-curve is just, I think, not within the ability of anyone to predict with accuracy." Id. at 131 (Ex. 14).

When Tesla unveiled the Model 3 at a launch event on July 28, 2017, Musk again acknowledged production challenges, saying: "[T]he thing that's going to be the major challenge for us over the next six to nine months is how do we build a huge number of cars and frankly, we're going to be in production hell." Id. at 150 (Ex. 16). And Musk reiterated the difficulties in the supply chain: "[A]lmost anything that goes wrong anywhere in the world . . . if we haven't buffered the supply chain, will interrupt the production progress. When you have 10,000 unique items in a vehicle . . . any one of them can slow down the production process. So the production rate will move as fast as the slowest and least luckiest component in the whole mix." Id. at 151.

In an earnings call on Aug. 2, 2017, Musk again emphasized the difficulties of predicting production timelines with certainty: "I would certainly urge people to not get

too caught up in what exactly falls within the exact calendar boundaries of a quarter, one quarter over the next, because when you have an exponentially growing production ramp, slight changes of a few weeks here or there can appear to have dramatic changes, but that is simply because of the arbitrary nature of . . . when a quarter ends." Id. at 166 (Ex. 18). Musk continued, "What we have ahead of us, of course, is an incredibly difficult production ramp," adding, "It's just fundamentally impossible to predict the exponential part of the manufacturing S-curve. It's crazy hard." Id. at 168. He clarified that even this was an oversimplification, saying that the process involved "running through a series of constraints . . . it's like a really jagged sort of upward growth, and it'll plateau, and then it'll grow rapidly, and it'll plateau again. And then sometimes it'll go backwards because something broke. When I said manufacturing hell . . . and supply chain hell on Friday, I meant it." Id.

### c. Analysis

The Private Securities Litigation Reform Act of 1995 ("PSLRA") carves out a safe harbor from liability for statements that are identified as "forward-looking" and are "accompanied by meaningful cautionary statements." 15 U.S.C. § 78u-5(c)(1)(A)(i). A forward-looking statement is "any statement regarding (1) financial projections, (2) plans and objectives of management for future operations, (3) future economic performance, or (4) the assumptions 'underlying or related to' any of these issues." No. 84 Employer-Teamster Joint Council Pension Trust Fund v. Am. W. Holding Corp., 320 F.3d 920, 936 (9th Cir. 2003). A projection may be said to contain an implied factual misstatement where (1) the speaker does not actually believe the statement to be true, (2) there is no reasonable basis to believe the statement to be true, or (3) the speaker is aware of undisclosed facts tending seriously to undermine the statement's accuracy. Provenz v. Miller, 102 F.3d 1478, 1487 (9th Cir. 1996).

Plaintiffs claim that Tesla's statements that it was "on track" to achieving its goal of producing 5,000 Model 3 vehicles per week by the end of 2017 were representations of the then-current state of affairs, rather than forward-looking projections, because they

purported to describe how far Tesla was, at that moment, from meeting its goal. But every future projection depends on the current state of affairs. Were the Court to adopt Plaintiffs' conclusion, the distinction between present statements and forward-looking statements would collapse. Tesla's representations fall solidly within the category of forward-looking statements regarding plans and objectives for future operations. See Joint Council Pension Trust Fund, 320 F.3d at 936.

Accordingly, Tesla's statements are only actionable if they are not identified as being forward-looking or are unaccompanied by meaningful cautionary statements. See 15 U.S.C. § 78u-5(c)(1)(B); Provenz, 102 F.3d at 1493. Plaintiffs are correct that Defendants' qualifications would not have been meaningful if Defendants had known that it was impossible for Tesla to meet its stated production goals, not merely highly unlikely. See FAC ¶¶ 219, 234; see also FAC ¶ 221. However, the facts Plaintiffs have put forth do not tend to establish that this was the case.

(1) That FE1 believed the production timeline to be impossible because Tesla had not release plans for body-mold parts as of June 2016 does not contradict Tesla's public statements: Tesla disclosed that this was the case. Bretan Decl. at 18. Market analysts appear to have had the same information on this point that FE1 did, and could have evaluated for themselves whether Tesla's planned timeline was possible. See Provenz, 102 F.3d at 1487. That FE1 believed Tesla did not have enough time to get the Fremont plant up and running also is consistent with Tesla's public statements: the company repeatedly represented that it had set an aggressive production schedule, and that there it was not certain it would be able to meet the deadlines it had set.

