Laurence M. Rosen, Esq. (SBN 219683)
**THE ROSEN LAW FIRM, P.A.**
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

*Lead Counsel for Plaintiffs and the Class*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GREGORY WOCHOS, Individually and on Behalf of All Others Similarly Situated,<br><br>    Plaintiff,<br><br>  vs.<br><br>TESLA, INC., ELON R. MUSK, DEEPAK AHUJA, and JASON WHEELER,<br><br>    Defendants. | Case No. 3:17-cv-05828-CRB<br><br>CLASS ACTION<br><br>**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE SECOND AMENDED COMPLAINT**<br><br>Date:        March 1, 2019<br>Time:        10 a.m.<br>Dept.:       Courtroom 6, 17th Floor<br>Judge:      Hon. Charles R. Breyer |

# TABLE OF CONTENTS

I.     INTRODUCTION ........................................................................................... 1

II.    STATEMENT OF FACTS ............................................................................... 2

III.   ARGUMENT .................................................................................................... 4

    A.    The SAC Adequately Pleads Falsity ................................................... 4

        1.    The SAC Adequately Pleads Defendants' Production Plan and the Falsity of Their "On Track" and "Progress" Statements .................... 4

        2.    The Materially False "On Track" Statements are Then-Present Statements that the PSLRA Safe Harbor Does Not Protect ................. 6

        3.    The SAC Adequately Pleads the Falsity of the Remaining May and August False and Misleading Statements ............................................. 11

        4.    Defendants Risk Disclosures Were False .............................................. 12

    B.    The SAC Adequately Pleads Scienter ................................................. 13

        1.    The SAC Adequately Alleges that Defendant Knew Their "On Track" and Similar Statements Were False When Made .................. 14

        2.    The Former Employee Statements Must be Credited ......................... 17

        3.    Tesla's February 7, 2018 Admission Strengthens the Scienter Inference ................................................................................................ 20

        4.    The Motive Allegations Support a Strong Inference of Scienter ........ 21

        5.    The Core Operations Doctrine Supports a Strong Inference of Scienter .................................................................................................. 23

    C.    The SAC Adequately Pleads Loss Causation ..................................... 24

    D.    The SAC Adequately Pleads Control Person Liability ....................... 25

IV.   CONCLUSION .............................................................................................. 25

1

## TABLE OF AUTHORITIES

2

Cases

3

*3226701 Canada, Inc. v. Qualcomm, Inc.,*
4       No. 15CV2678-MMA (WVG), 2017 WL 4759021 (S.D. Cal. Oct. 20, 2017) ........................ 9

5

*Aldridge v. A.T. Cross Corp.,*
6       284 F.3d 72 (1st Cir. 2002)........................................................................................... 14

7

*Anspach ex rel. Anspach v. City of Philadelphia, Dep't of Pub. Health,*
        503 F.3d 256 (3d Cir. 2007)............................................................................................ x
8

9

*Ashcroft v. Iqbal,*
        556 U.S. 662 (2009)...................................................................................................... 4

10

*Berson v. Applied Signal Tech., Inc.,*
11       527 F.3d 982 (9th Cir. 2008) ............................................................................. 4, 12, 18

12

*Brodsky v. Yahoo! Inc.,*
13       592 F. Supp. 2d 1192 (N.D. Cal. 2008) ........................................................................ 19

14

*Callan v. Motricity Inc.,*
        No. C11-1340 TSZ, 2013 WL 5492957 (W.D. Wash. Oct. 1, 2013) ...................................... 10
15

16

*Cement Masons & Plasterers Joint Pension Tr. v. Equinix, Inc.,*
        No. 11-01016 SC, 2012 WL 6044787 (N.D. Cal. Dec. 5, 2012)............................................ 18

17

*City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.,*
18       856 F.3d 605 (9th Cir. 2017) ........................................................................................ 18

19

*Constr. Workers Pension Tr. Fun – Lake Cty. v. Genoptix, Inc.,*
20       No. 10CV2502-CAB (DHB), 2013 WL 12123841 (S.D. Cal. Mar. 22, 2013) ........................ 20

21

*Curry v. Hansen Med., Inc.,* No. C,
        09-5094 CW, 2012 WL 3242447 (N.D. Cal. Aug. 10, 2012)................................................ 24
22

23

*ESG Capital Partners, LP v. Stratos,*
        828 F.3d 1023 (9th Cir. 2016) ....................................................................................... 14

24

*Ferber v. Travelers Corp.,*
25       802 F. Supp. 698 (D. Conn. 1992) .................................................................................. 16

26

*Flynn v. Sientra, Inc.,*
27       No. CV1507548SJORAOX, 2016 WL 3360676 (C.D. Cal. June 9, 2016)...................... 12, 17

28

*Hatamian v. Advanced Micro Devices, Inc.*,
  87 F. Supp. 3d 1149 (N.D. Cal. 2015) ................................................................ 14

*In re Advanta Corp. Sec. Litig.*,
  180 F.3d 525 (3d Cir. 1999).................................................................................. 10

*In re Allied Nevada Gold Corp.*,
  No. 314CV00175LRHWGC, 2016 WL 4191017 (D. Nev. Aug. 8, 2016) .............. 9

*In re Alstom SA*,
  406 F. Supp. 2d 433 (S.D.N.Y. 2005)................................................................... 20

*In re AT&T Corp. Sec. Litig.*,
  No. CIV. 00-CV5364(GEB), 2002 WL 31190863 (D.N.J. Jan. 30, 2002)............. 10

*In re Bare Escentuals, Inc. Sec. Litig.*,
  745 F. Supp. 2d 1052 (N.D. Cal. 2010) ............................................................... 24

*In re Bus. Objects S.A. Sec. Litig.*,
  No. C 04-2401 MJJ, 2005 WL 1787860 (N.D. Cal. July 27, 2005) ...................... 20

*In re Cell Therapeutics, Inc. Class Action Litig.*,
  No. 2:10-CV-00414-MJP, 2011 WL 444676 (W.D. Wash. Feb. 4, 2011) ............. 24

*In re Countrywide Fin. Corp. Sec. Litig.*,
  588 F. Supp. 2d 1132 (C.D. Cal. 2008) ............................................................... 23

*In re Extreme Networks, Inc. Sec. Litig.*,
  No. 15-CV-04883-BLF, 2018 WL 1411129 (N.D. Cal. Mar. 21, 2018)................... 8

*In re Foundry Networks, Inc. Sec. Litig.*,
  No. C 00-4823 MMC, 2003 WL 22077729 (N.D. Cal. Aug. 29, 2003)................... 10

*In re Fusion-io, Inc. Sec. Litig.*,
  No. 13-CV-05368-LHK, 2015 WL 661869 (N.D. Cal. Feb. 12, 2015)................... 10

*In re Illumina, Inc. Sec. Litig.*,
  No. 3:16-CV-3044-L-KSC, 2018 WL 500990 (S.D. Cal. Jan. 22, 2018).............. 15, 16, 17

*In re Immune Response Sec. Litig.*,
  375 F. Supp. 2d 983 (S.D. Cal. 2005)................................................ xiii, xiv, 14, 15

*In re MGM Mirage Sec. Litig.*,
  No. 2:09-CV-01558-GMN, 2013 WL 5435832 (D. Nev. Sept. 26, 2013) ............... 8

*In re Nimble Storage, Inc. Sec. Litig.*,
  252 F. Supp. 3d 848 (N.D. Cal. 2017) .................................................................... 9

iii

*In re Quality Sys., Inc. Sec. Litig.*,
  865 F.3d 1130 (9th Cir. 2017) ................................................................... passim

*In re Read-Rite Corp.*,
  335 F.3d 843 (9th Cir. 2003) ................................................................... 20

*In re Secure Computing Corp. Sec. Litig.*,
  184 F. Supp. 2d 980 (N.D. Cal. 2001) ................................................... 9

*In re Silicon Image, Inc. Sec. Litig.*,
  No. C-05-456 MMC, 2007 WL 2778414 (N.D. Cal. Sept. 21, 2007) ...................... 19

*In re UTStarcom, Inc. Sec. Litig.*,
  617 F. Supp. 2d 964 (N.D. Cal. 2009) ................................................... 20, 23

*In re VeriFone Holdings, Inc. Sec. Litig.*,
  704 F.3d 694 (9th Cir. 2012) ................................................................... 13

*In re Veritas Software Corp. Sec. Litig.*,
  No. 04-831-SLR, 2006 WL 1431209 (D. Del. May 23, 2006)................................. 10

*In re Worlds of Wonder Sec. Litig.*,
  35 F.3d 1407 (9th Cir. 1994) ................................................................... 16

*In re: Bofi Holding, Inc. Sec. Litig.*,
  No. 315CV02324GPCKSC, 2016 WL 5390533 (S.D. Cal. Sept. 27, 2016)...................... 24

*Khoja v. Orexigen Therapeutics, Inc.*,
  899 F.3d 988 (9th Cir. 2018) ................................................................... x, 6

*M & M Hart Living Tr. v. Glob. Eagle Entm't, Inc.*,
  No. CV 17-1479 PA (MRWX), 2017 WL 5635425 (C.D. Cal. Oct. 30, 2017) .................. 9

*Maverick Fund, L.D.C. v. First Solar, Inc.*,
  No. CV15-1156-PHX-DGC, 2018 WL 6181241 (D. Ariz. Nov. 27, 2018)..................... passim

*Mineworkers' Pension Scheme v. First Solar Inc.*,
  881 F.3d 750 (9th Cir. 2018) ................................................................... 25

*Mulligan v. Impax Labs., Inc.*,
  36 F. Supp. 3d 942 (N.D. Cal. 2014) ................................................... 8, 18

*New Mexico State Inv. Council v. Ernst & Young LLP*,
  641 F.3d 1089 (9th Cir. 2011) ................................................................... 13

*No. 84 Employer-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*,
  320 F.3d 920 (9th Cir. 2003) ................................................................... 22

iv

*Nordstrom, Inc. v. Chubb & Son, Inc.*,
  54 F.3d 1424 (9th Cir. 1995) ......................................................................... 13

*Oregon Pub. Employees Ret. Fund v. Apollo Grp. Inc.*,
  774 F.3d 598 (9th Cir. 2014) ......................................................................... 24

*Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*,
  759 F.3d 1051 (9th Cir. 2014) ......................................................................... 9

*Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*,
  No. 10-CV-03451-LHK, 2012 WL 1868874 (N.D. Cal. May 22, 2012) ............................... 18

*Pompano Beach Police & Firefighters' Ret. Sys. v. Las Vegas Sands Corp.*,
  732 F. App'x 543 (9th Cir. 2018) ......................................................................... 9

*Pub. Employees' Ret. Sys. of Mississippi v. TreeHouse Foods, Inc.*,
  No. 16 C 10632, 2018 WL 844420 (N.D. Ill. Feb. 12, 2018) ......................................... 9

*Rabkin v. Lion Biotechnologies, Inc.*,
  No. 17-CV-02086-SI, 2018 WL 905862 (N.D. Cal. Feb. 15, 2018) ................................. 23

*Reese v. Malone*,
  747 F.3d 557 (9th Cir. 2014) ......................................................................... 23

*Rihn v. Acadia Pharm. Inc.*,
  No. 15CV00575 BTM(DHB), 2016 WL 5076147 (S.D. Cal. Sept. 19, 2016) .......................... 9

*Roberti v. OSI Sys., Inc.*,
  No. CV 13-9174-MWF VBKX, 2015 WL 1985562 (C.D. Cal. Feb. 27, 2015) ..................... 13

*S. Ferry LP, No. 2 v. Killinger*,
  542 F.3d 776 (9th Cir. 2008) ......................................................................... 13, 23

*Schueneman v. Arena Pharm., Inc.*,
  840 F.3d 698 (9th Cir. 2016) ......................................................................... 14

*Sharenow v. Impac Mortg. Holdings, Inc.*,
  385 F. App'x 714 (9th Cir. 2010) ......................................................................... 22