(2) That suppliers may have believed Tesla's timelines were impossible to meet similarly does not contradict Tesla's public statements. Defendants repeatedly stated that Tesla was demanding of suppliers, and that its expectations of them might differ from suppliers' own estimates. Bretan Decl. at 19. And Tesla implied at the time that it was still in the process of choosing suppliers when FE2 said this was the case. Id. ("We'll be asking for firm commitments from suppliers to meet that timeframe."). That Tesla

1   employees and suppliers may have disagreed with Tesla's own estimates of what was a
2   realistic timeline does not make Tesla's estimates false, given that the market had access to
3   the same factual information as those employees and suppliers.  Meanwhile, FE6's
4   allegation that everyone at Tesla, including Musk, knew by the end of 2016 that the goal of
5   achieving a run rate of 5,000 Model 3s per week by the end of 2017 was impossible is a
6   conclusory allegation, not a fact, and cannot be taken as true.  See Iqbal, 556 U.S. at 678.

   (3)  The allegation that the Reno facility was running behind schedule fails to
negate any of Tesla's public statements because Plaintiffs have not put forth detailed facts
regarding Tesla's production schedule, aside from its overall goal.  While Plaintiffs claim
that Musk at the July 28 unveiling event "led investors to believe that Tesla's automated
production line had built the Model 3s it had just delivered, when in fact Tesla built those
cars by hand," Opp. (dkt. 37) at 8, they point to no specific statement in which Tesla made
this representation.

   (4)  The allegation that Defendants must have known from visiting the plants that
Tesla's goals were impossible to reach fails because it is not a factual statement, but rather
a conclusion based on the assumption that the goal was in fact impossible to reach.  See id.

   (5)  That production equipment necessary to produce batteries at the Reno
facility was in Germany during the class period does not contradict Tesla's public
statements because Plaintiffs do not put forth any facts tending to show that it would have
been impossible for Tesla to transport and reassemble the equipment in time to reach its
production goals.

   (6)  Similarly, that there were no fully automated lines to produce car batteries
during the class period does not negate Tesla's public statements because Plaintiffs have
not put forth any facts tending to show that this made Tesla's projections impossible to
reach.

### 2. General representations re: production process

Plaintiffs also contend that two more general statements Tesla made regarding its production process constituted misrepresentations.

11

First, they argue that the following statement by Musk regarding the supply chain for the Model 3 is misleading: "We've got I think a much better supply chain in place where we've got the A team from the A suppliers. We didn't have that for the Model X or the S. And as far as we know, there are no issues [with the supply chain]." FAC ¶ 214. Plaintiffs argue that this is misleading because of the facts already listed discussed regarding Tesla's representations about its production goals.

To the extent Plaintiffs contend that this statement was misleading because Musk represented that Tesla had the best suppliers, their claim fails because Plaintiffs do not put forth any facts tending to show that this was not the case. Moreover, it is an inactionable statement of opinion. See Omnicare v. Laborers Dist. Council Constr. Indus. Pension Fund, 135 S. Ct. 1318, 1327 (2015). To the extent Plaintiffs contend that Musk's statement that as far as he knew there were "no issues" with the supply chain as of May 3, 2017, was misleading, their claim fails because they have put forth no facts tending to show that Tesla was behind schedule, or that there were challenges other than the ones Tesla disclosed. To the extent they rely on FE1 and FE2's judgments regarding the progress Tesla had made to show that Tesla was behind schedule, this fails because Tesla disclosed the factual basis on which these differing judgments were based, as already explained.

Plaintiffs also contend that Musk's statement on an Aug. 2, 2017, earnings call that the company was "making great progress on the battery front" (FAC ¶ 229) was misleading because progress was in fact slow. This statement might perhaps be actionable if Tesla were making no progress at all, but the statement is sufficiently general that it cannot be said to contradict the facts on the ground.

### 3. Representation re: then-current production

Finally, Plaintiffs argue that Musk misrepresented the then-current state of Model 3 production when he said during the Aug. 2, 2017, earnings call that Tesla was "producing a few hundred vehicles a week." FAC ¶ 231. Specifically, they contend that Musk was aware that the automated production line for the Model 3 in Fremont was not yet

12

functioning, and that Tesla only produced 260 Model 3s during the entire third quarter of 2017, all of them by hand. FAC ¶ 232. However, the context of the statement makes it clear that Musk was merely making a projection, rather than a statement about then-current production levels. Musk was speaking about second-quarter earnings, and an analyst asked why Tesla's projected margin in the <u>third</u> quarter was low. The only way to interpret Musk's statement is as a representation that margins were projected to be low because Tesla would be using a factory meant to produce 5,000 cars per week to turn out only a few hundred cars per week. Bretan Decl. at 171. This was made clear by Musk's follow-up statement that marginal costs tend to decrease as production volume increases. <u>Id.</u> at 172.

### III. CONCLUSION

For the foregoing reasons, the Court **GRANTS** the motion to dismiss, and **GRANTS IN PART** the motion for judicial notice. Should Plaintiffs wish to further amend the complaint, they must do so by Sept. 28, 2018.

**IT IS SO ORDERED.**

Dated: Aug. 24, 2018

CHARLES R. BREYER
United States District Judge