*Shenwick v. Twitter, Inc.*,
  282 F. Supp. 3d 1115 (N.D. Cal. 2017) ......................................................................... 22

*Shurkin v. Golden State Vintners Inc.*,
  471 F. Supp. 2d 998 (N.D. Cal. 2006) ......................................................................... 19

*Silverman v. Motorola, Inc.*,
  No. 07 C 4507, 2008 WL 4360648 (N.D. Ill. Sept. 23, 2008) ......................................... 9

v

*Siracusano v. Matrixx Initiatives, Inc.*,
   585 F.3d 1167 (9th Cir. 2009) ............................................................................... xiv, 12, 16

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
   551 U.S. 308 (2007) ................................................................................... 4, 11, 13, 22

*Turocy v. El Pollo Loco Holdings, Inc.*,
   No. SACV151343DOCKESX, 2017 WL 3328543 (C.D. Cal. Aug. 4, 2017) ........................ 14

*Washtenaw Cty. Employees Ret. Sys. v. Celera Corp.*,
   No. 5:10-CV-02604 EJD, 2012 WL 3835078 (N.D. Cal. Sept. 4, 2012) ................................. 17

*Westley v. Oclaro, Inc.*,
   897 F. Supp. 2d 902 (N.D. Cal. 2012) ................................................................................. xi, 8

*Yanek v. Staar Surgical Co.*,
   388 F. Supp. 2d 1110 (C.D. Cal. 2005) ................................................................................... 4

*Zucco Partners, LLC v. Digimarc Corp.*,
   552 F.3d 981 (9th Cir. 2009) ............................................................................... 19, 23

**Rules**

Fed. R. Civ. P. 9(b) ................................................................................................... 24

## SUMMARY OF ARGUMENT

The United States Department of Justice is currently investigating whether the very fraud Plaintiffs allege in this case—that Defendants lied about Tesla's Model 3 production ramp—constitutes a *crime*. The Securities and Exchange Commission ("SEC"), too, is investigating whether those same statements violated SEC regulations.[1]

In dismissing the First Amended Complaint, this Court found that Plaintiffs had failed to allege the specifics of a plan for Tesla to reach mass, automated Model 3 production by the end of 2017. The Court reasoned, in essence, that without such a plan, Plaintiffs could not adequately allege that Tesla was no "on track" as of May 3, 2017 to ramp up automated production by the end of 2017. The SAC, however, includes particularized facts that Defendants touted publicly, constituting just such a plan. In May, 2017, Defendants conveyed to investors that Tesla would begin automated production of the Model 3 in early July, 2017 and anticipated six months to ramp up to mass production. They also told investors that they had begun installing the automated production lines in February, 2017. Thus, the market understood that installation of automated equipment would consume five months and ramping up production would consume six. In May, 2017, Defendants conveyed and the market understood, therefore, that Tesla *planned eleven months from the commencement of installation to the ramp up of automated production*.

As with any production schedule viewed *ex ante*, Defendants conveyed and the market understood that their eleven month "Plan" was a best-case scenario. The vicissitudes of a new manufacturing process and potential problems specific to their Model 3 production ramp, they cautioned, constituted risks that they would fail to meet their Plan's mass production goal. It was clear to the market, however, that even a slight miss, extending the time for ramping up to mass

---

[1] The Court may take judicial notice of Tesla's November 2, 2018 10-Q for the third quarter of 2018 (3Q 2018 10-Q"), at 32, in a "Certain Investigations" subsection of the "Legal Proceedings" disclosures, stating that the SEC "has issued subpoenas to Tesla in connection with… (b) certain projections that we made for Model 3 production rates in 2017 and other public statements relating to Model 3 production," and "[t]he DOJ has also asked us to voluntarily provide it with information about each of these matters and is investigating." Relevant portions of the 3Q 2018 10-Q are attached as Exhibit A to the Declaration of Jacob A. Goldberg ("Goldberg Dec.").

production of the Model 3, was material to Tesla's financial health. Musk himself has recently conceded publicly and unequivocally, that before and during the Class Period, Tesla was burning through cash. Failure to succeed in its Plan was of existential importance to the Company. In a televised interview on HBO that aired on November 25, 2018, Musk admitted that during the "Model 3 production ramp…. the Company was bleeding money like crazy and if we didn't solve these problems in a very short period of time, uh, we would die." In fact, Musk admitted, Tesla came within "single digit weeks" of "death."[2] Meeting their own Plan, therefore, was not only critical to the success of the Model 3. It was existential for the Company.

Against this backdrop, in May, 2017, Defendants told investors that they had begun the five month installation process at their Fremont and Gigafactory facilities in February, 2017 and that the Company was, therefore, "on track" to ramp up to Model 3 mass production by December 31, 2017.[3] This was a lie. The Complaint pleads particularized facts from personnel on the ground that Defendants failed to start installing equipment in Fremont until late April or early May, 2017. As such, as of early May, 2017, given Defendants' own best-case Plan—requiring not only eleven months from beginning of installation to ramp up of Model 3 mass production but that none of the risks about which Defendants cautioned materialized—Defendants knew or recklessly disregarded that the earliest Tesla could achieve mass production was late March, 2018, fully one quarter after they claimed. Tesla was never "on track" to meet its December 31, 2017 Model 3 production goal *even if none of the risks of which it had warned materialized*. Significant risks about which they

---

[2] *See* https://www.youtube.com/watch?v=Wgo4-SsDP1k. Musk's HBO interview aired after the SAC's filing. Should the Court grant the motion to dismiss, Plaintiffs request leave to amend to add these allegations, because the Company never shared with investors or analysts that Tesla's liquidity crisis left it weeks from "death." Tesla's ability to raise needed funds, which it did in August 2017 at its preferred price, would have been negatively impacted if it told investors that automated production had not begun in July and that its mass production Plan would not be achieved.

[3] This statement is in the 1Q 2017 10-Q, follows a paragraph which states "[f]or the three months ended March 31, 2017….," and plainly references Q1 2017. Defendants attach a document stating that installation began in February, 2017, DMem 12, thus expanding the time frame needed for installation from 4-6 months to 5-6 months. It would be error for the Court to consider the claim that installation began in Q1 for the truth, as Defendants are not entitled to an alternate set of facts.

warned, however, had materialized by May 3, 2017, and months earlier, causing them to begin installation 3 months late, so that the goal could not be reached by December, 2017. Many of the risk disclosures were meaningless in context because they were inapplicable in May, 2017, as Defendants had only commenced implementing their Plan days before their May 3, 2017 statement.

On May 10, 2017, in its 10-Q for the first quarter of 2017 ("1Q 2017 10-Q"), Tesla announced its Plan to mass produce the Model 3 in 2017, stating "[w]e have started the installation of Model 3 manufacturing equipment at the Fremont Factory and Gigafactory 1, and we are on-track for start of Model 3 production in July 2017." ¶¶19, 119, 134, 247. The Company's Plan, in a single sentence, tied the start of installation of **automated** equipment in the first quarter to the start of **automated** Model 3 production **in both factories**.[4] To begin automated production in July, Defendants, themselves, told the market they anticipated five months of installation.[5] The SAC cites to Tesla employees who state that installation of automated production equipment did not begin until late April or early May, 2017, ¶¶21, 178. Given Defendants' announced eleven month Plan from the start of automated equipment installation to mass production, Defendants knew, before they spoke in May 2017, that they could not reach mass production before the end of March 20*18*, at the earliest. Defendants' "on track" statements in May about present or historical facts on the ground in the first quarter of 2017 – *e.g.*, that Tesla began installing automated equipment in Q1 2017 – statements upon which predictions of future achievements were based, such as "I don't know anything that would prevent us from starting firstly in July," ¶¶116, 240, were lies. Tesla's Plan to mass produce the Model 3 in 2017 was already blown before it spoke to investors in May 2017, but the Company chose to lie.

---

[4] This statement defeats any claim that automated production of batteries was never necessary for mass production of the Model 3, or that Tesla never announced a production plan and timeline for automated mass production of batteries. *See* "Order Dismissing Complaint with Leave to Amend" ("Order"), Dkt. No. 42, at 11.

[5] Defendants' statement further renders obsolete their contention that Plaintiff never pleaded that Defendants stated that production in July would be automated.

Plaintiffs are entitled to all of these straightforward inferences regarding Defendants' Plan. Defendants, by contrast, are not entitled to present any competing inference to rebut falsity allegations, much less unreasonable inferences, nor are they entitled to present competing facts through external documents. *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1003 (9th Cir. 2018). It would be error for this Court to rely on an assertion for the truth in documents Defendants attach to their Memorandum to create an alternative universe of facts.[6]

Defendants ignore the SAC's amended allegations of Defendants' Plan, ¶¶247-248, failing even to mention them or to assert that their May 10, 2017 statement that they began installing in the first quarter of 2017 was not materially false. Instead, Defendants reiterate virtually identical arguments they asserted about the *First* Amended Complaint's ("FAC") inadequacies. Of course, if Defendants acknowledged the newly-pleaded allegations, they would have no choice but to concede that the SAC alleges that automated equipment installation had *not* begun in 1Q 2017, contrary to their May 10, 2017 claim, thereby establishing the material falsity of the May 2017 allegations. Having failed to contest the adequacy of the SAC's newly-pleaded falsity allegations, Defendants concede that they are actionable and, therefore, have *waived* their right to raise the issue in their Reply brief.[7]

Defendants' failure to confront the newly-added Plan allegations is puzzling, considering that while absent from the FAC, Plaintiffs previewed these new allegations at the August 24, 2018 oral argument on Defendants' motion to dismiss the FAC. At that hearing, after noting that defense counsel had cited to Tesla's 1Q 2017 10-Q statement that installation of automated equipment began in February (which this Court cannot consider for the truth of the matter asserted), Plaintiffs'

---

[6] *See*, e.g., DMem 12, where Defendants cite to and attach an external document stating that installation of automated equipment began in February, 2017. The SAC alleges eyewitness testimony that installation did not begin until late April or May of 2017, a well-pleaded allegation this Court must accept as true at the motion to dismiss stage. *Id.*

[7] Should the Court consider an argument first raised in a Reply brief, Plaintiffs request the Court allow Plaintiffs to submit a sur-reply on February 22, 2019, one week after the Reply brief is filed and one week before oral argument on the present Motion. *See Anspach ex rel. Anspach v. City of Philadelphia, Dep't of Pub. Health*, 503 F.3d 256, 259 n. 1 (3d Cir. 2007) ("absent compelling circumstances… failure to raise an argument in one's opening brief waives it" (citation omitted)).

counsel used that assertion, which is pleaded as false in the SAC, to demonstrate that since the FAC (and the SAC, *see* ¶¶21, 178) plead that installation did not begin for months after 1Q 2017, Defendants' Plan could not be achieved, and Defendants knew it. August 24, 2016 Transcript of Proceedings at 6-8, 14-16. The SAC plainly describes the Plan allegations. Defendants enunciated a contemporaneous plan, lied about achieving its benchmarks on two occasions, and lied about the implications of achieving those benchmarks. That Defendants ignore the allegations is telling.

Tesla's sea of cautionary statements do not immunize from liability its statements of present and historical fact, which the Court can only deem forward-looking if it disregards the well-pleaded Plan allegations. The SAC's pleading of Defendants' Plan allows the Court to evaluate the "on track" statements against a contemporaneously expressed Plan. Portions of the statements are provably false, and therefore, not forward-looking. *Westley v. Oclaro, Inc.*, 897 F. Supp. 2d 902, 918–19 (N.D. Cal. 2012) ("a statement about a past or present fact can demonstrably be proven false" and is not forward-looking).The risk warnings were meaningless in the context of facts Defendants knew to be true on May 3, 2017. No risk disclosure short of one containing an admission by Tesla that it was lying elsewhere in the same document would have meaning.[8]

Even if the "on-track" statements were forward-looking, the SAC plainly pleads that Defendants knew they were false when uttered, and that the risk disclosures were not only not meaningful, but actually inapplicable to the reality that Tesla's Plan had been blown. Telling investors that events *might* render you unable to mass produce by December, 2017, when you already *know* that the earliest you will be able to mass produce is the end of March, 2018, is useless information to investors, who must be told that the risks to your perfect production Plan had materialized.[9]

---

[8] "[V]irtually no cautionary language short of an outright admission that the non-forward-looking statements were materially false and misleading would have been adequate." *In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1148 (9th Cir. 2017).

[9] Further, Defendants' "on-track" cases are distinguishable; almost all concern financial projections, and not statements concerning existing facts.

Tesla's public August "on track" statements similarly reference historical or present facts which Defendants told investors had already occurred when they had not. Defendants' primary line of defense to the well-pleaded allegations that Tesla lied about having achieved its Plan of beginning automated production of the Model 3 in July 2017 is that Tesla never told investors that the Plan's July benchmark called for *automated* production. This contention is absurd, and contradicted by Tesla's own words. First, as noted, in May 2017 Tesla directly tied the start of installation of automated equipment in the first quarter to its ability to start automated Model 3 production in July 2017 ("[w]e have started the installation of Model 3 manufacturing equipment at the Fremont Factory and Gigafactory 1, and we are on-track for start of Model 3 production in July 2017), thereby tying July automated production to the ability to mass produce in 2017.[10] ¶¶19, 119, 134, 247. Tesla cannot now disavow their own announced Plan. Further, in August 2017, the Company bragged (falsely) about its *automated* production in July of the vehicles distributed at the July 28, 2017 "handover" event in an offering circular to raise $1.8 billion in Notes to fund Model 3 production:

> Clear path to scale…. We started production and completed our first customer deliveries of Model 3 in July 2017. Model 3's streamlined design and manufacturing process enables increased automation…. Our new body shop enables us to reduce Model 3 total labor content significantly through the use of over 1,000 robots in a highly dense layout. We believe these process and design improvement will allow us to ramp Model 3 production significantly faster than our prior vehicles….[11]

Defendants' claim that the July 2017 start of production did not mean *automated* production is simply false, nor, of course, are Defendants entitled to their own set of facts at this

---

[10] It is unreasonable to infer anything other than that this sentence is telling investors that production in July will be automated. Plaintiffs are entitled, as a matter of law, to this inference.

[11] The Court can take judicial notice of Tesla's filed August 11, 2017 8-K and August 23, 2017 8-K, attached hereto as Exhibits B and C, respectively, to the Goldberg Dec., stating that Tesla issued $1.8 billion in Senior Notes in a private offering. The excerpted portion of the August 11, 2017 Offering Circular is found at *Inter-Local Pension Fund GCC/IBT v. Tesla, Inc.*, et al., No. 3:18-cv-07325-RS, Dkt. 1-1, at ¶34. This court can take judicial notice of the pleading in that case, and of the language in Tesla's Offering Circular. Should this Court grant the motion to dismiss, Plaintiff requests leave to amend to add the Offering Circular, which provides Tesla motive to lie during the Class Period about their failure to meet their Plan's July 2017 benchmarks.

stage, or to consideration of any competing inference to the falsity allegations. Indeed, any inference to the contrary would be *un*reasonable. The SAC pleads, at length, that automated production had *not* begun in either Fremont or Reno in July, and would not for months afterward. When the Company told investors in August that already-existing facts on the ground in both locations supported a statement that the Model 3 would be mass produced in 2017, its "on track" statements referenced the start of automated production, a historical fact about which Defendants lied, and *not* a forward-looking statement. The Company similarly lied in all of the well-pleaded August 2017 false statements, including that "preparations at our production facilities are progressing to support the ramp of Model 3 [mass] production… at some point in 2017." Defendants knew that they were months behind their own plan for 2017 mass production, that the plan was blown and that their stated goal would not be attained. The SAC cites, repeatedly, to multiple employees in both factories who make this point plain.

Next, the SAC's well-pleaded facts, considered holistically, adequately allege Defendants' scienter. The SAC pleads that in May and August of 2017, when Defendants told investors that they were "on-track" for the start of automated production in July and mass production later in 2017, they knew that installation of automated equipment had not begun in the first quarter, and that there was no automated production in July in either Fremont or at the Gigafactory. Defendants also indisputably knew – as evidenced by their own Plan– that these steps were essential for Tesla to meet its stated intention to mass produce its Model 3 by the end of 2017. Defendants saw, regularly, the lack of progress in both Fremont and in the Gigafactory, which was so "openly visible" as to constitute "common knowledge" within the Company. Defendants knew their statements of present and historical fact regarding the Company's core operations were false. This alone establishes their scienter.

The SAC cites to former employees who corroborate that Tesla did not begin installation of automated equipment in 1Q 2017, or automated production in either factory for months after July of 2017, and Tesla was thus not on-track with their Plan, despite their public statements. *In re Immune Response Sec. Litig.*, 375 F. Supp. 2d 983, 1022 (S.D. Cal. 2005) (making statements

while knowing facts "suggesting the statements were inaccurate or misleadingly incomplete is classic evidence of scienter."). The former employees' knowledge strengthens the scienter inference. *Id.* at 1022. Contrary to Defendants' contention, the former employees' titles, responsibilities, and access to the information they observe or hear is adequately described, and their allegations must be considered. *Maverick Fund, L.D.C. v. First Solar, Inc.*, No. CV15-1156-PHX-DGC, 2018 WL 6181241, at *11 (D. Ariz. Nov. 27, 2018). Finally, Defendants knew that a production line necessary to mass produce batteries at the Gigafactory was in Germany during the entire Class Period, and indeed into 2018.

Defendants lastly rely on their risk warnings to combat the scienter allegations, but cite pre-PSLRA case law that does not immunize them from having to disclose what they knew had actually gone wrong. In this Circuit, reference to risk "with no indication that the risk may already have come to fruition" is insufficient to rebut well-pleaded allegations that Defendants recklessly disregarded then-existing potential problems. *Siracusano v. Matrixx Initiatives, Inc.*, 585 F.3d 1167 (9th Cir. 2009), *aff'd sub nom Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27 (2011). Here, the risks about which Defendants spoke hypothetically at the start of the Class Period and in August 2017 had already materialized. Defendants knew it, and lied about matters of present and historical fact, establishing their scienter.

More, as noted, the Company faced an existential threat, constituting a motive to deceive investors that adds material support to the strong inference of scienter the Complaint pleads. Indeed, Defendants uttered their materially false August, 2017, statements that automated production had begun in July at the same time the Company was trying to raise $1.8 billion and distributing an Offering Circular falsely bragging about the process already using thousands of robots, establishing strong motive to lie about the start of automated production and being "on track" to mass produce the Model 3.

The SAC adequately pleads loss causation. Defendants concede that following publication of the October 6, 2017 *Wall Street Journal* article, the stock price fell significantly, and concede, by arguing that the published information mischaracterized the actual problems with production,

that the information in the article was previously unpublished. Similarly, Defendants concede that following their November 1, 2017 post-close of market announcement that the Model 3 would not be mass produced in 2017, Tesla's stock price fell precipitously the next day. The SAC alleges that Defendants concealed information and misrepresented facts surrounding Tesla's inability to mass produce the Model 3 in 2017, and that the stock price declined upon revelations relating to these allegations. Loss causation is adequately pleaded.

Finally, because the SAC adequately pleads a primary violation, the Court should sustain Plaintiffs' claim for control person liability.

Lead Plaintiff Kurt Friedman and Named Plaintiff Uppili Srinivasan (collectively, "Plaintiffs"), respectfully submit this Memorandum in Opposition to Defendants' Motion to Dismiss the SAC and state the following:[12]

## I.   <u>INTRODUCTION</u>

This Court dismissed the FAC essentially for its failure to plead a contemporaneous production plan against which the Court could evaluate whether Tesla was "on track" to reach its Model 3 mass production goal. The SAC, however, includes particularized facts that Defendants publicly touted, constituting a "Plan." According to Defendants, Tesla required five months for installation of automated equipment and six months to ramp up Model 3 mass production. Defendants, therefore, disclosed publically that in the best case scenario—absent any of the risks about which they had warned materializing—the Company would achieve Model 3 mass production within eleven month of beginning installation.

The Company, however, did not commence installation of automated equipment until around its May 3, 2017 statements about being "on track" to mass produce the Model 3 by December 31, 2017. In the face of an existential cash crunch, Defendants knew or recklessly disregarded that its failure to commence equipment installation until May, 2017 would disable it from achieving Model 3 mass production until March, 2018, at earliest. Faced with these new allegations of a contemporaneous Plan, Defendants simply ignore the Complaint's well-pleaded allegations that the Company lied about when it began installing equipment in Fremont. Instead, Defendants ask this Court, essentially, to rule again on the earlier FAC.

The SAC adequately pleads Defendants' Plan, allegations from multiple eyewitnesses that Tesla failed to commence that Plan until around May 1, 2017, and that Defendants were minimally reckless in not knowing that during the Class Period, the Company was not "on track" to meet its

---

[12] Defendants are Tesla, Inc. ("Tesla" or "Company"), Chief Executive Officer ("CEO") Elon R. Musk, and Chief Financial Officer ("CFO") Deepak Ahuja. References to "¶__" are to the SAC. References to "DMem _" are to Defendants' Memorandum in support of their Motion to Dismiss the SAC (ECF No. 49).

1

*Plaintiffs' Memorandum of Law in Opposition to the Motion to Dismiss
the Second Amended Class Action Complaint Case No. 3:17-cv-05828-CRB*

December 31, 2017 mass production goal.  For the following reasons, this Court should deny Defendants' Motion to Dismiss.

## II.   STATEMENT OF FACTS

To survive as more than a niche, luxury electric car manufacturer, Tesla needed to manufacture and sell a mass-produced, affordable electric car. ¶¶11, 31, 57, 103, 105.[13] To accomplish that would require Tesla to burn through a billion dollars a quarter. ¶¶10, 104, 106 & n. 27, 107, 110. Established auto manufacturers with decades of experience producing affordable vehicles were investing billions of dollars in their own electric vehicles, threatening Tesla's future. ¶¶111-113. Timely achieving mass production of an affordable car was of the essence.

In May 2017, Tesla publicly disclosed that it required eleven months to achieve Model 3 mass production, five months to install the automated lines and six months to ramp up automated production. ¶¶19, 119, 134, 247-248. On May 3, 2017,[14] Defendants claimed that "[p]reparations at our production facilities are on track to support the ramp" to 5,000 vehicles per week in 2017. ¶¶115, 238. Defendant Musk, himself, stated, "I don't know anything that would prevent us from starting firstly in July, and exceeding 5,000 units per week by the end of the year." ¶¶116, 240. Analysts believed the Company was on track, writing that progress is "ahead of our expectations," ¶122. Following delivery of the first thirty Model 3s at a "handover event" on July 28, 2017, analysts expressed that the Company's actual progress on the ground supported its promise of mass production in 2017. ¶124.

In late July and early August, 2017, Defendants continued to express that Tesla was on track to mass produce by year's end, in line with their Plan. ¶128 ("on track to achieve a 5,000 unit week by the end of this year"); ¶260 ("confident we can produce just over 1,500 vehicles in Q3, and achieve a run rate of 5,000 vehicles per week by the end of 2017"); ¶262 ("great progress on the battery front"); ¶268 ("progress at Gigafactory 1 will allow us to reach our production targets…");

---

[13] Defendants move the goalposts, writing that the Model 3 is the "best-selling mid-sized *premium* sedan. DMem xiii (emphasis added). The Model 3, of course, was meant to be an *affordable* sedan, not a premium vehicle. To date, Tesla cannot afford to sell even a single $35,000 Model 3.

[14] The Class Period is May 3, 2017 through November 1, 2017, both dates inclusive.

¶264 (Fremont had "a gigantic machine producing – that's meant for 5,000 vehicles a week and it's producing a few hundred vehicles a week"); ¶¶256-57 (at July 28, 2017 "handover" event, touting having made 50 production cars ). Again, analysts believed Tesla, conveying Tesla's purported "preparedness to achieve production targets," having begun Model 3 production in July. ¶¶130-131.

Then-existing conditions in both Fremont and Reno, however, belied Defendants' statements that Tesla was on track to meet its Plan. Tesla had not begun installing the automated line at Fremont until around the time of their May 3, 2017 statement that Tesla was on track. ¶¶21, 178.[15] Confirming the late start in installation, Tesla did not begin automated production in July, nor was it close. ¶¶25, 160-164, 165, 167, 173, 175, 178-182, 276, 279.[16] FE5, a robot programmer in Fremont, stated that as late as September, 2017, robot installation on the automated line was still not complete, many robot parts had not been delivered, and the body shop was not even near completion. ¶¶179-182. FE3 stated that as late as mid-October 2017, the production line was not operational, and not a single Model 3 was constructed on an automated line. ¶¶160-162, 165.

Further confirming the five month installation and its commencement around early May, the Complaint alleges with particularity that the Gigafactory did not begin even partial automated battery production until September 2017. ¶¶203, 207; ¶230 (summer of 2017, Gigafactory automated lines not yet completed; manual production of batteries continued through the end of the third quarter of 2017); ¶210 (Gigafactory produced two battery packs per day in October 2017); ¶¶212-214 (production issues persisted through the end of 2017); ¶226 (mass production of batteries impossible in 2017); ¶¶102, 204 (Panasonic's CEO says no automated battery production during the Class Period). After the Class Period, Defendants admitted that the Gigafactory could never have produced 5,000 batteries per week in 2017, as production equipment necessary to ever achieve production beyond 2,500 batteries per week was still in Germany in February 2018. ¶¶236-237.

During all of 2017, Musk and Defendants regularly visited both the Fremont and Reno factories, and saw the lack of progress in both facilities. ¶¶26-28, 191-192, 194, 234-235.

---

[15] *See*, Bretan Decl. Ex. 10, at 2 (Defendants claim commencing installation in February, 2017).

[16] In July and August, 2017, Tesla built all Model 3s by hand. ¶167.

An October 6, 2017, *The Wall Street Journal* article revealed that Tesla continued to build only three 3 Model 3s per day, by hand, that the production line was not yet complete, and that Tesla had failed to install the "body in white line" as of September 2017. ¶276. On this news, Tesla stock fell $13.94, or 3.91%, harming investors. ¶277. On November 1, 2017, after market close, Tesla admitted that it would not mass produce the Model 3 in 2017. ¶278. On November 2, 2017, at 12 p.m. EST, *Jalopnik* published that Tesla continued to build Model 3s by hand in October, 2017, in an area separate from the not yet completed automated line. ¶279. On these disclosures, Tesla stock fell $21.82, or 6.8%.

## III.   **ARGUMENT**[17]

### A.   The SAC Adequately Pleads Falsity[18]

#### 1.   **The SAC Adequately Pleads Defendants' Production Plan and the Falsity of Their "On Track" and "Progress" Statements**

The SAC adequately alleges Defendants' Plan against which the Court can assess the falsity of their statements that Tesla was "on track" to mass produce the Model 3 by December, 2017.[19] In May, 2017 Defendants statements informed investors both that installation of automated equipment would take at least four to five months, ¶¶19, 119, 134, 247-248, and the ramp up from the start of automated production to mass production would take six months. ¶¶21, 248. This is not in dispute.[20] Taken together, these facts establish that Defendants conveyed their belief to the

---

[17] The Court accepts all well-pleaded factual allegations as true, *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007), drawing all reasonable inferences in Plaintiffs' favor. *Yanek v. Staar Surgical Co.*, 388 F. Supp. 2d 1110, 1120 (C.D. Cal. 2005). The SAC's allegations must state a facially plausible claim. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotation omitted).

[18] A statement is misleading when it gives a reasonable investor the "impression of a state of affairs that differs in a material way from the one that actually exists." *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 985 (9th Cir. 2008).

[19] That Defendants never uttered the word "plan" is irrelevant. Their public statements informed investors of the stages leading to mass production, including the required start and finish date for each stage.

[20] Defendants cannot dispute these facts. Any inference that Tesla did not require five months to install the automated production equipment defies credulity. If Tesla could have installed in fewer than five months, then they would have begun automated production before July, 2017.

4

market that, best-case, Tesla required ten to eleven months from the beginning of installation to mass production. Tesla did not, however, begin installation until around the beginning of May, 2017. ¶¶21, 178. As of May 3, 2017, therefore, Tesla could not reach mass production of the Model 3 until, at earliest, March, 2018.

That by its own Plan Tesla could not mass produce the Model 3 until late March, 2018, at earliest, renders materially false Defendants' May, 2017, statements about the Company's progress toward Model 3 mass production. For example, the SAC alleges as materially false Defendants' 1Q 2017 10-Q statement that "[w]e have started the installation of Model 3 manufacturing equipment at the Fremont Factory and Gigafactory 1, and we are on-track for start of Model 3 production in July 2017." ¶¶19, 119, 134, 247-248.[21] This informed investors that Tesla required (1) 4-6 months installation time[22] and (2) six months from the July, 2017 start of automated production to ramp up to mass production by the end of 2017.[23] Having alleged a contemporaneously announced Plan for installation of equipment and the ramp up of automated production of the Model 3 necessary to achieve mass production in 2017, ¶¶19, 119, 134, 247-248, the SAC alleges with particularity that Defendants had not begun installing automated production equipment until around the time of their May, 2017 statements. Thus, by the terms of their own Plan, by May, 2017, Tesla could not have achieved mass production by December, 2017.

---

[21] "Production" here means automated production, requiring fully installed and working automated production equipment and processes. Defendants conveyed that, in early July, 2017, Tesla would begin automated production, ramping up to 5,000 per week by December 31, 2017. They could not have been referring to the Company's hand-building cars. The market knew Tesla could hand-build Model 3s. It was determining whether and when the Company could mass produce the Model 3, something it could achieve only through automation.

[22] Defendants concede that they informed the market that they had begun installing equipment in February, 2017. DMem. 12 (citations omitted). While Tesla claims to have begun installing the automated lines in February, 2017, however, the exhibits to which Defendants refer do not mention an installation start date of February 22, 2017. *See* Bretan Decl., Ex. 10 at 2.

[23] The SAC does not allege that Tesla's plan involved automated production of thousands of cars per week in July, but that production using automated processes needed to begin in July, 2017, to ramp up to mass production in December.

Tacitly conceding the material falsity of their statements about when Tesla began installing automated equipment, Defendants ignore these new allegations, incorrectly asserting that the SAC continues to rely on FE1's 2016 statements to establish the Plan.[24] In the context of the Complaint's well-pleaded allegation that Tesla did not start installation until around May, 2017, if Defendants acknowledged the new allegations, then they would have to concede both the falsity and scienter of these allegations.[25]

### 2.   The Materially False "On Track" Statements are Then-Present Statements that the PSLRA Safe Harbor Does Not Protect

Defendants' May, 2017 statements that Tesla began installation in February, 2017, are historical and in no way whatsoever forward-looking. The Safe Harbor is inapplicable and this statement is actionable because the SAC alleges its falsity with requisite particularity. *E.g.* ¶178. In the context of Defendants' best-case, eleven month Plan to achieve Model 3 mass production, Tesla's failure to begin installation timely was a then-current fact as of May 3, 2017. Tesla was not "on track" either to begin automated production in July, 2017 or to mass produce by year's end—a present fact that the SAC alleges is demonstrably false. That the May statements reference future dates does not render them forward-looking. Those future dates are merely reference points against which investors could evaluate the truth of the present statement that preparations, ***at that moment***, were on track. Because Tesla was already well-behind its own Plan, the "on track" statements are not forward looking. The Safe Harbor is inapplicable.

Alternatively, in light of the SAC's particularized allegations of the Plan, if the Court finds that, in some way, the on track statements implicate the future, these statements are minimally

---

[24] *See*, e.g., DMem 3 ("deficient allegations of FE1, which [sic] plaintiffs now mischaracterize as Tesla's 'plan'…."); DMem 20 (SAC "reiterate[s] the ***exact same*** opinion of FE1 (which ***plaintiffs*** now dub a 'plan' that Tesla supposedly 'verbalized'")) (emphasis in original)). The Court can take note, however, that both FE1's production plan timelines and his warning that Tesla needed to expand the Fremont plant to mass produce the Model 3 proved accurate. ¶143.

[25] In support of their argument that the SAC simply recycles the allegations from FE1, Defendants submit and rely upon 35 exhibits, improperly insisting that the Court adopt their alternative facts. The Ninth Circuit, however, made plain that this Court errs by substituting Defendants' facts for the allegations of the Complaint. *See Khoja*, 899 F.3d at 1003. Defendants do not cite to *Khoja*, ignoring authority binding this Court.

6

mixed, and the "on track" portion is then-current fact. As the Ninth Circuit has clarified, the Safe Harbor is inapplicable to the non-forward looking portion of a mixed statement. *Quality Systems*, 865 F.3d at 1142 (citations omitted). The SAC pleads that because of its failure to begin installation until around early May, 2017, Tesla was not "on track" with its Plan and could neither begin automated production in July 2017, ¶¶178, nor achieve mass production by year's end. ¶¶115, 238. At the time of Defendants' May, 2017 statements, as a matter of then-current fact, the Plan was 2-3 months behind, ¶¶21, 178, such that Tesla could not timely achieve mass production.[26] If the Court determines the statements mixed, the on track portion is not forward looking.

Similarly, the SAC adequately alleges that, when compared to the Plan, each of Defendants' August statements was materially false.[27] In May, Tesla specifically tied the July start of automated production in both factories to achieving mass production by the end of 2017. ¶¶19, 119, 134, 247-248. Defendants' August "on track" statements told investors that automated production had begun in July—that Tesla had met the Plan's July benchmark.[28] The SAC,

---

[26] Because Defendants knew that installation began months after they stated it had, Tesla's 1Q 2017 10-Q statement that "preparations at our production facilities are progressing to support" year-end mass production," ¶¶118, 245, is false . ¶¶21, 26-28, 178, 191-195, 235. The statement in the same document that "we continue to remain on-track with our progress at Gigafactory," ¶251, is false for the same reasons. ¶¶21, 26-28, 178, 191-195, 235.

[27] *See*, ¶¶128, 260 (August 2, 2017, Musk reiterates that Company is on track to mass produce by year's end); ¶¶127, 258 (August 2, 2017, Second Quarter 2017 Update, stating "based on our preparedness at this time" we can reach mass production by year's end); ¶¶129, 262 (Musk stated, with respect to the Gigafactory also progressing toward mass production by year's end); ¶268 (August 4, 2017 10-Q, stating that "progress at Gigafactory 1 will allow us to reach our production targets . . .").

[28] With respect to Defendants' statements at the July 28, 2017 handover event, ¶¶256-257 (Company made "a total of 50 production cars that we made this month"), the most reasonable inference to draw is that Musk was stating that Tesla had built 50 cars using automated processes. Defendants ask this Court to infer that "production cars" might have meant hand-built cars. Defendants, however, tied installation of the automated equipment to beginning production in July, and beginning production in July to achieving mass production in 2017. *E.g.*, ¶247-248. This assertion is nonsensical if July production meant building Model 3s by hand. Defendants did not need to install any automated equipment to hand-build Model 3s. They had been doing that for months. ¶¶27, 167. The only reasonable inference is that Tesla was telling investors that it had started automated production in July. That was a lie.

---

7

*Plaintiffs' Memorandum of Law in Opposition to the Motion to Dismiss
the Second Amended Class Action Complaint Case No. 3:17-cv-05828-CRB*

however, pleads that Tesla had not begun automated production in either Fremont or in Reno in July, 2017. As late as mid-October, 2017, the production lines were not operational, and not a single Model 3 was constructed on an automated line. *E.g.*, ¶¶160-162. Nor was the Gigafactory producing batteries on an automated line in July. ¶¶203, 207 (battery production plagued with unresolved production and supply issues did not even begin at the Gigafactory until September 2017); ¶210 (no more than two battery packs per day in October, 2017).[29] Evaluating these "on track" statements against Tesla's Plan shows clearly that they are present statements and demonstrably false. As such, even if the Court rules that Defendants' including future dates in their statements about then-present facts creates a forward looking component, the on track portion is not forward looking.

Courts have repeatedly held in analogous situations that the "on track" portion of a mixed statements is an expression of present fact.[30] *See, e.g.*, *Mulligan v. Impax Labs., Inc.*, 36 F. Supp. 3d 942, 964 (N.D. Cal. 2014) (statements of present fact do not become forward looking because a defendant bases a future prediction upon it) (*quoting Westley*, 897 F. Supp. 2d at 918–19 ("a statement about a past or present fact can demonstrably be proven false" and is not forward-looking)).[31] In *Quality Systems.*, reversing dismissal, the defendants made false statements about

---

[29] *See also*, ¶¶215-217 (no more than 14 finished Model 3 batteries were completed every 1-2 weeks in January 2018); ¶¶226, 230 (*manual* production of batteries continued through the end of the third quarter of 2017); ¶¶102, 204 (at no time during the Class Period was battery pack production automated); ¶¶236-237 (Production equipment necessary to produce 2,500 batteries per week in Germany in February 2018).

[30] The Court's assertion that these statements are forward looking defies Ninth Circuit precedent. Order at 9-10. In light of *Quality Systems*, statements about the future can, and often do, include present components. If that were not the case, no mixed statement could exist. An assumption that predicts the future and on which an issuer bases a projection is fundamentally different from a statement that the issuer had already achieved an interim goal that would contribute to achieving the ultimate projection. If one claims to have completed building a line—and one has not— including this lie in the context of a projection does not transmogrify the lie into a forward looking statement.

[31] *See also In re MGM Mirage Sec. Litig.*, No. 2:09-CV-01558-GMN, 2013 WL 5435832, at *7– 8 (D. Nev. Sept. 26, 2013) ("on track" relates to current conditions and not to the future, and "omission of plan changes… would make any on-schedule statement misleading"); *In re Extreme Networks, Inc. Sec. Litig.*, No. 15-CV-04883-BLF, 2018 WL 1411129, at *18 (N.D. Cal. Mar. 21,

---

8

1   the "current pipeline" for products in support of their future projections. 865 F.3d at 1147. The

2   Ninth Court ruled that "virtually no cautionary language short of an outright admission that the

3   non-forward-looking statements were materially false and misleading would have been adequate."

4   *Id.* at 1148. Similarly here, the "on-track" statements are non-forward-looking even as they are

5   made to support statements about the future, and Defendants' risk disclosures certainly did not

6   admit that their concurrent public "on track" statements were lies. *Maverick Fund, L.D.C.*, 2018

7   WL 6181241, at *7 (citing *Quality Systems,* 865 F.3d at 1142) (denying the motion to dismiss,

8   safe harbor did not protect the "on track" statements "to the extent they are statements of current

9   or past facts, combined with a forward-looking statement").

10      As noted, Defendants make no effort to parry the well-pleaded contemporaneous Plan,

11  ignoring these allegations entirely. Instead, Defendants again quote cases turning on the failure to

12  plead Defendants' Plan – among the very allegations newly included in the SAC! ¶¶19, 119, 134,

13  247-248. Defendants' argument on forward-looking vs. non-forward- looking statements thus fails

14  at its inception.[32]

15

16  2018) ("on-track" is current if complaint pleads progress was stalled); *Rihn v. Acadia Pharm. Inc.*,
    No. 15CV00575 BTM(DHB), 2016 WL 5076147, at *6 (S.D. Cal. Sept. 19, 2016) (on-track
17  statements were "representations about the current state of affairs"); *In re Secure Computing Corp.
    Sec. Litig.*, 184 F. Supp. 2d 980, 990 (N.D. Cal. 2001) (same); *Pub. Employees' Ret. Sys. of
18  Mississippi v. TreeHouse Foods, Inc.*, No. 16 C 10632, 2018 WL 844420, at *3 (N.D. Ill. Feb. 12,
    2018) (same); *Silverman v. Motorola, Inc.*, No. 07 C 4507, 2008 WL 4360648, at *10 (N.D. Ill.
19  Sept. 23, 2008) (same).

20  [32] The cases Defendants cite are inapposite, or involve financial goals or projections. *See e.g.
    Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1058 (9th Cir. 2014)
21  (assumptions underlying financial projections are forward-looking); *Pompano Beach Police &
    Firefighters' Ret. Sys. v. Las Vegas Sands Corp.*, 732 F. App'x 543, 547 (9th Cir. 2018) (statements
22  constituting "plans and objectives of management for future operations" are not statements of
    present fact); *3226701 Canada, Inc. v. Qualcomm, Inc.*, No. 15CV2678-MMA (WVG), 2017 WL
23  4759021, at *15 (S.D. Cal. Oct. 20, 2017) ("on-track" statements referred to future use of the
    company's Snapdragon 810 microprocessor in commercial devices, and not specific present facts
24  concerning production); *M & M Hart Living Tr. v. Glob. Eagle Entm't, Inc.*, No. CV 17-1479 PA
    (MRWX), 2017 WL 5635425 (C.D. Cal. Oct. 30, 2017) ("on-track for $15 million in savings in
25  2017, growing to at least $40 million in 2018 and thereafter" forward-looking because it related to
    earnings guidance and projections); *In re Allied Nevada Gold Corp.*, No. 314CV00175LRHWGC,
26  2016 WL 4191017 (D. Nev. Aug. 8, 2016) ("on-track" statement pertained to financial
27  performance goals); *In re Nimble Storage, Inc. Sec. Litig.*, 252 F. Supp. 3d 848 (N.D. Cal. 2017)

28

Even if the Court rules that the "on track" statements were wholly forward-looking," the Safe Harbor is still inapplicable. Defendants were regularly in both factories, ¶¶26-28, 191-195, 235, were aware that benchmarks had not been met, ¶¶21, 102, 160-162, 165, 167, 178-182, 203-204, 207, 210, 212-217, 226, 230, 236-237, and knew that their public "on track" statements did not match reality, *i.e.*, knew their statements about having begun installation in the first quarter and automated production in July were false.

Further, in the context of Defendants' announced plan and their knowledge that Tesla could not achieve the December mass production date, the risk disclosures were meaningless. Having announced their 11 month best-case plan for reaching mass production, beginning with installation in February, automated production in July, and mass production by the end of December, all of the risk disclosures advised investors of things that might happen to throw off the *December* mass production schedule. When Musk spoke in early May, however, Defendants knew that the Company did not begin installation until around May. If everything proceeded perfectly from that point forward, mass production could not occur until *March* 2018 at the earliest. As such, many of the risk disclosures were not yet applicable because Tesla had only just begun implementing the Plan.

"No manner of cautionary language can cure false statements knowingly made." *In re Veritas Software Corp. Sec. Litig.*, No. 04-831-SLR, 2006 WL 1431209, at *7 (D. Del. May 23, 2006). The safe harbor provision "does not afford corporations a free pass to lie to investors." *In re AT&T Corp. Sec. Litig.*, No. CIV. 00-CV5364(GEB), 2002 WL 31190863, at *14 (D.N.J. Jan. 30, 2002) (quoting *In re Advanta Corp. Sec. Litig.*, 180 F.3d 525 (3d Cir. 1999), *overruled*, *in part*,

---

(similar); *In re Foundry Networks, Inc. Sec. Litig.*, No. C 00-4823 MMC, 2003 WL 22077729 (N.D. Cal. Aug. 29, 2003) (general statement that "business remains on-track" related to financial performance goals, did not reference any prior specific statement, estimates or report); *Callan v. Motricity Inc.*, No. C11-1340 TSZ, 2013 WL 5492957, at *6–7 (W.D. Wash. Oct. 1, 2013) (general statements that company's Asian business was "on-track" related to financial performance goals, did not reference any prior specific statement, estimates or report); *In re Fusion-io, Inc. Sec. Litig.*, No. 13-CV-05368-LHK, 2015 WL 661869, at *12 (N.D. Cal. Feb. 12, 2015) (statements made "in the context of Fusion-io's guidance for its third-quarter revenues").

10

*on other grounds*, *Tellabs*, 551 U.S. 308). Having alleged that Defendants knew their statements were false, the risk warnings provide no comfort.

### 3. The SAC Adequately Pleads the Falsity of the Remaining May and August False and Misleading Statements

The SAC adequately alleges the falsity of the remaining false and misleading statements. On May 3, 2017, during the earnings conference call, Musk stated that "I don't know anything that would prevent us from starting firstly in July, and exceeding 5,000 units per week by the end of the year." ¶¶116, 240. Because Tesla had only just begun installation, in early May, 2017, it was still 5 months from the start of automated production, and 10-11 months from mass production.

Also during the May 3, 2017 earnings call, Musk stated, with respect to the supply chain for the Model 3, that "as far as we know, there are no issues." ¶¶90, 243. This directly contradicts the SAC's well pleaded allegations.[33] The SAC describes observable Model 3 supply chain issues as of May 3, 2017. Long after May 3, hundreds of robot parts had not arrived. ¶183. In June, 2017, construction workers building the automated line in Fremont often had no more than a half-day's work to do because there was nothing available to install or build on most days. ¶176. In the Gigafactory in May, 2017 production downtime lasting full shifts was common due to a "lack of parts," ¶201, and in September 2017 supply issues causing production issues persisted. ¶207.

Finally, the SAC adequately pleads the falsity of Musk's August 2, 2017 statement, conveying then current facts, about "a gigantic machine producing – that's meant for 5,000 vehicles a week and it's producing a few hundred vehicles a week." ¶¶108, 264-265. When the analyst asked about margins in the then-current third quarter, Musk responded with a present tense lie – that Model 3s were already being produced on automated lines. Musk could easily have explained the truth about economies of scale – a lesson no analyst needed to learn – by telling the truth, that automated production had not begun in July, the start of the third quarter, nor had it begun by August 2, 2017. Instead, he lied, furthering the other false August statements and the statement at the "handover" event that production on automated lines had started in July, and that

---

[33] Defendants' statements did not specify the Fremont or Gigafactory facilities; they applied to both. ¶243.

11

*Plaintiffs' Memorandum of Law in Opposition to the Motion to Dismiss
the Second Amended Class Action Complaint Case No. 3:17-cv-05828-CRB*

the Company was on track with its announced Plan. The SAC pleads that as of August 2, 2017, Tesla still built Model 3s by hand in the beta shop. ¶167. It had neither completed nor produced vehicles on its automated production line, *e.g.* ¶¶160-164, and Musk, who regularly visited Fremont, personally witnessed that the automated line had produced no Model 3s, much less hundreds a week. *E.g.* ¶¶26-28.

### 4.    Defendants Risk Disclosures Were False

Risk warnings are actionable as material omissions when the warning speaks to "entirely… as-yet-unrealized risks and contingencies" and fails to alert "the reader that some of these risks may already have come to fruition." *Berson, 527 F.3d at 986*; *see also Siracusano v. Matrixx Initiatives, Inc.*, 585 F.3d 1167, 1181 (9th Cir. 2009) ("By choosing to speak about the [topic] Defendants assumed a duty to disclose material information" about it), *aff'd*, 563 U.S. 27.

The SAC alleges false and misleading omissions with respect to three separate risk warnings. The first, in the May 10, 2017 10-Q, relates to delays in timelines and volume targets. ¶249. As detailed above, this risk had materialized by May of 2017. The second, from the August 4, 2017 10-Q, ¶266, is identical, except that it states that "we commenced production… of Model 3 in July 2017," omitting that Tesla hand-built those units but had not yet commenced automated production. This risk had materialized by August of 2017. Finally, the August 10-Q included a risk warning relating to battery production at the Gigafactory, including a statement that "we currently believe that we will reach our production targets…." ¶270. As detailed, *supra.*, the risk of production delays at the Gigafactory had materialized by May of 2017.

*Flynn v. Sientra, Inc.*, No. CV1507548SJORAOX, 2016 WL 3360676, at *10–11 (C.D. Cal. June 9, 2016), is directly on point. In *Flynn*, finding falsity and scienter, the court found that though defendants warned generally about risks of product contamination in production facilities, similar to Defendants' general warnings here, they "knew or recklessly disregarded" that the risk had specifically materialized. *Id.* As in *Flynn*, Defendants here had a duty to inform investors that the risks about which they had warned had materialized, but instead lied about meeting their Plan's benchmarks. Installation did not begin in February, automated production did not begin in July, and—by the elements of Defendants' own Plan—the Model 3 could not be mass produced by

12

December. Defendants' failure to include this information renders the risk warnings materially false.[34]

**B.     The SAC Adequately Pleads Scienter[35]**

The SAC establishes a strong inference of scienter at least as compelling as any non-culpable inference. *See Tellabs*, 551 U.S. at 326. [36] In May and August of 2017, when Defendants lied about being "on-track" for the start of automated production in July and mass production later in 2017, they knew that installation of automated equipment had not begun in the first quarter, and that Tesla did not have any automated production in July in either Fremont or the Gigafactory. Yet according to the Plan, these steps were necessary for Tesla to meet its stated intention to mass produce its Model 3 by the end of 2017. Further, the Company was weeks from death, and simultaneously attempting to raise $1.8 billion while bragging to potential investors that automated production began in July. The SAC adequately pleads a strong inference of scienter that is "at least

---

[34] Defendants Musk and Ahuja were aware, or were reckless in not being aware, that statements in each 10-Q were materially false, rendering their Certifications, ¶¶253-254, 272-273, actionably false. *See Roberti v. OSI Sys., Inc.*, No. CV 13-9174-MWF VBKX, 2015 WL 1985562, at *10–11 (C.D. Cal. Feb. 27, 2015) (false certification adequately alleged when falsity of certification arises from same basic facts as other misrepresentations).

[35] If no individual allegation suffices to establish a strong inference of scienter, a court "must conduct 'a "holistic" review of the same allegations to determine whether the insufficient allegations combine to create a strong inference of intentional conduct or deliberate recklessness.'" *Maverick Fund, L.D.C.*, 2018 WL 6181241, at *10 (quoting *New Mexico State Inv. Council v. Ernst & Young LLP*, 641 F.3d 1089, 1095 (9th Cir. 2011)). "[A]n extreme departure from the standards of ordinary care . . . that is either known to the defendant or is so obvious that the actor must have been aware of it" suffices. *In re VeriFone Holdings, Inc. Sec. Litig.*, 704 F.3d 694, 702 (9th Cir. 2012) (internal quotation marks and citations omitted). A strong inference "need not be irrefutable, i.e., of the 'smoking-gun genre,' or even the 'most plausible of competing inferences.'" *Tellabs*, 551 U.S. at 324 (internal citations omitted). Courts "need not close their eyes to circumstances that are probative of scienter viewed with a practical and common-sense perspective." *S. Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 784 (9th Cir. 2008).

[36] Tesla's scienter can be imputed from the scienter of either of the two individual defendants. *See, e.g., Nordstrom, Inc. v. Chubb & Son, Inc.*, 54 F.3d 1424, 1435 (9th Cir. 1995), *as amended on denial of reh'g* (Aug. 1, 1995).

13

as plausible as a nonfraudulent alternative." *ESG Capital Partners, LP v. Stratos*, 828 F.3d 1023, 1035 (9th Cir. 2016).

> **1.    The SAC Adequately Alleges that Defendant Knew Their "On Track" and Similar Statements Were False When Made**

A complaint adequately pleads scienter where it alleges that the defendants knew of specific information undermining their public statements to investors. *Schueneman v. Arena Pharm., Inc.*, 840 F.3d 698, 707 (9th Cir. 2016); *In re Immune Response,* 375 F. Supp. 2d at 1022 (quoting *Aldridge v. A.T. Cross Corp.*, 284 F.3d 72, 83 (1st Cir. 2002)) (making statements while knowing facts "suggesting the statements were inaccurate or misleadingly incomplete is classic evidence of scienter"). As the Supreme Court ruled, when a corporate officer elects to speak on a subject, the implication is that the officer has investigated and knows the facts underlying his statements (or is reckless for not doing so). *Maverick Fund, L.D.C.*, 2018 WL 6181241, at *13,

Defendants' Plan, required installation of automated lines to begin in the first quarter of 2017 in order to begin automated production in July 2017, and to mass produce the Model 3 in 2017. ¶¶19, 119, 134, 247-248. The SAC alleges Defendants' knowledge that the interim benchmarks had not been met when they stated the opposite, and thus alleges their scienter. Installation of automated production equipment did not begin until around May of 2017, ¶¶21, 178. Defendants regularly visited both the Fremont and Reno factories, ¶¶26-28, 117, 191-192, 194, 234-235, and were personally aware that automated line installation did not begin in 1Q 2017.[37] Defendants thus knew that the 4-6 months they stated installation required meant that automated production could not begin in July, and the Plan's end goal—mass production in 2017— was no longer plausible because it required a 6 month ramp up. Assuming nothing went wrong,

---

[37] Musk's presence at meetings, discussing internally the same adverse information he withheld from investors, *see* ¶¶193, 195, supports a strong inference of scienter. *See Maverick Fund, L.D.C.*, 2018 WL 6181241, at *13 (confidential witness-supported allegations that defendants met to discuss misrepresented and/or omitted facts gave rise to a strong inference of scienter); *see also Hatamian v. Advanced Micro Devices, Inc.*, 87 F. Supp. 3d 1149, 1162–63 (N.D. Cal. 2015) (same); *Turocy v. El Pollo Loco Holdings, Inc.*, No. SACV151343DOCKESX, 2017 WL 3328543, at *17 (C.D. Cal. Aug. 4, 2017) (allegations that Defendants were "hands-on managers" with access to information concerning the alleged problems support a strong inference of scienter).

14

*Plaintiffs' Memorandum of Law in Opposition to the Motion to Dismiss the Second Amended Class Action Complaint Case No. 3:17-cv-05828-CRB*

1   March 2018 was the earliest date for mass production. ¶¶21, 248.

2   Likewise, Defendants knew their August, 2017, "on-track" and similar statements that

3   automated production had begun in July, ¶¶127-129, 260, 262, were false when made. As noted,

4   Defendants personally and regularly visited both Fremont and the Gigafactory, ¶¶26-28, 191-192,

5   194, 234-235, and saw, and certainly should have seen, that automated production did not begin

6   in July 2017. The SAC in fact pleads that no automated production began in July 2017, or for

7   months thereafter. ¶¶25, 160-164, 165, 167, 173, 175, 178-182, 276, 279.[38] Defendants had actual

8   knowledge undermining their Class Period statements that installation of automated equipment

9   began in 1Q 2017, and that automated production began in July 2017 in either factory, giving rise

10  to a strong inference of scienter. *Immune Response*, 375 F. Supp. 2d at 1022.[39]

11  Unable to counter the well-pleaded allegations, from multiple eyewitnesses, that

12  Defendants had not achieved their production benchmarks even as they publicly stated they had,

13  Defendants seize on the word "impossible," arguing that to adequately allege scienter Plaintiffs

14  must prove that Defendants knew their own already-blown plan for mass production was

15  impossible to achieve. Defendants are wrong. To adequately allege scienter, Plaintiffs must allege

16  that given their actual knowledge of their own plan and that deadlines had been missed by months,

17  the pleaded allegations plausibly suggest Defendants knew they would not reach their stated goal.

18  In *In re Illumina, Inc. Sec. Litig.*, No. 3:16-CV-3044-L-KSC, 2018 WL 500990 (S.D. Cal. Jan. 22,

19  2018), the court rejected Defendants' argument that impossibility needed to be proved where

20  Defendants missed their interim benchmarks, *id.* at *5, holding that:

21

22  [38] The citations to the SAC, including observations from 7 different former employees who were
23  present during some or all of the Class Period, make plain not only that the Plan's deadlines were
     missed by *months*, but describe obvious chaotic conditions at both factories, including lack of
24  supplies, poor quality supplies, poor workmanship, failure of equipment, and constant delays.
     ¶¶21, 25, 160-165, 167, 172-173, 175, 177-184, 197-201, 203-211, 214, 217, 223, 228-229, 231-
25  233, 236-237, 276, 279.

26  [39] Whether the May 10 and August 2, 2017 statements were "forward-looking" is irrelevant.
     Where, as here, forward-looking statements are premised upon non-forward-looking statements,
27  "[i]t necessarily follows that [defendants] also had actual knowledge that their forward-looking
     statements were false or misleading." *In re Quality Systems*, 865 F.3d at 1149.
28

15

*Plaintiffs' Memorandum of Law in Opposition to the Motion to Dismiss
the Second Amended Class Action Complaint Case No. 3:17-cv-05828-CRB*

> "Taken together, this before-the-fact knowledge of lower HiSeq sales and after-the-fact statement toward customers favoring certain features of the NextSeq systems plausibly suggest the following: Defendants knew HiSeq sales were in a decline at the time they forecasted an increase in HiSeq sales. Because Defendants justified their overall earnings guidance in part on HiSeq sales, the Court finds for purpose of this motion that Plaintiff has adequately alleged that Defendants knew their earnings guidance was misguided." *Id.*

In dismissing the FAC with leave to amend, this Court wrote, Order at 10, that "Plaintiffs are correct that Defendants' qualifications would not have been meaningful if Defendants had known that it was impossible to meet its stated production goals, not merely highly unlikely.... The SAC's allegations, however, do not tend to establish this was the case." Having now pleaded Defendants' Plan, the Court can measure already existing progress against the Plan. The SAC pleads that Tesla had already failed to meet contemporaneous Plan deadlines. Under the best-case—the eleven month Plan without any material interruption from the risks that could interfere—mass production could not occur in 2017. In the light of lies about already-missed benchmarks, Defendants' warnings about things that might go wrong are insufficient. Plaintiffs do not need to prove "impossibility," and have met the pleading standard.[40]

Defendants' risk disclosures do nothing to weaken the strong inference of scienter. Defendants' claims that the risk disclosures are "irreconcilable with scienter," DMem 18, ignores *Siracusano v. Matrixx Initiatives, Inc.*, 585 F.3d 1167 (9th Cir. 2009), *aff'd sub nom Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27 (2011) (reversing district court's dismissal for failure to plead scienter), holding that reference to risk, in the abstract, "with no indication that the risk may already have come to fruition" cannot parry well-pleaded facts that Defendants recklessly disregarded then-existing potential problems. *Id.* at 1181.[41] Defendants' ambiguous claim of being

---

[40] With knowledge that the Plan's benchmarks had not been met, which Defendants observed at the factories, and thus that the mass production deadline would not be met, scienter is adequately pleaded with respect to all of Defendants' other Class Period statements. ¶¶238-281.

[41] Defendants' citation to *In re Worlds of Wonder Sec. Litig.*, 35 F.3d 1407 (9th Cir. 1994) ("*WoW*") betrays the profound weakness in their scienter argument. In *WoW*, cursorily and indirectly citing *Ferber v. Travelers Corp.*, 802 F. Supp. 698, 714 (D. Conn. 1992), the Ninth Circuit simply affirmed the axiom that a defendant who provides to the public *actual adverse*

in "production hell" and other general warnings failed to disclose, in any manner whatsoever, detailed or otherwise, that Tesla failed to meet its first quarter 2017 deadline for beginning installation of automated equipment. Defendants further failed to disclose that they knew they would fail to meet the July 2017 deadline for beginning automated production. Finally, Defendants failed to disclose what they knew before they spoke in May, that Tesla could not mass produce the Model 3 in 2017.  Instead, Defendants' "cautionary warnings" themselves were materially false, ¶¶249-250, 266, 270, inadequate warnings of hypothetical risks when the risks had already materialized. *See Flynn*, 2016 WL 3360676, at *11; *see also* ¶255 (alleging that "Defendants were duty bound, but failed, to disclose that the hypothetical 'risks' warned of had already occurred, rendering the foregoing risk disclosures meaningless."); *In re Illumina, Inc.*, 2018 WL 500990 at *5 (scienter adequately alleged where defendants knew sales were in a state of decline at the time they forecasted an increase in sales). Defendants' insufficient risk disclosures do not negate scienter.

## 2.    The Former Employee Statements Must be Credited

Having ignored the newly-pleaded allegations of a contemporaneous Plan, ¶¶21, 178, Defendants concentrate their attacks on the former employees, most of whom were present during part or all of the Class Period, and ask this Court to consider that the fact that none of the FEs verbalized Tesla's Plan undercuts their importance. DMem 21-23. Defendants ignore, of course, that Defendants themselves verbalized the Plan, ¶¶247-248, and that the SAC cites to multiple FEs who provide eyewitness evidence alleging that the Plan's benchmarks had been missed by months, and that Defendants were present to see the failures. ¶¶21, 25, 160-165, 167, 172-173, 175, 177-184, 197-201, 203-211, 214, 217, 223, 228-229, 231-233, 236-237, 276, 279. Defendants cite to no cases mandating that former employees must have actual knowledge of Defendants' Plan or have their allegations ignored, nor can they. The law does not require that confidential informants be mind-readers. *See Washtenaw Cty. Employees Ret. Sys. v. Celera Corp.*, No. 5:10-CV-02604

*information* likely has no intent to defraud. *WoW* at 1425. It did not hold that detailed risk disclosures—what *could* go wrong—immunize a defendant from having to disclose what she knew or recklessly disregarded had actually gone wrong. In any event, to the extent the *dictum* in *WoW* had continuing viability, the Ninth Circuit's *Siracusano* opinion, as affirmed, abrogates it.

17

*Plaintiffs' Memorandum of Law in Opposition to the Motion to Dismiss
the Second Amended Class Action Complaint Case No. 3:17-cv-05828-CRB*

1   EJD, 2012 WL 3835078, at *3 (N.D. Cal. Sept. 4, 2012) ("failure to recruit a confidential witness

2   with personal knowledge of the Defendants' mental state[s] does not mean the allegations must be

3   disregarded altogether."); *S. Ferry LP # 2*, 687 F. Supp. at 1254 (a complaint may rely on either

4   direct or circumstantial evidence to plead scienter adequately).[42]

5        Defendants conceded that the SAC adequately describes the FEs. Indeed, this Court's

6   Order did not hold that any of the FEs were inadequately described and that their allegations could

7   not be considered, and Defendants' contention that dismissal of the FAC operates to disqualify FE

8   allegations in the SAC, DMem 20, is without support. Courts credit allegations attributed to

9   unnamed sources if a complaint pleads facts sufficient to show the witnesses would "be in a

10  position to infer" the facts attributed to them." *Berson*, 527 F.3d at 985; *see also Mulligan*, 36 F.

11  Supp. 3d at 963 (question is whether witnesses have enough knowledge regarding facts attributed

12  to them).[43] As laid out above, the observations and operational knowledge of the cited FEs confirm

13  that installation of automated equipment had not begun in 1Q 2017, and that automated production

14  did not begin in July 2017 in either factory, rendering Defendants' statements to the contrary false,

15  and establishing scienter.

16

---

17  [42] Nor is it required that every confidential witness report personal interactions with individually-
18  named defendants, *see* DMem. xi, xii, 20, 23. Defendants' reliance on *Police Ret. Sys. of St. Louis
    v. Intuitive Surgical, Inc.*, No. 10-CV-03451-LHK, 2012 WL 1868874 (N.D. Cal. May 22, 2012)
19  and *Cement Masons & Plasterers Joint Pension Tr. v. Equinix, Inc.*, No. 11-01016 SC, 2012 WL
    6044787, at *8 (N.D. Cal. Dec. 5, 2012), DMem 23, is misplaced. These cases do not set forth a
20  blanket requirement of personal contact for confidential witnesses generally. Such a requirement
    would make little sense, as here, where several of the FE statements relate exclusively to
21  "commonly known" and readily observable conditions.

22  [43] Here, the FEs were sufficiently described and were in positions to possess knowledge of the
23  information they provided, and such information, when considered in its totality, supports an
    inference of scienter. *See Maverick Fund, L.D.C.*, 2018 WL 6181241, at *11 ("Throughout the
24  complaint, Plaintiffs indicate the role the confidential witnesses served … how the confidential
    witnesses received information about the company, and often who the confidential witnesses
25  worked under or reported to … Plaintiffs also allege facts that the confidential witnesses, based on
    their position descriptions, were positioned to know") (internal citation omitted); *see also City of
26  Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605, 620 (9th Cir.
27  2017) (particularized allegations that witnesses had actual access to the disputed information raises
    a strong inference of scienter).

28

---

18

Consistent with their approach of ignoring the 2017 contemporaneous pleading by Defendants of their Plan, Defendants devote multiple pages to attacking their straw man, FE1. DMem 21-22. FE1 provides valuable pre-Class Period information on what personnel who had Musk's ear told him in 2016 about the feasibility of the 2017 mass production goal, and in any holistic analysis, this information contributes to a finding of scienter. The SAC's having pleaded Defendants' Plan, ¶¶19, 119, 134, 247, as well as Defendants' lies about achieving the Plan's benchmarks, and the allegations from FEs present at both factories in 2017 that Tesla failed to meet the benchmarks, consideration of FE1's valuable observations is not required to rule that the SAC adequately pleads every element of a securities fraud case.[44]

Nevertheless, Defendants are wrong in stating that *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981 (9th Cir. 2009) holds that allegations from FEs who left Tesla before the start of the Class Period cannot be considered.[45] *Zucco* says no such thing, instead setting a standard for qualitative evaluation of confidential sources.[46] Courts routinely rely on information outside of the class period that tends to "shed light on what a defendant should have known during the class period." *Quality Systems*, 865 F.3d at 1135 (crediting statements from witness who "was not at [defendant company] during the Class Period," but who "had personal knowledge of executive-

---

[44] Tesla confirmed much of FE1's production timeline in announcing its Plan. ¶¶18, 21, 135, 178.

[45] The cases cited by Defendants for this point, *see* DMem 20-21, fare no better and are inapposite. In *In re Silicon Image, Inc. Sec. Litig.*, No. C-05-456 MMC, 2007 WL 2778414, at *1–2 (N.D. Cal. Sept. 21, 2007), the court discounted confidential witness statements not for their timing, but rather lack of probative value. *See also Shurkin v. Golden State Vintners Inc.*, 471 F. Supp. 2d 998, 1015 (N.D. Cal. 2006) (same); *Brodsky v. Yahoo! Inc.*, 592 F. Supp. 2d 1192, 1201 (N.D. Cal. 2008) (confidential witnesses lacked first-hand knowledge of Defendants' accounting decisions). As discussed herein, the pre-Class Period FE statements regarding Tesla's production capabilities were based on personal knowledge of what could be achieved based on baseline industry metrics and/or the contemporaneous state of affairs at the Fremont plant.

[46] In *Zucco* the Ninth Circuit instructed that confidential witness reliability be gauged in relation to "the level of detail provided by the confidential sources, the corroborative nature of the other facts alleged (including from other sources), the coherence and plausibility of the allegations, the number of sources, the reliability of the sources, and similar indicia." *Zucco*, 552 F.3d at 995.

level management's real-time access to" relevant reports).[47]

Finally, Plaintiffs are not required to "link" confidential witness statements to specific alleged misstatements. D Mem. 22.[48] Courts accept confidential witness statements concerning a company's "widely known" problems. *See, e.g., In re UTStarcom, Inc. Sec. Litig.*, 617 F. Supp. 2d 964, 975 (N.D. Cal. 2009) (that revenue problems were well known throughout the company relevant to scienter analysis); *In re Alstom SA*, 406 F. Supp. 2d 433, 504–05 (S.D.N.Y. 2005) (finding scienter based in part on confidential witness account that cost overruns were "widely known" at the company).

### 3. Tesla's February 7, 2018 Admission Strengthens the Scienter Inference

A post-Class Period statement "may suggest that a defendant had contemporaneous knowledge of the falsity of his statement, if the later statement directly contradicts or is inconsistent with the earlier statement." *In re Read-Rite Corp.*, 335 F.3d 843, 846 (9th Cir. 2003). *See also Constr. Workers Pension Tr. Fun – Lake Cty. v. Genoptix, Inc.*, No. 10CV2502-CAB (DHB), 2013 WL 12123841, at *7 (S.D. Cal. Mar. 22, 2013) (post class period statements about decline in demand corroborate witness account that management learned of negative trend in sales meetings).

---

[47] Defendants repeatedly ask the Court to impose a standard well beyond what the law requires. FE12, e.g., wrote production capacity forecasts for the Gigafactory beginning in June 2017, each concluding that the Gigafactory would not be able to mass produce battery "car sets" in 2017. ¶¶220, 225. Unable to dispute FE12's access to information, Defendants demand that the assumptions underlying each of FE12's forecasts be provided, as well as evidence that the forecasts were provided to Musk or Ahuja. DMem 23. The case Defendants cite for the proposition, however, *In re Bus. Objects S.A. Sec. Litig.*, No. C 04-2401 MJJ, 2005 WL 1787860 (N.D. Cal. July 27, 2005), is silent as to the detail required of FE-attributed work product. Similarly, Defendants' argument that the SAC must allege from *individual* FEs "that it was impossible for Tesla to meet its goal," DMem 21, is inconsistent with a holistic scienter analysis. *See Maverick Fund,* 2018 WL 6181241, at *10.

[48] Defendants' assertion that individualized FE allegations relate only to "various points in time," DMem 22, is redolent of Defendants' incorrect view that these statements should be considered piecemeal, rather than holistically, as *Tellabs* requires. Collectively, the FE allegations encompass a period before, during, and after the Class Period. *See* ¶¶138-233. No single FE is required to "prove[]… the actual constraint that led to the Q3 2017 production miss." DMem 21. Defendants' attempt to cherry-pick the Gigafactory FE allegations to include production slowdowns, but not limited production capabilities independent of those slowdowns (*compare* D. Mem. 22-23 *with* ¶¶196-233), further contravenes *Tellabs*'s mandate of holistic review.

20

On February 7, 2018, Defendant Musk admitted that its ability *ever* to produce more than 2,500 Model 3 batteries per week at the Gigafactory required the Company to disassemble a production line that was still in Germany, ship it to Nevada, and reassemble it in Nevada. ¶236.

Musk's comments directly contradict Defendants' Class Period statements, which reassured investors, *inter alia*, that "preparations at our production facilities are on track to support the ramp of Model 3 production to 5,000 vehicles per week at some point in 2017….," ¶118, that "[w]e have started the installation of Model 3 manufacturing equipment at the Fremont Factory and Gigafactory 1, and we are on-track for start of Model 3 production in July 2017," ¶119, that "we continue to remain on track with our progress at Gigafactory 1 . . . .," ¶120, "[a]nd then batteries – also making great progress on the battery front." ¶129. Musk's admission contributes to a strong inference of scienter.[49]

### 4.   The Motive Allegations Support a Strong Inference of Scienter

Though not required, motive may be relevant to a Section 10(b) claim. *See Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 48 ("absence of a motive allegation, though relevant, is not dispositive") (citation omitted). The SAC alleges that mass producing the Model 3 was of "existential" importance to Tesla, ¶¶11, 31, 57, 103, 105, and that pressure to achieve mass production of the Model 3 "motivated Defendants to mislead investors during the Class Period to preserve Tesla's stock price and its ability to raise money to fund operations." *See,* e.g., ¶103 & n. 24 thereto. In a television interview that aired post-Class Period, Musk admitted that Tesla came within "single digit weeks" of "death" as a direct result of its failure to timely reach its Model 3 mass production goal.[50] Tesla burned through billions to develop and mass produce the Model 3,

---

[49] Musk's February 7, 2018 statement does not constitute fraud by hindsight. The more compelling inference is that the fact that equipment necessary to manufacture sufficient batteries to mass produce the Model 3 was still half a world away in 2018 strengthens the other allegations that Defendants were not on-track to mass produce the Model 3 in 2017, thus strengthening the strong inference of scienter.

[50] *See* https://www.youtube.com/watch?v=Wgo4-SsDP1k. Musk's HBO interview aired after the SAC's filing. Should the Court grant the motion to dismiss, Plaintiffs request leave to amend to add these allegations, because the Company never shared with investors or analysts in any public filing that Tesla's liquidity crisis left it weeks from "death." Tesla's ability to raise needed funds, which it did in August 2017 at its preferred price, would have been negatively impacted if it told

21

*Plaintiffs' Memorandum of Law in Opposition to the Motion to Dismiss
the Second Amended Class Action Complaint Case No. 3:17-cv-05828-CRB*

depending on Model 3 sales to increase cash flow and allow the Company to continue its development as an electric vehicle company. ¶104.

In fact, Tesla raised $1.8 billion during the Class Period, by selling potential investors on the automated production that did not actually exist, writing in an Offering Circular[51] that:

> Clear path to scale…. We started production and completed our first customer deliveries of Model 3 in July 2017. Model 3's streamlined design and manufacturing process enables increased automation…. Our new body shop enables us to reduce Model 3 total labor content significantly through the use of over 1,000 robots in a highly dense layout. We believe these process and design improvement will allow us to ramp Model 3 production significantly faster than our prior vehicles…..[52]

The need to raise funds at favorable rates provides Tesla motive to lie about meeting benchmarks, and supports a strong inference of scienter.[53] It also answers Defendants' claim that Tesla had no reason to lie when it would need to reveal quarterly results. DMem xi, 19. Contrary to Defendants' inaccurate claim that "plaintiffs affirmatively abandoned any pretense of a financial motive in the prior motion," DMem 18, the SAC alleges a *Company-wide* – rather than an individualized – "financial motive" to commit fraud. *See* ¶¶103-114. $1.8 billion, and the fear of

---

investors that automated production had not begun in July and that its mass production Plan would not be achieved.

[51] The excerpted portion of the August 11, 2017 Offering Circular is found at *Inter-Local Pension Fund GCC/IBT v. Tesla, Inc.,* et *al.*, No. 3:18-cv-07325-RS, Dkt. 1-1, at ¶34. This court can take judicial notice of the pleading in that case, and of the language in Tesla's Offering Circular. Should this Court grant the motion to dismiss, Plaintiff requests leave to amend to add the Offering Circular, which provides Tesla motive to lie during the Class Period about their failure to meet their Plan's July 2017 benchmarks.

[52] No reasonable reading of this language in its totality allows any inference other than that the automated production process was fully operational.

[53] Contrary to Defendants' assertion, *see* DMem 18, the absence of insider sales does not suggest innocence. *Tellabs*, 551 U.S. at 325 (lack of sales by executive did not establish lack of scienter). "Scienter can be established even if the officers who made the misleading statements did not sell stock during the class period." *No. 84 Employer-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 944 (9th Cir. 2003). A lack of stock sales does not justify a negative inference. *See Shenwick v. Twitter, Inc.*, 282 F. Supp. 3d 1115, 1148 (N.D. Cal. 2017) (citing *Sharenow v. Impac Mortg. Holdings, Inc.*, 385 F. App'x 714, 717 n.2 (9th Cir. 2010)).

22

*Plaintiffs' Memorandum of Law in Opposition to the Motion to Dismiss
the Second Amended Class Action Complaint Case No. 3:17-cv-05828-CRB*

Tesla's "death" within "single digit weeks," gave Defendants a significant motive to lie in the short term.[54]

### 5.    The Core Operations Doctrine Supports a Strong Inference of Scienter

Allegations regarding management's role add to the PSLRA's scienter calculus. *See In re Countrywide Fin. Corp. Sec. Litig.*, 588 F. Supp. 2d 1132, 1191 (C.D. Cal. 2008) ("a defendant's position within the company is a relevant circumstance to consider in the *Tellabs* analysis"). Scienter can be imputed to Tesla's key officers "based on the inference that they have knowledge of the 'core operations' of the company." *Reese v. Malone*, 747 F.3d 557, 575 (9th Cir. 2014). The SAC alleges particularized facts that "suggest that defendants had actual access to the disputed information" about Tesla's Model 3 production capabilities both before and during the Class Period. When "the nature of the relevant fact is of such prominence that it would be 'absurd' to suggest that management was without knowledge of the matter," as is the case here, scienter may be inferred just on the basis of the core operations doctrine. *S. Ferry LP,* 542 F.3d at 786; *Rabkin v. Lion Biotechnologies, Inc.*, No. 17-CV-02086-SI, 2018 WL 905862, at *12 (N.D. Cal. Feb. 15, 2018).

Here, it would be "absurd" to imagine that Defendants would be unaware that Tesla could not, in fact, mass produce the Model 3 in a self-imposed timeframe – particularly given that achieving Model 3 mass production was existential to Tesla's survival, , ¶¶11, 31, 57, 103, 105, Defendants were hands-on managers who undertook regular on-site visits, ¶¶26-27, 192, 194, slept at Tesla production facilities, ¶235, signed the Company's SEC filings, ¶¶115, 127, 238, 242, 253-254, 266, 272-273, led conference calls with analysts, ¶¶107-109, 116, 128-129, 240, 243, 260, 262, 264, and generally represented that they had superior knowledge of the specific matters at issue here, matters at the core of the Company's operations. ¶¶107-109, 107-108, 115-116, 127-129, 238-282. The SAC contains "particular details about the defendants' access to information within the company," *Zucco*, 552 F.3d at 1000, and thus adequately alleges scienter. *See also*

---

[54] Defendants' argument that the "[t]he only reasonable inference is that Tesla believed that it could reach its goals," DMem. 20, is at odds with every well-pleaded fact in the SAC, is far weaker than the SAC's strong inference of scienter, and is insufficient to compel dismissal of the SAC. *See UTStarcom*, 617 F. Supp. 2d at 975.

*Quality Systems*, 865 F.3d at 1145 (where "executives themselves told investors they had real-time access to, and knowledge of," particular information alleged to be false and misleading, such facts support scienter).

### C.      The SAC Adequately Pleads Loss Causation[55]

Defendants concede that the October 6 *WSJ* article caused Tesla's share price to drop on October 9, 2017. They assert, instead, that the *WSJ* article comprised "previously-disclosed" information, identifying nothing specifically. DMem 24-25. This argument fails. The article disclosed Defendants' lies about the Plan and Tesla's having begun installation when it had not.[56] Rather than repackaging already public information, the *WSJ* information that differed materially from Tesla's self-serving, demonstrably misleading statements.

Next, Defendants argue that an October 10 increase in Tesla's stock price defeats loss causation. D. Mem. 25. A loss causation inquiry focuses on the trading day after the alleged correction and not on subsequent fluctuations in price that any number of factors might cause. *See In re Cell Therapeutics, Inc. Class Action Litig.*, No. 2:10-CV-00414-MJP, 2011 WL 444676, at *6 (W.D. Wash. Feb. 4, 2011) (price fluctuations after initial drop may does "not invalidate loss causation"). The October 10 increase cannot defeat loss causation.

Last, with respect to the November 2, 2017 *Jalopnik* article, which was entirely negative, the article added to the November 1, 2017 disclosure, which, standing alone, establishes loss causation for the November 2, 2017 price drop. At this point in time, it is unknown whether company-specific information or market and industry factors caused the small price increase in the afternoon hours of November 2, 2017. Therefore, at this stage, it is well-pleaded that the after-

---

[55] While Fed. R. Civ. P. 9(b) applies to pleading loss causation, *Oregon Pub. Employees Ret. Fund v. Apollo Grp. Inc.*, 774 F.3d 598, 605 (9th Cir. 2014), the Ninth Circuit has yet to define the parameters of review on a motion to dismiss.

[56] This Court will reject Defendants assertion that the WSJ "mischaracterized" facts. *Cf. In re: Bofi Holding, Inc. Sec. Litig.*, No. 315CV02324GPCKSC, 2016 WL 5390533, at *15 (S.D. Cal. Sept. 27, 2016) (courts will consider documents of which they can take judicial notice but not for the truth of the matter of any statement) (citing *In re Bare Escentuals, Inc. Sec. Litig.*, 745 F. Supp. 2d 1052, 1067 (N.D. Cal. 2010); *Curry v. Hansen Med., Inc.*, No. C 09-5094 CW, 2012 WL 3242447, at *3 (N.D. Cal. Aug. 10, 2012).

close of market November 1 Tesla statement, and the November 2 Jalopnik article, caused a day-over-day material decline. At the pleading stage this suffices.

With respect to Tesla's November 1, post-close disclosure, Defendants' argument about Tesla's prior guidance ignores well-settled Ninth Circuit law that "the ultimate issue is whether the defendant's misstatement, as opposed to some other fact, foreseeably caused the plaintiff's loss." *Mineworkers' Pension Scheme v. First Solar Inc.*, 881 F.3d 750, 753 (9th Cir. 2018). Because the November 1 disclosure specifically touched on circumstances surrounding Tesla's inability to mass produce the Model 3 timely, ¶¶35, 278, it adequately pleads loss causation. *See Nuveen Mun. High Income Opportunity Fund v. City of Alameda*, 7301 F.3d 1111, 1120 (9th Cir. 2013) (citation omitted) (citing, *in dictum*, the materialization of risk theory of loss causation).

**D.    The SAC Adequately Pleads Control Person Liability**

Because Plaintiffs have adequately pleaded an underlying violation, the Court should hold that the SAC adequately pleads a Section 20(a) violation.

**IV.    <u>CONCLUSION</u>**

For the foregoing reasons, the Court should deny Defendants' motion to dismiss in its entirety.[57]

Dated: January 11, 2019                         **THE ROSEN LAW FIRM, P.A.**

/s/ *Laurence M. Rosen*
Laurence M. Rosen (SBN 219683)
355 S. Grand Avenue, Suite 2450
Los Angeles, CA 90071
Tel: (213) 785-2610
Fax: (213) 226-4684
lrosen@rosenlegal.com

---

[57] If the Court dismisses the case, Plaintiffs seeks leave further to amend the SAC.

25

and

Jacob A. Goldberg
Gonen Haklay
101 Greenwood Avenue, Suite 440
Jenkintown, PA 19046
Telephone: (215) 600-2817
Facsimile: (212) 202-3827
Email: ghaklay@rosenlegal.com
        jgoldberg@rosenlegal.com
**Lead Counsel for Lead Plaintiffs and the
Class**

**POMERANTZ LLP**
Jeremy A. Lieberman
J. Alexander Hood
600 Third Avenue, 20th Floor
New York, NY 10016
Telephone:  (212) 661-1100
Facsimile:  (212) 661-8665
Email: jalieberman@pomlaw.com
        ahood@pomlaw.com

**POMERANTZ LLP**

Patrick V. Dahlstrom
Louis C. Ludwig
10 South LaSalle Street
Chicago, IL 60603
Telephone: (312) 377-1181
Email: pdahlstrom@pomlaw.com
        lcludwig@pomlaw.com

**Additional Counsel for Plaintiffs**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## **CERTIFICATE OF SERVICE**

I, Jacob A. Goldberg, hereby declare under penalty of perjury as follows:

I am attorney with The Rosen Law Firm, P.A., with offices at 101 Greenwood Avenue, Suite 440, Jenkintown, PA 19046. I am over the age of eighteen.

On January 11, 2019, I electronically filed the foregoing **PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE SECOND AMENDED CLASS ACTION COMPLAINT** with the Clerk of the Court using the CM/ECF system, which sent notification of such filing to counsel of record.

Executed on January 11, 2019

/s/ Jacob A. Goldberg

Jacob A. Goldberg

27

*Plaintiffs' Memorandum of Law in Opposition to the Motion to Dismiss
the Second Amended Class Action Complaint Case No. 3:17-cv-05828-CRB*